1  Jennifer R. Liakos, Esq. (CA SBN 207487)
   Matthew M. Lavin, Esq. (*pro hac vice forthcoming*)
2  NAPOLI SHKOLNIK PLLC
   5757 W. Century Boulevard, Suite 680
3  Los Angeles, CA 90045
   (212) 397-1000 / Fax (646) 843-7603
4
   *Attorneys for Plaintiffs and the Putative Class*
5

6              **UNITED STATES DISTRICT COURT**
               **NORTHERN DISTRICT OF CALIFORNIA**
7                **SAN FRANCISCO DIVISION**

8

9  MERIDIAN TREATMENT SERVICES,          )
   IRECOVER TREATMENT INC. d/b/a         )  Case No:
10 SERENITY PALMS TREATMENT              )
   CENTER and HARMONY HOLLYWOOD          )
11 TREATMENT CENTER, on their own        )
   behalves and on behalf of all others similarly )
12 situated,                             )
                                         )
13            Plaintiffs,                )  **CLASS ACTION COMPLAINT**
                                         )
14 v.                                    )  **JURY TRIAL DEMANDED**
                                         )
15                                       )
   UNITED BEHAVIORAL HEALTH              )
16 (operating as OPTUMHEALTH             )
   BEHAVIORAL SOLUTIONS)                 )
17                                       )
              Defendant.                 )
18  ──────────────────────────────       )

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2  TABLE OF CONTENTS........................................................................................................ i

3  INTRODUCTION ............................................................................................................... 1

4  SUMMARY OF PLAINTIFFS ALLEGATIONS ................................................................ 4

5  BACKGROUND ................................................................................................................. 6

6  THE PARTIES................................................................................................................... 18

7  JURISDICTION................................................................................................................ 19

8  FACTUAL ALLEGATIONS AS TO ALL COUNTS ...................................................... 20

9  CLASS ACTION ALLEGATIONS .................................................................................. 35

10  CAUSES OF ACTION ..................................................................................................... 38

11  COUNT I:
       UNFAIR BUSINESS PRACTICES ...................................................................... 39
12
   COUNT II:
13     BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING .......................... 40

14  COUNT III:
       BREACH OF IMPLIED CONTRACT ............................................................... 41
15
   COUNT IV:
16     INTENTIONAL MISREPRESENTATION ........................................................... 41

17  COUNT V:
       NEGLIGENT MISREPRESENTATION ............................................................. 42
18
   COUNT VI: 43
19     CONCEALMENT ............................................................................................ 43

20  COUNT VII:
       INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS................... 43
21
   COUNT VIII:
22     INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS. 44

23  PRAYER FOR RELIEF..................................................................................................... 45

24  JURY DEMAND ............................................................................................................... 45

25

26

27

28

CLASS ACTION COMPLAINT

**CLASS ACTION COMPLAINT**

Plaintiffs Meridian Treatment Services, iRecover Treatment Inc. d/b/a Serenity Palms Treatment Center, and Harmony Hollywood Treatment Center ("Plaintiffs"), complain on their own behalves and jointly, on behalf of all others similarly situated, against United Behavioral Health ("UBH") (operating as OptumHealth Behavioral Solutions), and allege the following:

**INTRODUCTION**

1.      On March 5, 2019, Magistrate Judge Spero of this Court entered Findings of Fact and Conclusions of Law in *Wit, et al. v. United Behavioral Health*, No. 14-CV-02346-JCS (hereinafter "*Wit*"). In that decision, Judge Spero specifically found that, for many years, UBH denied claims using guidelines that were based on profit and cost saving rather than the actual clinical needs of its members who suffered from mental health and/or substance use disorders. This Court found that those coverage guidelines were inherently corrupted and violated both state and federal laws as well as generally accepted principles of behavioral healthcare. Plaintiffs incorporate the entirety of the *Wit* decision herein by reference.

2.      Plaintiffs, and the class they seek to represent, are behavioral healthcare providers who treated patients with UBH insurance during the class period as defined in *Wit*, et al. through January 31, 2019[1]. Plaintiffs, and the class they seek to represent, have not been paid for years' worth of claims that were denied by UBH based on the now-discredited guidelines. In every case, Plaintiffs, in their professional judgment as licensed clinicians, determined that the services provided to their patients met generally accepted criteria and were medically necessary before UBH denied their claims. Following the recent *Wit* decision, all adverse behavioral health clinical determinations by UBH during the *Wit* class period, until the time UBH changed its guidelines after January 31, 2019, are now suspect. Therefore, Plaintiffs, and the class they seek to represent, ask this Court to enter a judgment requiring a neutral third-party overseen and appointed by the Court to re-process all denied claims from behavioral health providers that UBH denied based on

---

[1] On February 1, 2019, UBH switched from using its own guidelines to utilizing the guidelines of the American Society of Addiction Medicine (ASAM), presumably in expectation of this Court's findings in *Wit*.

CLASS ACTION COMPLAINT

UBH's former, discredited clinical guidelines. This action also seeks punitive damages pursuant to California law. The Plaintiffs and putative class did not discover that the denials were the result of improper guidelines until the entry of this Court's decision in *Wit* on March 5, 2019. As is industry practice, Plaintiffs and the putative class have assignment of benefits and financial responsibility agreements with all patients that entitle them to direct payment of claims by UBH.

3.     The potential dollar amount of wrongfully denied payments owed to Plaintiffs and the class is substantial. The three named Plaintiffs had 157 patients with over 2000 collective claims denied by UBH pursuant to their discredited medical necessity guidelines during the relevant period. In all cases, services were provided to UBH's members in good faith but were denied under faulty guidelines and have never been paid. For the Named Plaintiffs' alone, denied claims total over $5 million.

4.     Plaintiffs estimate that the number of providers effected by the *Wit* decision, including both individual providers and facilities, is in the tens of thousands and includes all licensed behavioral healthcare providers in the United States who accepted patients with UBH insurance during the *Wit* class period through January 31, 2019. Based on extrapolation of data known to Plaintiffs, Plaintiffs believe class-wide damages may exceed $8.3 billion dollars.

5.     Although the decision in *Wit* specifically addressed ERISA plans, UBH utilized the same guidelines to assess claims from non-ERISA plans. The Court's findings and holdings concerning UBH's guidelines do not depend on the plans being ERISA plans. Plaintiffs, and those similarly situated, treated both ERISA and non-ERISA UBH plan members alike. Additionally, UBH applied their flawed guidelines to coverage decisions based on medical necessity to both in-network and out-of-network providers, equally. The same defective guidelines were used across the entire spectrum of UBH plans and provider category.

6.     Because these categories comprise the entire universe of possible commercial behavioral health insurance claims (ERISA, non-ERISA, in-network, out-of-network), ***all*** claims denied by UBH under the discredited guidelines during the *Wit* class period, through January 31, 2019, must be reprocessed, at UBH's expense, under appropriate, industry-recognized and accepted guidelines by a third-party neutral overseen by the Court, as UBH has demonstrated that

CLASS ACTION COMPLAINT

they cannot apply guidelines in a fair, impartial or clinically appropriate manner.

7.     As further described below, the claim denials that Plaintiffs are seeking to have reprocessed involve both unreasonably delayed pre-service, pre-certification or prior-authorization level of care benefit denials during courses of treatment and also claims involving post-service denials where treatment had previously been authorized or otherwise permitted by UBH. In all instances relevant, the denied claims at issue were either fully appealed, the appeals were ignored, or further appeals would have been futile. Plaintiffs and the class they seek to represent, have no recourse other than the bringing of this action.

8.     As shown in *Wit*, UBH has egregiously and consistently violated its independent legal duties to providers. UBH's medical necessity and level of care determinations were shaped by a financial team and not by established, accepted clinical standards. As a result of UBH's conduct, Plaintiffs' continuing ability to provide treatment to behavioral health patients is in jeopardy. Faced with a past and present deluge of UBH members suffering from mental health disorders and addiction, and billions of dollars in illegally unreimbursed care, many providers across the country, most of whom are small and community-based, are on the verge of insolvency or bankruptcy. At the same time, in 2018, UBH's parent company, UnitedHealth Group is reported profits of $12 billion dollars on $226 billion dollars in revenue for 2018[2].

9.     Profit, not patient care, drove medical necessity decision making at UBH. This action seeks to hold UBH for services provided to its members that were medically necessary but denied. Plaintiffs and class members cannot hold UBH accountable for services that were medically necessary but not provided through this action; however, that does not diminish or excuse UBH's decisions or in any way wash the blood from its hundreds of thousands of hands.

---

[2] Fortune 500, United Health Group: https://fortune.com/fortune500/2019/unitedhealth-group (last accessed Sep. 10, 2019).

CLASS ACTION COMPLAINT

## SUMMARY OF PLAINTIFFS ALLEGATIONS

10.     Plaintiffs Meridian Treatment Center ("Meridian"), iRecover Treatment Inc. d/b/a Serenity Palms Recovery ("Serenity"), Hollywood Harmony Treatment Center ("Harmony"), and the more than ten thousand similarly situated treatment centers across the United States (collectively "Plaintiffs and Plaintiff Class") provide sub-acute mental health and substance use disorder services to commercially insured patients under both ERISA and non-ERISA plans both as in-network and out-of-network providers.

11.     Defendant United Behavioral Health ("UBH" or "Defendant") is responsible for making coverage and level of care determinations that UnitedHealth Group or its subsidiaries' insureds receive. UBH makes MH/SUD coverage determinations regarding plans issued, administered, underwritten, and/or otherwise managed by UnitedHealth Group or its subsidiaries.

12.     At issue in this action are the services that Plaintiffs and putative class members provided for patients whose coverage and level of care benefits were determined by UBH between 2011 and January 31, 2019. UBH used proprietary "Level of Care Guidelines" ("LOCGs") and "Coverage Determinations Guidelines" ("CDGs") (collectively, "Guidelines") to evaluate and determine the medical necessity of coverage. The Guidelines were found by this Court to be unlawful in *Wit*.

13.     *Wit* held that UBH breached its Employee Income Security Act of 1974 ("ERISA") mandated fiduciary duties by basing coverage determinations and level of care decisions on its own profit motives rather than on generally accepted, clinical standards of medical necessity. Although the findings were limited to ERISA plans as that was the issue before the Court, the Court's holdings in no way depend upon the plans being ERISA plans as the Guidelines were applied with equal injustice to both ERISA and non-ERISA plans.

14.     While *Wit* seeks to address the substantial harm caused to patients who were able to pay the cost of uncovered care, that decision does nothing to redress the substantial harm caused to healthcare providers who provided medically necessary care without recompense. The Plaintiffs and Plaintiff Class in this action seek redress in the form of reprocessing for what is likely billions of dollars in wrongfully denied claims. All the while, UBH, UnitedHealth Group and its subsidiaries

4

profited and pocketed premiums while those actually seeking help, often at some of the lowest, most desperate times of their life, were denied it by those tasked with ensuring their insureds received medically necessary care.

15. As a California Corporation, UBH has a legal duty to act legally, ethically, and with regard for the public's interest under Cal. Civ. Code §§17200 *et seq*. Through its practice of applying profit-oriented Guidelines to deny care that was medically necessary, and by applying those Guidelines specifically to behavioral health treatment patients and providers, UBH breached these legal duties.

16. Plaintiffs and the Plaintiff Class entered into implied contracts with UBH to provide medically necessary care in exchange for UBH's promise to pay for medically necessary care. Plaintiffs and the Plaintiff Class performed their duties under these implied contracts while UBH breached theirs by creating and applying illegal Guidelines. UBH's Guidelines are bad-faith, tactical policies used to increase shareholder value at the cost of human lives.

17. As a condition of providing treatment, Plaintiffs sought and obtained representations from UBH that their insureds had active coverage for medically necessary services. UBH made such representations to Plaintiffs while hiding their policies and procedures that applied illegal Guidelines used to deny coverage. As a direct result of the application of illegal Guidelines and the following claim denials, Plaintiffs were made to bear the full cost of care they provided to UBH's insureds under generally accepted standards of medical necessity.

18. When patients whose benefits UBH administered entered treatment, they executed powers of attorney and/or assignments of benefits and financial responsibility agreements to enable Plaintiffs and the Plaintiff Class to seek payment directly from UBH for treatment services. UBH is aware that this is a standard practice in healthcare and that such contracts exist for every licensed healthcare provider. Despite this knowledge, UBH consistently refused to acknowledge Plaintiffs' and the Plaintiff Classes' right to seek payment for services they provided. Plaintiffs suffered irrevocable harm because they bore all of the expense of improperly denied claims. Similarly, UBH interfered with the prospective economic gain that, but for UBH's illegal tactics, Plaintiffs and the

5

Plaintiff Class could reasonably expect to obtain from providing medically necessary services to patients covered under UBH plans.

19.     Plaintiffs and all those similarly situated bring this action to achieve redress for the harm they suffered as a result of Defendant's illegal practices. Plaintiffs seek equitable relief in the form of a third-party neutral, at Defendant's expense, to reprocess denied claims under appropriate, industry accepted guidelines and punitive damages in an amount to be proven at trial.

## BACKGROUND

20.     The causes of action in this case stem from the proliferation of mental health and addiction that is devastating the United States. The treatment that Plaintiffs and the Plaintiff Class provide are one of the few remedies that have been shown effective against this epidemic's spread. Despite UBH's full knowledge of these facts, it chose to deny coverage through illegal Guidelines for life-saving, medically necessary treatment. It is generally accepted in the industry that the ASAM criteria are the standard as to the care that should be provided to patients seeking MH/SUD treatment.

### a.   The ASAM Criteria & Its Background

21.     The ASAM criteria have become the most widely used and comprehensive set of guidelines for placement, continued stay and transfer/discharge of patients with addiction and co-occurring conditions. Over 30 states have mandated use of ASAM criteria.

22.     The ASAM guidelines outline evidence-based criteria and treatment protocols by which providers can safely and effectively evaluate and provide care for patients. Addiction professionals rely on ASAM to make clinical decisions about patient care, but are faced with opposition and indifference from UBH, who substituted its own LOCGs and CDGSs instead of ASAM criteria thereby obstructing clinicians' ability to render care pursuant to their own clinical judgement.

23. The current ASAM Criteria has six dimensions:

**Dimension 1**: Acute Intoxication and/or Withdrawal Potential – Exploring an individual's past and current experiences of substance use and withdrawal.

**Dimension 2**: Biomedical Conditions and Complications – Exploring an individual's health history and current physical condition.

6

**Dimension 3:** Emotional, Behavioral, or Cognitive Conditions and Complications – Exploring and individual's thoughts, emotions and mental health issues.

**Dimension 4:** Readiness to Change – Exploring and individual's readiness and interest in changing.

**Dimension 5:** Relapse, Continued Use, or Continued Problem Potential – Exploring an individual's unique relationship with relapse or continued use or problems.

**Dimension 6:** Recovery/Living Environment – Exploring an individual's recovery or living situation, and the surrounding people, places and things.[3]

24.     Applying these dimensions leads to a determination as to the appropriate ASAM level of care. The levels of care are subgroups of facility-based treatments, and compose a continuum of care that, when properly rendered, constitute a patient's best chance at successful treatment. Medical and clinical professionals employed by Plaintiffs and the Plaintiff Class applied ASAM criteria to optimize treatment outcomes and to provide the best care possible. The benchmark levels of care for adults are:

| Level | Adult Title | Description |
|-------|-------------|-------------|
| .5 | Early Intervention | Assessment and education for at risk individuals who do not meet diagnostic criteria for SUD |
| 1 | Outpatient Services | Less than 9 hours of service/week for motivational enhancement/strategies |
| 2.1 | Intensive Outpatient Services | 9 or more hours of service/week to treat multidimensional instability |
| 2.5 | Partial Hospitalization Services | 20 or more hours service/week for multi-dimensional instability not requiring 24-hour care |
| 3.1 | Clinically Managed Low-Intensity Residential Services | 24-hour structure with available trained personnel; at least 5 hours of clinical service/week |
| 3.3 | Clinically Managed Population-specific High-Intensity Residential Services | 24-hour care with trained counselors to stabilize multidimensional imminent danger and prepare for outpatient treatment. Able to tolerate and use full active milieu or therapeutic community |

---

[3] ASAM Criteria, 3rd Ed. pg. 43 (2013)

7

| | | |
|---|---|---|
| **3.5** | Clinically Managed High-Intensity Residential Services | 24-hour care with trained counselors to stabilize multidimensional imminent danger and prepare for outpatient treatment. Able to tolerate and use full active milieu or therapeutic community |
| **3.7** | Medically Monitored Intensive Inpatient Services | 24-hour nursing care and daily physician care for severe, unstable problems in Dimensions 1, 2 or 3. Counseling available to engage patient in treatment. |
| **4** | Medically Managed Intensive Inpatient Services | 24-hour nursing care and daily physician care for severe, unstable problems in Dimensions 1, 2 or 3. Counseling available to engage patient in treatment. |
| **OTP** | Opioid Treatment (1) Program (Level 1) | Daily or several times weekly opioid agonist medication and counseling multidimensional Stability for those with severe Opioid Disorder[4] |

25.     These criteria and levels of care provide an accepted industry standard for determining medical necessity and the appropriate case and treatment of the patient. Plaintiffs and the Plaintiff Class applied the diagnostic dimensions above to make decisions about clinically appropriate care for each patient. Insofar as all claims at issue in this case, UBH chose to apply its own Guidelines to deny the coverage for services that were provided pursuant to clinicians' judgment. UBH's Guidelines were created based on profit, not clinical necessity.

26.     Despite the predominance and acceptance of ASAM as the industry standard, UBH created opaque, proprietary criteria that bear little resemblance to the ASAM Criteria or any evidence-based standards of clinical evaluation. This is because UBH administered benefits based primarily on its interest in maximizing profits while ASAM is based on maximizing patient recovery.

_____

[4] [4] ASAM Criteria, 3rd Ed. pg. 106 (2013)

CLASS ACTION COMPLAINT

b. **UBH's Guidelines**

27.     During all times relevant to this action, UBH created and controlled medical necessity criteria and authorization guidelines for all insurance and benefits plans it administered. UBH did not use medical necessity and authorization guidelines that were based on accepted, industry standards, such as those put forward by ASAM.

28.     Instead, UBH imposed a proprietary, cost-focused schema where it granted or denied pre-authorizations and granted or denied coverage for services that did not require pre-authorization ("no-auth services"). In all cases relevant here, UBH issued its final denial of coverage for both types only after Plaintiffs and the Plaintiff Class had provided treatment UBH's insureds. Plaintiffs and the Plaintiff Class chose to provide services based on their professional, clinical judgment and the needs of the patients. Plaintiffs and the Plaintiff Class relied on UBH's good faith performance of its stated intent to cover medically necessary MH/SUD benefits. Instead, UBH exercised its discretion over LOCGs and CDGs to arbitrarily and capriciously deny payment for medically necessary claims to maximize its own profits.

c. **Findings in the *Wit* Decision**

29.     In *Wit*, this Court held UBH liable to a class of more than 50,000 insureds on all of the ERISA counts asserted against it for breach of fiduciary duty and improper denial of benefits under 29 U.S.C. §§ 1132(a)(1)(B), (a)(3)(A), and (a)(3)(B). The Court's findings show that UBH's violations were pervasive, brazen, and intentional. UBH was driven by its own financial interests rather than those of patients.

30.     *Wit* details the generally accepted standards of clinical practice for treatment of mental health and substance use disorders, having reviewed numerous clinical sources and extensive testimony, summarized as follows:

31.     **First**, it is generally accepted that many mental health and substance use disorders are long-term and chronic. Although a patient may present with certain immediate needs ("acute" or "current symptoms"), often these current acute symptoms are manifestations chronic, underlying condition(s). Effective treatment of individuals with mental health and/or substance use disorders

CLASS ACTION COMPLAINT

requires much more than just the alleviation of the current, acute symptoms. The chronic, underlying condition(s) must also be addressed. Many MH/SUD's manifest in chronic, severe impairments that are not acute but are nonetheless treatable.

32.     **Second**, many MH/SUD's involve multiple co-occurring conditions that operate synergistically to aggravate each other. Effectively treating an individual disorder requires a comprehensive, coordinated approach to all of the co-occurring conditions. For example, and of particular importance in the present case, effective treatment of substance use disorders requires comprehensive treatment of any co-occurring depressive disorders because that can be the underlying cause for the substance use. The inverse also occurs. A depressive disorder can both exacerbate and be exacerbated by the co-occurring substance use. Co-occurring medical conditions can also aggravate MH/SUD's in such a way that effective patient treatment requires a more intensive level of care than might be justified if only the one condition was present.

33.     Thus, a patient might require residential treatment if, for example, that substance abuser suffers from debilitating social anxiety disorders that make it impossible for that patient to leave home to seek outpatient care even if, in isolation, that patient's substance use disorder would not require residential treatment. The synergy of the two disorders necessitates residential treatment for effective, lasting treatment.

34.     **Third**, effective treatment of patients with MH/SUD's requires placement at the appropriate level of care. It would be inappropriate, as occurred in this case, to deny residential treatment to plaintiffs and class member's patients where application of ASAM guidelines would require residential treatment (primarily ASAM 3.7 to 3.1) simply because that patient is not currently suffering from some imminent complication or acute condition of their MH/SUD's. Behavioral health professionals generally accept that safety and effectiveness are the primary driving factors in determining the appropriate treatment level for any given patient, these determinations were made by behavioral health professionals on behalf of Plaintiffs and class members. UBH did not care about the safety of the patients of effectiveness of treatment and applied illegal guidelines developed for profit, not patients.

CLASS ACTION COMPLAINT

35.     **Fourth**, patients with mental health and substance use disorders must receive treatment at the appropriate level of intensity. In the present case, this almost always will be for patients that clinical necessity dictates residential treatment at ASAM levels 3.7 through 3.1 depending on the patient. Those who receive treatment at a less-than-clinically-appropriate level of care, including no care, face far worse outcomes than those who are treated at the appropriate level of care. By contrast, providing a higher level of care where there is a question about the appropriate level of care intensity does not result in adverse outcomes. It is generally accepted in the MH/SUD field that ambiguity as to the appropriate level of care, given the life or death nature of MH/SUD's, dictates erring on the side of caution and placing the patient at the higher level of care.

36.     **Fifth**, effective treatment must not be limited simply to temporary improvement in the patient's level of functioning. Residential treatment, here ASAM 3.7 through 3.1, cannot be limited to temporary improvement over "baseline" as effective treatment must also aim to prevent relapse or deterioration of the patients' condition(s) and to maintain their level of functioning. This can only occur when all factors are considered and not merely currently presenting or resolved acute symptoms as in UBH's illegal guidelines.

37.     **Sixth**, treatment must not be artificially time limited. The appropriate duration of treatment must be predicated on the individual needs of the patient. In the present case, this means the appropriate duration of residential treatment under ASAM criteria for levels 3.7 through 3.1. It is generally accepted that a patient should not be discharged or placed at a lower level before treatment has been optimized. Further, treatment should not be terminated or downgraded simply because a patient has become unwilling or unable to participate in treatment. Indeed, if a patient demonstrates an unwillingness to participate in treatment, this may actually justify an increased intensity o treatment rather than the termination of it.

38.     **Seventh**, there exist significant developmental differences between adults, children, and adolescents. Children and adolescents are not fully "developed," in the psychiatric sense. Level of care intensity decisions require plans to account for the unique needs of children and adolescents suffering from MH/SUD's. This, in turn, requires a relaxation of admissions and continued service requirements when children and adolescents are involved.

CLASS ACTION COMPLAINT

39. **Eighth**, MH/SUD assessments must not be limited to less than a full multidimensional assessment that accounts for the wide variety of information about the patient, which requires behavioral health providers to conduct a holistic, biopsychosocial assessment that involves consideration of multiple factors. Thus, it falls below the required standard of care to make the level of intensity decision based on only a few enumerated factors focused on acute symptoms rather than the entire patient picture.

40. The *Wit* plaintiffs are individual members of ERISA plans administered by UBH. The plan members brought their action against UBH on their own behalf and in a representative capacity under the Employee Retirement Income Security Act of 1974 ("ERISA") alleging that they were improperly denied benefits for treatment of mental health and substance use disorders because UBH's Guidelines did not comply with the terms of their insurance plans and/or state law.

41. The Court certified three separate classes:

*Wit Guideline Class*: Any member of a health benefit plan governed by ERISA whose request for coverage of residential treatment services for a mental illness or substance use disorder was denied by UBH, in whole or in part, between May 22, 2011 and June 1, 2017, based upon UBH's Level of Care Guidelines or UBH's Coverage Determination Guidelines. The Wit Guideline Class excludes members of the Wit State Mandate Class.

*Wit State Mandate Class*: Any member of a fully-insured health benefit plan governed by both ERISA and the state law of Connecticut, Illinois, Rhode Island, or Texas, whose request for coverage of residential treatment services for a substance use disorder was denied by UBH, in whole or in part, within the Class period, based upon UBH's Level of Care Guidelines or UBH's Coverage Determination Guidelines, and not upon the level-of-care criteria mandated by the applicable state law. With respect to plans governed by Texas law, the Wit State Mandate Class includes only denials of requests for coverage of substance use disorder services that were sought or received in Texas. The Class period for the Wit State Mandate Class includes denials governed by Texas law that occurred between May 22, 2011 and June 1, 2017, denials governed by Illinois law that occurred between August 18, 2011 and June 1, 2017, denials governed by Connecticut law that occurred between October 1, 2013 and June 1, 2017, and denials governed by Rhode Island law that occurred between July 10, 2015 and June 1, 2017

*Alexander Guideline Class*: Any member of a health benefit plan governed by ERISA whose request for coverage of outpatient or intensive outpatient services for a mental illness or substance use disorder was denied by UBH, in whole or in part, between December 4, 2011 and June 1, 2017, based upon UBH's Level of Care Guidelines or UBH's Coverage Determination Guidelines. The Alexander Guideline Class excludes any member of a fully insured plan governed by both ERISA and the state law of Connecticut, Illinois, Rhode Island or Texas, whose request for coverage of intensive outpatient treatment or outpatient treatment was

CLASS ACTION COMPLAINT

related to a substance use disorder, except that the Alexander Guideline Class includes members of plans governed by the state law of Texas who were denied coverage of substance use disorder services sought or provided outside of Texas.

42.     The *Wit* Plaintiffs asserted two types of claims: breach of fiduciary duty and arbitrary and capricious denial of benefits.

43.     The breach of fiduciary duty claim asserted that UBH is an ERISA fiduciary under 29 U.S.C. § 1104(a) and owed fiduciary duties to the class members, including the duties to administer the class members' health benefit plans "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), "with ... care, skill, prudence, and diligence," 29 U.S.C. § 1104(a)(1)(B), and "in accordance with the documents and instruments governing the plans," 29 U.S.C. § 1104(a)(1)(D). This Court found that UBH breached these duties by: 1) developing guidelines for making coverage determinations that are far more restrictive than those that are generally accepted even though plaintiffs' health insurance plans provide for coverage of treatment that is consistent with generally accepted standards of care; and 2) prioritizing cost savings over members' interests.

44.     The denial of benefits claim is based on the theory that UBH improperly adjudicated and denied plaintiffs' requests for both inpatient and outpatient coverage by using its overly restrictive Guidelines to make coverage determinations. Plaintiffs asserted and the Court ultimately held that UBH's reliance on the Guidelines was arbitrary and capricious because: 1) plaintiffs' health insurance plans provided for coverage consistent with generally accepted standards of care; and 2) as to the *Wit State Mandate Class*, the Class members' health insurance plans were subject to state laws that explicitly mandate the use of clinical criteria issued by the American Society of Addiction Medicine ("ASAM") or the Texas Department of Insurance ("TDI").

45.     In the present litigation, Plaintiffs and the Plaintiff Class are behavioral healthcare providers with claims that were denied by UBH based on medical necessity during the *Wit* class period through January 31, 2019, with such medical necessity coverage determinations made using illegal guidelines, the same guidelines found illegal in *Wit*.

46.     The *Wit* plaintiffs paid providers out-of-pocket for the wrongly denied care, suffering personal financial harm. As such, they were the proper Plaintiffs to bring suit. However,

13

their experiences and ability to pay for such treatment are the exception, not the rule. For the claims at issue here, far more typical of the experiences of MH/SUD treatment providers nation-wide, addicted and mentally-ill patients were not able to pay out-of-pocket for services rendered and the financial burden of the wrongfully denied claims fell on the Plaintiff-providers, not the patients or their families. Plaintiffs, in this Complaint, are not pursuing any legal claims with respect to any specific UBH benefit determinations challenged by individual members of the certified classes in *Wit* or *Alexander* above, to the extent that any such claims may overlap. As described *supra*, Plaintiffs do not believe that the legal claims overlap.

47.     All causes of action here directly relate to the *Wit* findings. The Plaintiffs and the Plaintiff Class in this litigation provided services based upon representations and promises made to them by UBH. After the services were provided, UBH retroactively denied the claims based on coverage decisions made using the Guidelines found illegal in *Wit*.  In other instances, providers would request from UBH authorization to keep a patient at a certain level of care. Routinely, UBH would take four days or more before responding to the request with a denial. Meanwhile the provider had expended four days of costs and resources to keep a patient at a higher level of care, only to find out that UBH would not be paying reimbursement.

48.     During the ten-day bench trial in *Wit*, the plaintiffs "established that the emphasis on cost-cutting that was embedded in [UBH]'s Guideline development process actually tainted the process, causing UBH to make decisions about Guidelines based as much or more on its own bottom line as on the interests of the plan members, to whom it owes a fiduciary duty… the Court finds, by a preponderance of the evidence, that UBH has breached its fiduciary duty by violating its duty of loyalty, its duty of due care, and its duty to comply with plan terms by adopting Guidelines that are unreasonable and do not reflect generally accepted standards of care."

49.     In *Wit*, UBH's experts "had serious credibility problems…with respect to a significant portion of their testimony each of them was evasive – and even deceptive – in their answers when confronted with contrary evidence" and the Court discounted their evidence. testified as to "generally accepted standards of care related to mental health and substance use disorder treatment and whether the [United] Guidelines meet those standards." Plaintiffs' experts, on the

other hand were found credible by the Court. They testified that the Guidelines did not meet those standards, which led to the wrongful denial of thousands of claims for addiction and mental health treatment services.

50.     *Wit* analyzed two frameworks by which UBH adjudicated claims: Level of Care Guidelines ("LOCGs") and Coverage Determination Guidelines ("CDGs"). Those guidelines were organized according to the acuity of care at issue (*e.g.*, outpatient vs. inpatient treatment). *Wit* found that UBH's application of profit-driven LOCGs and CDGs caused claim denials that are at issue in this litigation.

51.     Implicitly acknowledging the illegality of its Guidelines, UBH updated its LOCGs and CDGs on January 3, 2019 when it formally adopted the ASAM Guidelines. The *Wit* court found that, prior to 2019, UBH's breached "generally accepted standards for determining the appropriate levels of care" in favor of a profit-driven benefits administration scheme.

52.     Distinguishing the Guidelines from the ERISA plans, *Wit* held "that the Guidelines are not Plan terms" because "they are developed internally by UBH without input from Plan's employer sponsors. In addition, no evidence was offered to show that when UBH revises the Guidelines it complies with the requirements contained in class members' Plans for amending those Plans."

53.     As the Guidelines are not plan terms, the Court can evaluate them and determine their applicability in all situations where they were applied by UBH. Here, Plaintiffs seek to hold UBH liable in tort, contract, statutory, and common law. UBH, not any underlying employer benefit plan, is the party responsible for breaching its duty to Plaintiffs. UBH is not a traditional ERISA party, and ERISA was not designed to protect UBH or any other third-party benefits administrator from liability for bad actions. As the tortfeasor and breaching party, UBH is the proper defendant in this action.

54.     The *Wit* court made the following specific findings as to MH/SUD generally accepted standards of care:

- It is a generally accepted standard of care that effective treatment requires treatment of the individual's underlying condition and is not limited to alleviation of the individual's current symptoms;

CLASS ACTION COMPLAINT

- It is a generally accepted standard of care that effective treatment requires treatment of co-occurring behavioral health disorders and/or medical conditions in a coordinated manner that considers the interactions of the disorders and conditions and their implications for determining the appropriate level of care;

- It is a generally accepted standard of care that patients should receive treatment for mental health and substance use disorders at the least intensive and restrictive level of care that is safe and effective;

- It is a generally accepted standard of care that when there is ambiguity as to the appropriate level of care, the practitioner should err on the side of caution by placing the patient in a higher level of care;

- It is a generally accepted standard of care that effective treatment of mental health and substance use disorders includes services needed to maintain functioning or prevent deterioration;

- It is a generally accepted standard of care that the appropriate duration of treatment for behavioral health disorders is based on the individual needs of the patient; there is no specific limit on the duration of such treatment;

- It is a generally accepted standard of care that the unique needs of children and adolescents must be taken into account when making level of care decisions involving their treatment for mental health or substance use disorders; and

- It is a generally accepted standard of care that the determination of the appropriate level of care for patients with mental health and/or substance use disorders should be made on the basis of a multidimensional assessment that takes into account a wide variety of information about the patient.

55.     UBH's guidelines did not meet generally accepted standards of care. UBH placed excessive emphasis on acute symptoms of withdrawal, without acknowledging the underlying symptoms, causes of the disease of addiction, and generally accepted standards of care identified in ASAM Guidelines and peer-reviewed publications. This Court found, therefore, that UBH had failed in its duty to adjudicate clinical necessity pursuant to the type of legitimate clinical criteria that ASAM deems critical to efficacy.

56.     Failures included the failure of United's guidelines to address the effective treatment of co-occurring conditions that may require a patient to be placed in a higher level of care for effective treatment.

57.     Further, the *Wit* court held, "The overemphasis on treatment of acute symptoms is found not only in the admission criteria of the challenged Guidelines but also in the continued service and discharge criteria that apply to all levels of care." *Id.* at 26. Inappropriate emphasis on

CLASS ACTION COMPLAINT

acute symptoms permeated UBH's claims adjudication practices for all levels of addiction treatment coverage.

58.     In *Wit*, the court found that United's guidelines were inconsistent with ASAM criteria and held specifically that "[t]he most glaring inconsistency between [United] Guidelines and the ASAM Criteria relates to coverage of residential treatment at levels 3.1, 3.3 and 3.5. [United] Guidelines simply do not provide criteria for coverage of services at these levels." *Id.* at 41.

59.     The Court ultimately found the UBH had breached its fiduciary duty to the individual Plaintiffs and to class members and that UBH was liable to Plaintiffs and class members for their denial of benefits claims.

60.     The present litigation seeks to enforce the *Wit* decision by applying its findings to the Plaintiffs and the Plaintiff Class who bore the brunt of the financial harm UBH's illegal actions caused. *Wit* itself stands to remedy only a narrow segment of those harmed by UBH's illegal LOCGs and CDGs. It does nothing to make whole those who received no treatment when they were entitled to it. Nevertheless, equity demands that UBH be accountable to Plaintiffs and others similarly situated, who were left financially responsible for billions of dollars in illegally denied care.

61.     Based on the findings and conclusions in *Wit*, plaintiffs have compelling reasons to believe that most, if not nearly all, of the denied claims should have been afforded coverage.

   **d.  UBH's Actions Harmed Plaintiffs and the Plaintiff Class**

62.     Plaintiffs and the Plaintiff Class were irrevocably harmed by UBH's illegal adjudication and denial for services that Plaintiffs and the Plaintiff Class provided to UBH's insureds based on objective, industry accepted, evidence based standards of care such as ASAM. As a direct result of illegal claim adjudications and denials, Plaintiffs and the Plaintiff Class were left uncompensated for care they provided. As such, they have been forced to absorb the costs billions of dollars' worth of uncompensated, medically necessary care.

63.     Because they have been harmed by UBH's misconduct, Plaintiffs complain on behalf of themselves and all others similarly situated to obtain all relief available under all

CLASS ACTION COMPLAINT

applicable California and Federal laws. This action seeks to have the denied claims for services rendered to Defendant's members reprocessed by a neutral, court-appointed third party, at UBH's expense, and to pay for those days of service that Plaintiffs provided to Defendant's insureds when there was medical necessity under the appropriate ASAM guidelines.

64.     It is well established in the Ninth Circuit that "[t]he district court has broad latitude in fashioning equitable relief when necessary to remedy an established wrong." *Alaska Center for the Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994). An order for the reprocessing of claims is an equitable remedy, not monetary relief. *See, for example, Wit v. United Behavioral Health*, 317 F.R.D. 106, 132 (N.D. Cal. 2016); *Meidl v. Aetna, Inc.*, 2017 WL 1831916, at *21 (D. Conn. May 4, 2017). Court supervision and the appointment of Special Master or neutral-third party for the reprocessing is necessary as the result of UBH's past behavior. *See, for example*, *Halderman v. Pennhurst State Sch. & Hosp.*, 526 F. Supp. 428, 433 (E.D. Pa. 1981) ("The Commonwealth defendants appear to take the position that they should be able to monitor their own compliance with the Court's Orders. This would be somewhat akin to requesting the fox to guard the henhouse. Unfortunately, as heretofore pointed out, the performance of the defendants in this case underscores the need for the Special Master").

### THE PARTIES

65.     Plaintiff Meridian Treatment Solutions, Inc., a Florida corporation, offers sub-acute treatment for individuals suffering from mental health, addiction and other co-occurring disorders in Lauderdale-By-The-Sea, Florida.  Meridian provides Mental Health and Substance Use Disorder ("MH/SUD") treatment to patients covered under health insurance plans sold or administered by UBH. Meridian routinely provided services for which it remains unreimbursed as a result of UBH's application of illegal Guidelines. Plaintiff was not aware that UBH was using the illegal Guidelines to make coverage and level of care decisions until the March 5, 2019 decision in *Wit*.

66.     Plaintiff iRecover Treatment Inc., a California Corporation d/b/a Serenity Palms Detox, offers sub-acute treatment for individuals suffering from mental health, addiction and other co-occurring disorders in Palm Desert/Cathedral City, California. Serenity provides MH/SUD treatment services to patients covered under health insurance plans sold or administered by UBH.

18

1 Serenity routinely provided services for which it remains uncompensated as a result of UBH's pre-

2 authorization and clinical necessity guidelines. Serenity was not aware that UBH was using illegal

3 guidelines to make coverage and level of care decisions until the March 5, 2019 decision in *Wit.*

4       67.    Plaintiff Harmony Hollywood, a California Limited Liability Company offers sub-

5 acute treatment for individuals suffering from mental health, addiction and other co-occurring

6 disorders in Los Angeles, California. Harmony provides MH/SUD treatment services to patients

7 covered under health insurance plans sold or administered by UBH. Harmony routinely provided

8 services for which it remains uncompensated as a result of UBH's pre-authorization and medical

9 necessity policies. Harmony was not aware that UBH was using illegal guidelines to make coverage

10 and level of care decisions until the March 5, 2019 decision by the District Court in the Northern

11 District of California in *Wit v. United Behavioral Health*

12       68.    Defendant United Behavioral Health ("UBH") is a California corporation, with its

13 principal place of business at 425 Market Street, 14th Floor, San Francisco, CA 94105. UBH is a

14 "provider of mental health[5]" and manages behavioral health services for UnitedHealth Group

15 members. It operates under the brand name OptumHealth Behavioral Solutions. It is responsible

16 for drafting and promulgating the internal level of care and coverage determination guidelines

17 referenced herein. It also adjudicates MH/SUD claims on behalf of UnitedHealth Group.

18 **JURISDICTION**

19     **Subject Matter Jurisdiction**

20       69.    Plaintiffs Meridian, Serenity, and Harmony are headquartered in diverse

21 jurisdictions, and the sum of the amounts in controversy exceeds $5,000,000. This Court has

22 jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA") under 28 USC §§

23 1332(d)as the amount in controversy exceeds $5,000,000, the class has more than 100 members,

24 and the parties are minimally diverse.

25

26

27

28   [5] 2018 Statement of Information of United Behavioral Health, Document G063267, Filed September 26, 2018.

19

CLASS ACTION COMPLAINT

**Personal Jurisdiction**

70.     The Court has personal jurisdiction over the named Plaintiffs as they have voluntarily submitted to the jurisdiction of the Court in the filing of the present lawsuit.

71.     The Court has personal jurisdiction over all absent and unnamed putative class members regardless of whether they have minimum contacts with the forum as Plaintiffs seek a remedy in equity, not law, and, further, any and all due process protections required will be provided for during the litigation after class certification. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985).

72.     Defendant UBH is a California corporation. The Judicial Council Comment to the California Code of Civil Procedure section 410.10 recognizes incorporation in the state as a basis for general, personal jurisdiction.

**VENUE**

73.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant UBH has its principal place of business in this jurisdiction.

74.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims brought herein occurred in this jurisdiction.

75.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(d) because Defendant is subject to personal jurisdiction within the state and have sufficient contacts with the Northern District of California to subject them to personal jurisdiction as if the district were a separate state.

76.     Venue is also proper pursuant to 29 U.S.C. § 1132(e)(2) as many of the breaches giving rise to the claims brought herein occurred in this district.

**FACTUAL ALLEGATIONS AS TO ALL COUNTS**

77.     In *Wit*, this court found that Defendant's claim processing practices were based on illegal criteria that caused the improper denial of MH/SUD claims between 2011 and 2019.

78.     UBH developed its Guidelines internally, they are not guidelines common to the MH/SUD treatment industry.

79.     The Guidelines at issue in the present case are those used by UBH from May 22, 2011 up to and until UBH adopted and began making clinical necessity decisions using the ASAM

1    guidelines after January 31, 2019.   UBH, by its own admission, ceased using its Clinical

2    Determination Guidelines and Level of Care Guidelines after January 31, 2019.

3        80.    UBH's Guidelines did not attempt to independently account for co-occurring mental

4    health disorders, risk of relapse, motivation barriers, availability of social support, or whether a

5    lower level of care will be equally as effective. Generally accepted industry standards recognize

6    that recognition and treatment of each of these omitted factors is critical to successful and effective

7    outcomes.

8        81.    UBH's Guidelines provided that residential rehabilitation for substance abuse will

9    only be covered when the claimant is intoxicated or experiencing or likely to develop withdrawal.

10       82.    UBH's Guidelines precluded treatment at the residential rehabilitation level of care

11   in the absence of intoxication upon admission without concurrent evidence or likelihood of

12   withdrawal. Even with evidence of withdrawal, they required immediate discharge once

13   detoxification or withdrawal has passed.

14       83.    Further, UBH's guidelines called for denial of residential treatment coverage if

15   inconsistent with UBH's Guidelines, requiring a lower level of care if it is "safe" (even if it will not

16   be as effective as a higher level of care) and the obligation of patients to prove by "compelling

17   evidence that continued treatment in the current level of care is required to prevent acute

18   deterioration or exacerbation of the member's current condition."

19       84.    UBH's Guidelines called for a denial of outpatient coverage absent the manifestation

20   of acute symptoms and/or imminent risk of harm or relapse. In many cases, the presence of pre-

21   requisite acute symptoms would qualify patients for hospitalization. In other cases, the UBH CDGs

22   included pre-requisites that bore no relation to the appropriate goals of outpatient care.

23       85.    ASAM guidelines represent the generally accepted clinical standards of care for

24   mental health and addiction treatment. ASAM guidelines indicate that residential treatment

25   "withdrawal management," a process potentially far exceeding the duration of detoxification, but

26   also discretely account for: "emotional, behavioral, or cognitive conditions and complications,"

27   "readiness to change," "relapse, continued use, or continued problem potential," and

28   "recovery/living environment." ASAM does not require the presence of either withdrawal or

21

comorbid mental health/medical conditions for admission to residential rehabilitation. ASAM guidelines and industry standards also indicate that continuing outpatient treatment is necessary in circumstances far beyond those specified in UBH's LOCGs and CDGs.

86.     Individuals who are appropriately placed in the clinically managed levels of care have minimal problems with intoxication or withdrawal (Dimension 1) and few biomedical complications (Dimension 2), so on-site physician services are not required. Such individuals may have relatively stable problems in emotional, behavioral, and cognitive conditions (Dimension 3), meeting the diagnostic criteria of the Diagnostic and Statistical Manual of Mental Disorders (DSM) of the American Psychiatric Association. Many also have significant limitations in the areas of readiness to change (Dimension 4), relapse, continued use, or continued problem potential (Dimension 5), or recovery environment (Dimension 6). Therefore, they need interventions directed by appropriately trained and credentialed addiction treatment staff. Such individuals also need case management services to facilitate their reintegration into the larger community.

87.     Moreover, ASAM calls for continued treatment at the prescribed level of care if any of the following apply:

The patient is making progress but has not yet achieved the goals articulated in the individualized treatment plan. Continued treatment at the present level of care is assessed as necessary to permit the patient to continue to work toward his or her treatment goals;

*-OR-*

The patient is not yet making progress but has the capacity to resolve his or her problems. He or she is actively working toward the goals articulated in the individualized treatment plan. Continued treatment at the present level of care is assessed as necessary to permit the patient to continue to work toward his or her treatment goals;

*-AND/OR-*

New problems have been identified that are appropriately treated at the present level of care. The new problem or priority requires services, the frequency and intensity of which can only safely be delivered by continued stay in the current level of care. The level of care in which the patient is receiving treatment is therefore the least intensive level at which the patient's new problems can be addressed effectively.

CLASS ACTION COMPLAINT

88.     ASAM further specifies that "[w]hile the duration of treatment varies with the severity of an individual's illness and his or her response to treatment, the length of service in clinically managed Level 3 programs tends to be longer than in the more intensive medically monitored and medically managed levels of care ... Longer exposure to treatment interventions is necessary for certain patients to acquire basic living skills and to master the application of coping and recovery skills."

89.     Unlike UBH's Guidelines, ASAM's Criteria instructively state that that "all matrices in The ASAM Criteria correlate risk ratings and the types of services and modalities needed and indicate the intensity of services where the patient's needs can best be met."

90.     Further, ASAM noted, when an insurer such as UBH develops its own treatment level of care guidelines "rather than adhering to nationally validated, reliable, and accepted guidelines, it may appear that decision-influencing factors such as cost considerations outweigh valid evidence-based authorization requests for medically necessary treatment."

91.     UBH applied faulty guidelines to services for all levels of MH/SUD treatment, including in making determinations about the medical necessity of out-patient levels of care. UBH denied claims for Partial Hospitalization Program ("PHP") services, Intensive Outpatient services ("IOP"), and routine Outpatient services ("OP") based on profit.

92.     As such, UBH's guidelines clearly discriminate against its insureds with MH/SUD's. Unlike the restrictive internal practices and policies that UBH applies to MH/SUD claims, UBH applies far less restrictive internal policies and practices to medical claims.

93.     It is in this environment that Plaintiffs and putative class members provided MH/SUD services to UBH's insureds.

94.     Plaintiffs own and operate sub-acute Mental Health and Substance Use Disorder MH/SUD facilities in Florida and California. Similarly situated Plaintiffs operate MH/SUD facilities throughout the country. Between 2011 and 2019, Plaintiffs and class members' facilities and individual providers administered MH/SUD services to millions of patients who were beneficiaries of health plans administrated by UBH and/or insured by plans sold and/or underwritten by UBH.

CLASS ACTION COMPLAINT

95.     Plaintiffs and the providers they seek to represent, provide, among other services, Sub-acute Detoxification Services ("DTX"), Residential Treatment Center services ("RTC"), Partial Hospitalization Program Services ("PHP"), Intensive Outpatient Services ("IOP"), and Outpatient services ("OP"). The DTX, RTC, PHP, IOP and OP services that Plaintiffs offer are the subject of this action.

96.     Members of the Plaintiff Class offer sub-acute detoxification services ("DTX") which correspond with ASAM level of care 3.7. ASAM 3.7 services are characterized as "Medically Monitored Intensive Inpatient Services" in which 24-hour nursing care with physician availability, and 16 hour per day clinician availability are necessary to treat and manage symptoms.

97.     ASAM indicates that level of care 3.7 is appropriate where, pursuant to ASAM Dimensions 1-6, patient has some combination of: high but manageable withdrawal risk; requires 24-hour medical monitoring; has moderately severe cognitive impairment requiring 24 hour structured setting; has low interest in treatment and needs motivational strategies; has challenges controlling use at less intensive care levels, or has a dangerous home environment. This summary of ASAM dimensions is an overview, and not all conditions need to be met to justify placing a patient at the 3.7 level of care.

98.     Members of the Plaintiff Class offer Residential Treatment Care services ("RTC") which correspond with ASAM level of care 3.5. ASAM 3.5 is characterized by 24-hour care with trained counselors, and is appropriate where patients have minimal severe withdrawal risk or manageable withdrawals, do not require 24-hour medical monitoring, would benefit from a 24-hour setting for stabilization, have difficulty with treatment, need skills to prevent continued use; and/or have dangerous home environments requiring a 24-hour structured environment. This summary of ASAM dimensions is simplified, and not all need to be met to justify placing a patient at the 3.5 level of care.

99.     Members of the Plaintiff Class offer Partial Hospitalization Services ("PHP") which correspond with ASAM level of care 2.5, characterized by more than 20 hours a week of services. According to ASAM standards, 2.5 level of care is appropriate where there is only moderate risk of severe withdrawal; little or no cognitive impairment; poor treatment engagement requiring

structured program; likelihood of relapse without near daily monitoring or support; unsupportive home environment the risks of which may be mitigated by structure and support. This summary of ASAM dimensions is simplified, and not all need to be met to justify placing a patient at the 2.5 level of care.

100.    Members of the Plaintiff Class offer Intensive Outpatient Services ("IOP") that correspond with ASAM level of care 2.1. ASAM level of care 2.1 is described as a program with more than 9 hours of service per week, which is appropriate where a patient has minimal risk of severe withdrawal; no biomedical complications; few cognitive impairments; openness to recovery with some need for structure; variable treatment engagement; high likelihood of relapse without support; unsupportive home environment which is mitigated by structure and monitoring. This summary of ASAM dimensions is simplified, and not all need to be met to justify placing a patient at the 2.1 level of care.

101.    Members of the Plaintiff Class offer Outpatient Services ("OP") that correspond with ASAM level of care 1.0. ASAM level of care 1.0 is described as a program with less than 9 hours of service per week, which is appropriate where a patient has minimal risk of severe withdrawal; no biomedical complications; no unmanageable cognitive impairments; ready for recovery but in need of strategies to strengthen readiness; able to maintain abstinence with little need for structure; and/or a supportive home environment with which the patient can cope. This summary of ASAM dimensions is simplified, and not all need to be met to justify placing a patient at the 1.0 level of care.

102.    Plaintiff and the Plaintiff Class are providers who are either in-network ("INN") or out-of-network ("OON") providers. The same Guidelines were used for INN and OON provider claims.

103.    INN, or contracting providers, have entered into reimbursement contracts with UBH where they agree to accept discounted reimbursement rates as a trade off in exchange for the benefit of increased business that results from being part of their "preferred provider organization." UBH's members and insureds are subject to lower co-payments and deductibles and are accessible through directories maintained by UBH. INN provider contracts generally set out the terms of

reimbursement but do not address the specifics of medical necessity criteria. The criteria are determined by the insurance arrangement or plan. INN patients must be pre-authorized to receive care through the same administrative and clinical mechanisms as OON providers.

104.    Unlike INN providers, OON providers, do not execute reimbursement contracts with UBH, and rely on good-faith reimbursement at usual, customary, or reasonable rates ("UCR") to cover the cost of patients' care in treatment.

105.    INN and OON providers are subject to identical pre-certification requirements and medical necessity standards. UBH's Utilization Management department administers pre-certification and pre-authorizations for both INN and ONN plans, and adjudicates post-service medical necessity. Pre-authorization protocols and guidelines are independent and external to the terms of INN contracts. Without pre-certification, claims will be summarily unpaid regardless of network status. UBH's application of illegal guidelines harmed in and out-of-network providers alike.

106.    Such plans include both ERISA and non-ERISA plans. None of Plaintiffs the Plaintiff Class members' claims herein are subject to ERISA. The claims are for interactions specifically between providers and UBH. They are not brought on behalf of the insureds, rather the claims as alleged here involve independent duties owed by UBH to the providers outside of ERISA.

107.    In 2016, approximately 292 Million Americans had some form of health insurance with approximately 216 million having a private or "commercial" plan. Of the commercial plans, approximately 178 million were employment based and 52 million were purchased directly[6]. According to the U.S. Department of Labor, in 2016 there were approximately "2.2 million ERISA-covered group health plans covering approximately 135 million people,[7]" or approximately 61% of covered workers according to The Henry J. Kaiser Foundation[8]. Therefore, around 39% of all

---

[6] Barnett, Jessica C., *et al.*, *Health Insurance Coverage in the United States: 2016* (March 2017), United States Census Bureau

[7] U.S. Dept. of Labor, *Annual Report to Congress on Self-Insured Group Health Plans* (March 2019)

[8] Henry J. Kaiser Family Foundation, *2016 Employer Health Benefits Survey*, kff.org (Sep. 14, 2016)

CLASS ACTION COMPLAINT

employment-based plans, approximately 86 million, and all individual plans, 52 million, a total of about 138 million, are non-ERISA based plans. As UBH has possession of every single plan relevant to the present litigation, they are in a position to provide the exact percentage of self-funded and fully-insured plans they oversee.

108.    Non-ERISA plans are frequently purchased by individuals from state healthcare exchanges or are small group employer plans.  Non-ERISA plans are also referred to as "fully insured plans" because benefit payments are paid from the assets of the insurer, rather than by the employer.

109.    Of the 216 million people insured by commercial insurance in 2016, 70 million, or 32%, were covered by plans issued or administered by UnitedHealth Group. It is the largest private health insurance company in the United States. In 2016, their revenue exceeded $186 billion dollars.

110.    For many services, UBH required that providers obtain "pre-certification" or "pre-authorization" as a condition of payment. Between 2011 and 2019, UBH based its pre-certification and pre-authorization determinations on the Guidelines. These are a set of clinical criteria that must be met for a patient to be eligible for benefits. When UBH decided that level of care criteria were not met for a requested service, they denied pre-authorization and refused to pay benefits for services, even if they were already being provided.

111.    Not all policies administered, sold, and/or underwritten by UBH required pre-certification or pre-authorization. UBH applied the same Guidelines for these plans in post-service reviews.

112.    Plaintiffs observed all of UBH's published policies in delivering care to their patients. Plaintiffs sought timely pre-certification and pre-authorization when required and timely submitted accurate bills for services provided. When pre-certification was not required, Plaintiffs rendered services in good faith, believing that UBH would cover medically necessary services.

---

https://www.kff.org/report-section/ehbs-2016-section-ten-plan-funding/

CLASS ACTION COMPLAINT

Plaintiffs medical and clinical staffs made care decisions pursuant to their addiction expertise and generally accepted industry standards, including those published by ASAM.

113.    Prior to providing care, Plaintiffs verified that patients had benefits for all services provided by conducting a "verification of benefits" phone inquiry ("VOB").

114.    During the VOB process, Plaintiffs' or their agents asked, and UBH's agents confirmed, coverage for clinically necessary MH/SUD services.

115.    Based on information received from the VOBs, Plaintiffs treated UBH's insureds. Plaintiffs reasonably relied on UBH to provide benefits according to the language and information obtained in the VOB.

116.    Plaintiffs and the Plaintiff Class rendered medically necessary services while pre-authorization decisions were pending, pursuant to their experienced, professional judgement, regardless of pre-certification requirements, in reliance upon UBH's statements that it would cover medically necessary MH/SUD services. In all cases relevant here, UBH refused to authorize services that had already been provided citing lack of medical necessity under their internal guidelines.

117.    All post-service claim denials and non-payments were based on UBH's Guidelines that this Court found illegal and based on UBH's profit over patients motive in *Wit*.

118.    Plaintiffs and all those similarly situated exhausted all appeals procedures and other administrative remedies available to dispute non-payment and/or further appeals would have been futile.

119.    For the claims at issue, UBH denied pre-authorization requests, denied claims and/or withheld payment for their own financial gain after the services had already been provided by Plaintiffs.

**Factual Allegations Regarding Facility Meridian Treatment Center**

120.    Plaintiff Meridian Treatment Centers is a MH/SUD provider with its primary place of business in Fort Lauderdale-by-the-Sea, Florida. Between 2014-2019 Meridian provided sub-acute MH/SUD services to 49 patients insured or covered under benefits plans administered by UBH, for which UBH denied payment based on medical necessity.

121.    Meridian provided PHP (ASAM 2.5), IOP (ASAM 2.1) and OP (ASAM 1.0) services to UBH members.

122.    Meridian is licensed by the State of Florida to provide PHP, IOP, and OP services. Each of the services Meridian provides correspond with the specific ASAM levels of care discussed above.

123.    All UBH patients who received treatment from Meridian executed valid assignment of benefits forms and financial responsibility forms assigning their rights to insurance payment to Meridian.

124.    Meridian administered care following clinical best-practices designed and implemented based on the ASAM criteria by their medical directors, licensed and board-certified physicians in the State of Florida with significant training, experience and expertise in addiction and mental health treatment. The medical directors applied ASAM Criteria when diagnosing and prescribing care. The medical directors supervised Meridian's clinical team to provide comprehensive, patient-specific, and symptom specific treatment in accordance with ASAM.

125.    Meridian used an internal billing team to submit and follow up on medical bills submitted to UBH, to conduct utilization review, and to pursue patient collections from UBH. The billing team worked closely with the clinical team to ensure that the treatment provided met the patients' needs. Prior to admitting UBH Patients, Meridian's billing team called UBH to confirm that each Patient had active coverage for the care to be provided. The billing team requested information about how services were covered, if pre-certification was required, and what conditions of pre-certification and coverage were. In general, UBH representatives stated that where there was coverage, medical necessity was a condition of treatment.

126.    Meridian relied upon UBH to fulfill assurances made during verifications of benefits and utilization review processes that clinically necessary care would be covered.  But for these representations and assurances, Meridian would not have provided services.

127.    Prior to and during UBH's members' admission and treatment, Meridian's utilization review team worked to obtain pre-certifications from UBH. Precertification is listed in the VOB as a condition of payment for some services. To obtain pre-certification, a member of

Meridian's utilization review team called UBH or one of its designated subsidiaries, requested coverage, and provided any needed clinical documentation. When UBH disagreed with Meridian's clinicians about appropriate level of care, or UBH categorically denied pre-certification, Meridian's utilization review team appealed the decision and requested a peer-to-peer review, in which clinicians at Meridian would discuss patient's care with clinicians at UBH. If UBH still disagreed with the clinical team, Meridian would file an appeal and await the decision.

128. The final decision often took three or four days, or longer if care was provided over a weekend. During that lag time, Meridian's treatment team provided appropriate, medically necessary care for UBH's insureds pursuant to their clinical judgement at their own expense in expectation of reimbursement. Ultimately, a final decision would be reached several days later. In all cases at issue here, UBH denied the care. As a result of UBH's coverage denial, the lag time to obtain that denial, and Meridian's duty to act in its patients' best interests, Meridian provided unreimbursed days of services.

129. In other cases, UBH verbally pre-authorized several days of care in advance only to later retroactively deny claims it had authorized based on clinical necessity under its Guidelines.

130. Medical necessity coverage denials by UBH have left Meridian unpaid for not less than **$1,739,852** in services. The coverage denials in question were based on criteria contained in the discredited UBH Guidelines. Although records of these claims are already in the possession of UBH, due to the protected health information contained within them, Plaintiffs will provide these records again either under seal or upon the entry of a protective order in this matter.

131. Meridian exhausted all available internal appeals mechanisms for all denied claims with UBH.

**Factual Allegations Regarding Serenity Palms**

132. Plaintiff iRecover Treatment Inc. d.b.a. Serenity Palms ("Serenity") is a MH/SUD provider with its primary place of business in Cathedral City, California. Between 2015-2019 Serenity provided sub-acute MH/SUD services to 202 patients insured or covered under benefit plans administered by UBH for which UBH denied payment based on medical necessity.

CLASS ACTION COMPLAINT

133.    Serenity provided DTX (ASAM 3.7), RTC (ASAM 3.5), PHP (ASAM 2.5), IOP (ASAM 2.1), and OP (ASAM 1.0) services to UBH's members.

134.    Serenity is licensed by the State of California to provide DTX, RTC, PHP, IOP and OP services. Each of the services Serenity provides correspond with specific ASAM levels of care discussed above. Since Serenity opened, it has provided care to many patients who required pre-certification from UBH as a condition of payment and whose care was subject to application of UBH's Guidelines.

135.    All UBH patients who received treatment from Serenity executed valid assignment of benefits and financial responsibility form assigning their rights to insurance payment to Serenity.

136.    Serenity administered care following clinical best-practices designed and implemented based on the ASAM criteria by their medical directors, licensed and board-certified physicians in the State of California with significant training, experience and expertise in addiction and mental health treatment. The medical directors applied ASAM Criteria when diagnosing and prescribing care. The medical directors supervised Serenity's clinical team to provide comprehensive, patient-specific, and symptom specific treatment in accordance with ASAM.

137.    Serenity employed a third-party billing company as its agent to submit and follow up on medical bills submitted to insurance, to conduct utilization review, and to pursue patient collections from UBH. The billing team worked closely with the clinical team to ensure that the treatment provided met the patients' needs. Prior to admitting UBH patients, Serenity's billing team called UBH to confirm that each Patient had active coverage for the care to be provided. The billing team requested information about how services were covered, if pre-certification was required, and what conditions of pre-certification and coverage were. In general, UBH representatives stated that where there was coverage, medical necessity was a condition of treatment.

138.    Serenity relied upon UBH to fulfill assurances made during verifications of benefits and utilization review processes that medically necessary care would be covered.  But for these representations and assurances, Serenity would not have provided services.

139.    Prior to and during UBH's patients' admission and treatment, Serenity's utilization review team worked to obtain pre-certifications from UBH. Precertification is listed in the VOB as

CLASS ACTION COMPLAINT

1   a condition of payment for some services. To obtain pre-certification, a member of Serenity's

2   utilization review team called UBH, requested coverage, and provided any needed clinical

3   documentation. When UBH disagreed with Serenity's clinicians about appropriate level of care, or

4   denied pre-certification under UBH Guidelines, Serenity's utilization review team appealed the

5   decision and requested a peer-to-peer review, in which clinicians at Serenity would discuss the

6   patient's care with staff clinicians at UBH. If UBH still denied the request, Serenity would file an

7   appeal and await the decision.

8        140.    The final decision from UBH often took three or four days, or longer if care was

9   provided over a weekend. During that lag time, Serenity's treatment team provided medically

10  necessary care for UBH's insureds pursuant to their clinical responsibilities, professional judgment,

11  and ASAM criteria. Ultimately, a decision would be reached several days later by UBH. In all cases

12  at issue here, UBH denied coverage. As a result of the coverage denial, the lag time to obtain that

13  denial, and Serenity's duty to act in its patients' best interests, Serenity was harmed by being unpaid

14  for several days of treatment per patient.

15       141.    In other cases, UBH verbally pre-authorized several days of care in advance only to

16  later retroactively deny claims it had authorized based on medical necessity under its Guidelines.

17       142.    As a result of UBH's coverage denials, the lag time to obtain the eventual denial,

18  and Serenity's duty to act in its patients' best interests, Serenity provided unpaid days of services.

19  Over the relevant time period, Serenity received no payment for services totaling not less than

20  **$627,795**.

21       143.    In all claims relevant to this action, Serenity is still unpaid for these days of services.

22  The coverage denials in question were based on criteria that *Wit* explained were illegal. Although

23  records of these claims are already in the possession of UBH, due to the protected health

24  information contained within them, Plaintiffs will provide these records again either under seal or

25  upon the entry of a protective order in this matter.

26       144.    Serenity, or its agents, exhausted all available internal appeals mechanisms for all

27  denied claims with UBH.

28

CLASS ACTION COMPLAINT

**Factual Allegations Regarding Plaintiff Harmony Hollywood**

145.    Plaintiff Harmony Hollywood is a MH/SUD provider with its primary place of business in Los Angeles, California. Between 2012-2019, Harmony provided sub-acute MH/SUD services to 92 patients insured or covered under benefit plans administered by UBH for which UBH denied payment based on medical necessity.

146.    Harmony provided DTX (ASAM 3.7), RTC (ASAM 3.5), PHP (ASAM 2.5), IOP (ASAM 2.1) and OP (ASAM 1.0) services to UBH's insureds.

147.    Harmony has been treating behavioral health patients and UBH members since 2012. Harmony is licensed by the State of California to provide DTX, RTC, PHP, IOP and OP services. Each of the services Harmony provides correspond with specific ASAM levels of care discussed above. The 92 patients referenced above required pre-certification from UBH as a condition of payment and whose care was subject to application of UBH's Guidelines.

148.    All UBH patients who received treatment from Harmony executed valid assignment of benefits and financial responsibility forms assigning their rights to insurance payment to Harmony.

149.    Harmony administered care following clinical best-practices designed and implemented based on the ASAM criteria by their medical directors, licensed and board-certified physicians in the State of California with significant training, experience and expertise in addiction and mental health treatment. The medical directors applied ASAM Criteria when diagnosing and prescribing care. The medical directors supervised Harmony's clinical team to provide comprehensive, patient-specific, and symptom specific treatment in accordance with ASAM.

150.    Harmony employed a third-party billing company as its agent to submit and follow up on medical bills submitted to UBH and to conduct Utilization Review. Prior to admitting UBH's insureds, Harmony's billing team called UBH to confirm that each patient had active coverage for the care to be provided. The billing team requested information about how services were covered, if pre-certification was required, and what conditions of pre-certification and coverage were. For the claims at issue, in general, UBH representatives stated that where there was coverage, medical necessity was a condition of treatment.

CLASS ACTION COMPLAINT

151. Harmony relied upon UBH to fulfill assurances made during VOBs and utilization review processes that medically necessary care would be covered. But for these representations and assurances, Harmony would not have provided services.

152. Prior to and during UBH patients' admission and treatment, a utilization review team worked to obtain pre-certifications from UBH. Precertification is listed in the VOB as a condition of payment for some services. To obtain pre-certification, a member of the utilization review team called UBH or one of its alter-egos, requested coverage, and provided any needed clinical documentation. When UBH disagreed with Harmony's clinicians about clinical necessity and/or the appropriate level of care, or UBH denied pre-certification, the UR team appealed the decision and requested a peer-to-peer review with clinicians at UBH. If UBH still denied coverage, Harmony would file an appeal and await the decision.

153. The final decision often took three or four days, or longer if care was provided over a weekend. During that lag time, Harmony's treatment team provided care for UBH's insureds pursuant to their clinical responsibilities, professional judgment, and ASAM criteria. Ultimately, a final decision would be reached several days later. In all cases at issue here, UBH denied coverage. As a result of UBH's coverage denial, the lag time to obtain that denial, and Harmony's duty to act in its patients' best interests, Harmony was harmed by being unpaid for several days of treatment per patient.

154. In other cases, UBH verbally pre-authorized several days of care in advance only to later retroactively deny claims it had authorized based on medical necessity under its Guidelines.

155. UBH denied claims from Harmony totaling not less than **$2,516,303**. The coverage denials in question were based on criteria that *Wit* decision found illegal. Although records of these claims are already in the possession of UBH, due to the protected health information contained within them, Plaintiffs will provide these records again either under seal or upon the entry of a protective order in this matter.

156. Harmony, or its agents, exhausted all available internal appeals mechanisms for all denied claims with UBH.

CLASS ACTION COMPLAINT

1

**CLASS ACTION ALLEGATIONS**

2        157.    Plaintiffs bring this action as a class action on their own behalf and on behalf of all

3   other persons similarly situated as members of the proposed subclasses and seek to certify and

4   maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and/or (b)(3) of the Federal

5   Rules of Civil Procedure, subject to amendment and additional discovery as follows:

6                                          Class Definitions

7        *Putative Class*: All behavioral healthcare providers who, between May 22, 2011
         and January 31, 2019 were denied payment and/or reimbursement on claims by
8        UBH for behavioral healthcare services; where such denials were based on the
         application UBH's Level of Care Guidelines and/or UBH's Coverage
9        Determination Guidelines; and where such claims remain unpaid.

10       *Size of Class*. The members of the class defined above are so numerous that joinder
         of all members is impracticable. The precise number of members in the class is
11       known only to UBH and Plaintiffs reasonably believe that the class number exceeds
         10,000.
12
         *Class Representatives*. Named Plaintiffs, Meridian Treatment Centers, Serenity
13       Palms, and Harmony Hollywood each provided MH/SUD services subject to the
         same UBH Guidelines as in *Wit*. Each Named Plaintiff engaged in industry standard
14       practices in each phase of administering treatment, billing, and following up on
         claims. Each Named Plaintiff billed for services according to standard, uniform,
15       medical coding. Each named plaintiff was uncompensated for claims based on
         illegal decision-making guidelines. Each named plaintiff is entitled to relief in the
16       form of claims reprocessing.

17       Excluded from the Class are:

18       i. Defendants, including any entity or division in which Defendants have a
         controlling interest, along with their legal representative, employees, officers,
19       directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or
         affiliates;
20
         ii. The Judge to whom this case is assigned, the Judge's staff, and the Judge's
21       immediate family;

22       iii. Any class counsel or their immediate family members; and

23       iv. All governmental entities.

24       158.    Plaintiffs reserve the right to amend the Class definition if discovery and further

25   investigation reveal that any Class should be expanded, divided into additional subclasses, or

26   modified in any other way.

27

28

CLASS ACTION COMPLAINT

1          <u>Numerosity and Ascertainability</u>

2          159.    This action meets the numerosity requirement of Fed. R. Civ. P. 23(a)(1), given that

3    the number of impacted providers are reasonably believed by the Plaintiffs to exceed ten thousand

4    making individual joinder of class members' respective claims impracticable. While the exact

5    number of class members is not yet known, a precise number can be ascertained from UBH's

6    records for denied MH/SUD claims made using illegal guidelines from 2011-2019.

7          160.    The resolution of the claims of the class members in a single action will provide

8    substantial benefits to all parties and the Court. It is expected that the class members will number

9    at least in the tens of thousands.

10         161.    Finally, Class members can be notified of the pendency of this action by Court-

11   approved notice methods.

12                                          <u>Typicality</u>

13         162.    Pursuant to Federal Rules of Civil Procedure 23(a)(3), Plaintiffs' claims are typical

14   of the claims of class members and arise from the same course of conduct by Defendants. Plaintiffs'

15   persons and real property, like all Class Members, have been damaged by UBH's misconduct in

16   that they have incurred damages and losses related to the claims wrongfully denied by UBH after

17   services had already been rendered through the use of illegal Guidelines.

18         163.    Furthermore, the factual basis of Defendants' actions and misconduct are common

19   to all Class Members and represent a common thread of misconduct resulting in common injury to

20   all Class Members. The relief Plaintiffs seek is typical of the relief sought for absent Class

21   Members.

22                                  <u>Adequacy of Representation</u>

23         164.    Plaintiffs will serve as fair and adequate class representatives as their interests, as

24   well as the interests of their counsel, do not conflict with the interest of other members of the class

25   they seek to represent.

26         165.    Further, Plaintiffs have retained counsel competent and well experienced in class

27   action, multi-district litigation, mass tort, insurance, pharmaceutical and environmental tort

28   litigation.

CLASS ACTION COMPLAINT

166.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither the Plaintiffs nor their counsel have interests adverse to the Class.

<u>Predominance of Common Issues</u>

167.    There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, making it appropriate to bring this action under Rule 23(b)(3). The answers to these common questions will advance resolution of the litigation as to all Class Members. Common legal and factual issues include:

a.    Whether UBH engaged in verifications of benefits (VOB) conversations with a provider prior to the insured receiving treatment.

b.    What level of treatment UBH authorized in VOB conversations.

c.    Whether UBH authorized treatment in utilization review and UCR conversations.

d.    What level of treatment was provided to the member.

e.    What payments were made to providers.

f.    Whether partial payments were made based on a lower level of care than was received by the member.

g.    What guidelines UBH used in determining MH/SUD benefits.

h.    What guidelines UBH used in determining MH/SUD coverage.

i.    What guidelines UBH used in determining "Level of Care."

j.    Whether such guidelines applied appropriate standards.

k.    Whether such guidelines provided appropriate care for members.

l.    Whether UBH intentionally delayed in processing claims.

m.    Whether UBH intentionally delayed in denying claims.

n.    Whether UBH delayed level of care decisions knowing that its members would continue to receive care until such decision was made.

o.    Whether UBH retroactively denied authorizations, knowing that its members had already received care, to save from paying benefits expenses.

p.    Whether UBH is liable to Plaintiffs and the Class for their actions.

q.  Whether UBH is required to reprocess all MH/SUD denials made under the illegal Guidelines via a Special Master or neutral third-party.

<u>Superiority</u>

168.  The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case. Given the great number of providers across the nation, it is impracticable for Plaintiffs and the Class to individually litigate their respective claims due to the risk of inconsistent or contradictory judgments, generating increased delays and expense, and wasting judicial resources. No unusual difficulties are likely to be encountered in the management of this class action. Therefore, the class action mechanism presents considerably less management challenges and provides the efficiency of a single adjudication under the comprehensive oversight of a single court.

## CAUSES OF ACTION

169.  Plaintiffs do not bring a cause of action under ERISA as the claims do not arise under and are not preempted by ERISA. A large percentage of the claims which underlie this law suit do not involve ERISA plans. *See* ¶ 106 *supra.*

170.  Second, The U.S. Supreme Court has established a clear test for determining whether a state-law claim is completely preempted by ERISA in *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004). Under *Davila,* there is no preemption as Plaintiffs have no inherent ability to bring a claim directly against UBH absent an independent cause of action. Additionally, Plaintiffs' causes of action all arise under contracts (written, oral, and/or implied) between Plaintiffs and UBH. For OON providers amounts due under oral and implied contracts do not satisfy the *Davila* test. *See Marin Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941, 948 (9th Cir. 2009).

171.  Plaintiffs and the Plaintiff Classes' claims rely on the violation duties that arise independently of an ERISA plan. *See Hansen v. Grp. Health Coop.*, 902 F.3d 1051 (9th Cir. 2018); *Marin Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941 (9th Cir. 2009). As such the claim is not preempted by ERISA. The causes of action asserted below are brought on behalf of providers for duties created extrinsic to the ERISA plans.

CLASS ACTION COMPLAINT

1

**COUNT I:**

2

**UNFAIR BUSINESS PRACTICES**

3       172.    Plaintiffs re-allege and incorporate the factual allegations above, as though such

4   allegations were fully stated herein.

5       173.    Plaintiffs bring Count I under Cal. Civ. Code §§ 17200 *et seq.*, California's Unfair

6   Competition Law ("UCL") for damages they sustained from Defendant's unlawful business

7   practices based on the conduct including that alleged above in paragraphs 1-144 and below in counts

8   II-VIII, and under Cal. Civ. Code § 3294 for punitive damages arising from the acts and based on

9   the conduct including that alleged above in paragraphs 1 through 156 and below in counts II-VIII.

10      174.    As a California corporation, UBH is subject to Cal. Civ. Code §§17200 *et seq*.

11      175.    Under the UCL "unlawful, unfair or fraudulent business act[s] or practice[s]" are

12  prohibited.

13      176.    The UCL's coverage for "an unlawful business practice" is broad, and embraces

14  "anything that can properly be called a business practice and that at the same time is forbidden by

15  law." *See Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1102 (S.D. Cal.

16  2017) *citing Cel–Tech Commc'ns v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180, 83 Cal.Rptr.2d

17  548, 973 P.2d 527 (1999).

18      177.    In *Wit* cited *supra*, the court found United's Guidelines to be illegal.

19      178.    Additionally, UBH violated the Paul Wellstone and Pete Domenici Mental Health

20  Parity and Addiction Equity Act of 2008, 42 U.S.C. § 300gg-26, as UBH's use of illegal Guidelines

21  in making decisions on clinical necessity for MH/SUD were more restrictive than those applied in

22  making decisions about coverage of medical/surgical services. UBH's MH/SUD guidelines used

23  profit, not medical necessity, as their basis.

24      179.    UBH violated the anti-discrimination mandate within the Affordable Care Act at 42

25  U.S.C. § 300gg-5 by discriminating against Plaintiffs and class members who provided services to

26  patients suffering from MH/SUD disorders based on illegal clinical necessity criteria that was

27  asymmetric to medical/surgical criteria, and that placed profit above patient well-being.

28

CLASS ACTION COMPLAINT

180.    UBH violated the California Mental Health Parity Act, incorporated into the Knox-Keene Health Care Service Plan Act at Cal. Health & Safety Code § 1374.72. UBH violated the Act as many of the claims at issue in the present litigation involve patients that are dual-diagnosis[9] with the "severe mental illnesses" included in the Act[10].

181.    UBH engaged in acts and practices that offend public policy and are immoral, unethical, oppressive and substantially injurious to consumers as stated in counts I-VIII.

182.    UBH's unfair acts and practices specified in counts I-VIII enriched UBH and irrevocably harmed Plaintiffs and class members.

## COUNT II:

## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

183.    Plaintiffs re-allege and incorporate the factual allegations above, as though such allegations were fully stated herein.

184.    Plaintiffs bring Count II under California common law cause of action for Breach of the Implied Duty of Good Faith and Fair Dealing to recover restitution and punitive damages resulting from such breach.

185.    Between 2011 and 2019 Plaintiffs and all others similarly situated entered into implied or written contracts with UBH to provide treatment services to their insureds in exchange for payment of benefits.

186.    Plaintiffs, and all others similarly situated, did all, or substantially all of the things that the contract required them to do when they provided healthcare for the benefit of UBH's insureds.

---

[9] Dual diagnosis (also referred to as co-occurring disorders) is a term for when a patient experiences a mental illness and a substance use disorder simultaneously. Either disorder—substance use or mental illness—can develop first. People experiencing a mental health condition may turn to alcohol or other drugs as a form of self-medication to improve the mental health symptoms they experience. However, research shows that alcohol and other drugs worsen the symptoms of mental illnesses. NAMI, Dual-Diagnosis, https://www.nami.org/learn-more/mental-health-conditions/related-conditions/dual-diagnosis (last visited Aug 12, 2019).

[10] (1) Schizophrenia. (2) Schizoaffective disorder. (3) Bipolar disorder (manic-depressive illness). (4) Major depressive disorders. (5) Panic disorder. (6) Obsessive-compulsive disorder. (7) Pervasive developmental disorder or autism. (8) Anorexia nervosa. (9) Bulimia nervosa. Cal. Health & Safety Code § 1374.72.

CLASS ACTION COMPLAINT

187.     Plaintiffs met all conditions required for UBH's performance.

188.     UBH unfairly interfered with Plaintiffs' right to receive the benefits of the contract by illegally denying pre-authorization and/or coverage for clinically necessary services.

189.     Plaintiffs and class members were harmed by UBH's conduct because they remain unpaid for medically necessary care they provided.

## COUNT III:

## BREACH OF IMPLIED CONTRACT

190.     Plaintiffs re-allege and incorporate the factual allegations above, as though such allegations were fully stated herein.

191.     Based on the conduct alleged above, including that alleged above in paragraphs 1-156, an implied in fact contracts exist whereby Plaintiff would provide medically necessary substance abuse treatment to UBH's insureds in exchange for reimbursement at Usual, Customary and Reasonable rates. Plaintiffs have performed all conditions, covenants, and promises required to be performed in accordance with the terms and conditions of said contracts/agreements except, if applicable, those that have been excused, waived or are otherwise inapplicable.

192.     UBH breached the implied in fact contracts, by way of example and without limitation, engaging in the conduct alleged above.

193.     As a proximate and direct result of the UBH's breach of contract, Plaintiffs and class members have suffered, and will continue to suffer in the future, damages subject to proof at the time of trial.

## COUNT IV:

## INTENTIONAL MISREPRESENTATION

194.     Plaintiffs re-allege and incorporate the factual allegations above, as though such allegations were fully stated herein.

195.     Plaintiffs bring Count IV under Cal. Civ. Code, § 1701(1) for Intentional Misrepresentation.

196.     UBH represented to Plaintiff that UBH intended to indemnify or otherwise pay for medically necessary healthcare services that Plaintiff provided for the benefit of UBH.

41

197.    UBH did not intend to pay Plaintiffs for the healthcare that Plaintiffs provided.

198.    UBH knew that its representation of intent to pay was false when made, and alternatively, UBH made the representation recklessly without regard for the truth.

199.    Plaintiffs reasonably relied on UBH's representation of intent to cover services pursuant to fair and reasonable level of care guidelines when Plaintiffs agreed to provide healthcare for UBH's insureds benefit.

200.    Plaintiffs, and all others similarly situated, were harmed by UBH's representation because they were never compensated for care that they bore the expense of providing.

201.    Plaintiffs and class members substantially relied on UBH's representation of intent to cover services when they agreed to render services for the benefit of UBH and its members.

## COUNT V:

## NEGLIGENT MISREPRESENTATION

202.    Plaintiffs re-allege and incorporate the factual allegations above, as though such allegations were fully stated herein.

203.    Plaintiffs bring Count V under Cal. Civ. Code § 1710 for negligent misrepresentation.

204.    As a California corporation defendant United Behavioral Health is subject to Cal. Civ. Code § 1710.

205.    The remaining defendants are subject to Cal. Civ. Code § 1710 as other states laws are substantially similar.

206.    UBH represented to Plaintiffs and UBH's insureds that UBH truly intended to pay healthcare benefits for healthcare services Plaintiffs provided for UBH's insureds.

207.    UBH's representation of its intent pay healthcare benefits was untrue.

208.    Plaintiffs reasonably relied on UBH's representation when they agreed to provide healthcare for UBH's insureds.

209.    Plaintiffs were harmed by bearing the cost of the care they provided for UBH's insureds, and by bearing the administrative costs of seeking redress.

CLASS ACTION COMPLAINT

210. Plaintiffs and class members' reliance on UBH's representation was a substantial factor in causing Plaintiffs' harm.

<u>**COUNT VI:**</u>

<u>**CONCEALMENT**</u>

211. Plaintiffs re-allege and incorporate the factual allegations above, as though such allegations were fully stated herein.

212. Plaintiffs bring Count VI under Cal. Civ. Code 1703(c) for damages resulting from fraudulent Concealment.

213. As a California corporation defendant United Behavioral Health is subject to Cal. Civ. Code § 1703(c).

214. UBH disclosed some facts to Plaintiffs about their intent to cover MH/SUD services but intentionally failed to disclose other facts (that its definition of clinical necessity was more restrictive than ASAM guidelines as more fully described above) that made its disclosure deceptive.

215. Plaintiffs did not know that UBH intended to use profit-based and and illegal level of care guidelines to deny payments.

216. UBH intended to deceive Plaintiffs and class members by concealing facts about its actual intent to cover clinically necessary services as understood and generally accepted in the industry.

<u>**COUNT VII:**</u>

<u>**INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**</u>

217. Plaintiffs re-allege and incorporate the factual allegations above, as though such allegations were fully stated herein.

218. Plaintiffs bring Count VII under California common law as a cause of action for Intentional Interference with Contractual Relations such that the reprocessing of Plaintiffs and the Plaintiff Class members' claims necessitate reprocessing by a Special Master or neutral third-party. under appropriate guidelines.

219. A valid contract existed between Plaintiffs and UBH's insureds which guaranteed payment in full for medically necessary care received by UBH's insureds.

43

220.   UBH knew of this contract.

221.   UBH intentionally disrupted this contract by refusing to authorize and/or provide coverage for medically necessary services.

222.   UBH intentionally used guidelines it created to maximize its own profits by denying coverage for its insureds receiving medically necessary care and treatment.

223.   Plaintiffs and class members were irrevocably harmed by the breach in the amount of benefits they were wrongly denied.

## COUNT VIII:

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

224.   Plaintiffs re-allege and incorporate the factual allegations above, as though such allegations were fully stated herein.

225.   Plaintiffs bring Count VIII under California common law as a cause of action for Intentional Interference with Prospective Economic Relations necessitating reprocessing of Plaintiffs and the Plaintiff Classes' denied claims by a Special Master or neutral-third party and for punitive damages resulting from such interference.

226.   Plaintiffs, and all others similarly situated, and UBH's insureds and beneficiaries of plans administered by UBH, had an economic relationship that would have resulted in an economic benefit to Plaintiffs.

227.   UBH knew of the relationship between Plaintiffs and their patients who were UBH's insureds or indemnified under plans administered by UBH.

228.   UBH engaged in wrongful conduct when it refused to authorize and pay for MH/SUD services based on illegal Guidelines after such services were already provided.

229.   UBH engaged in wrongful conduct with the intention of disrupting Plaintiffs and the Plaintiff Classes' business model based on payment for medically necessary services rendered. UBH knew with reasonable certainty that its wrongful conduct would interfere with this.

230.   UBH did cause the relationship between Plaintiffs and UBH's insureds to be disrupted.

CLASS ACTION COMPLAINT

231.    UBH's conduct was a substantial factor in causing irrevocable economic harm to Plaintiffs and all those similarly situated.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs and the Class demand judgment against Defendant, and each of them, jointly and severally, and request the following relief from the Court:

A.      an award certifying the Class;

B.      a declaration that UBH acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health and safety their insureds;

C.      an order requiring that the reprocessing of all claims denied or underpaid on the basis of its illegal guidelines for where Plaintiffs provided treatment to UBH's insureds by a Special Master or neutral third-party at Defendant's expense;

D.      an award to Plaintiffs and the Class of injunctive and punitive damages;

E.      an order for an award of attorney fees and costs, as provided by law;

F.      an award of pre-judgment and post-judgment interest as provided by law; and

G.      an order for all such other relief the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of any and all issues in this matter so triable.

## [Signature page follows]

CLASS ACTION COMPLAINT

1

2      Dated: September 11, 2019                 Respectfully submitted,

3                                                NAPOLI SHKOLNIK PLLC

4                                                By: /s/ Jennifer R. Liakos

5                                                Jennifer R. Liakos, Esq. (CA 207487)
6                                                5757 W. Century Blvd., Suite 680
                                                 Los Angeles, CA 90045
7                                                (212) 397-1000 / Fax (646) 843-7603
                                                 jliakos@napolilaw.com
8
                                                 Matthew M. Lavin, Esq. (*pro hac vice forthcoming*)
9                                                1750 Tysons Blvd., Suite 1500
                                                 McLean, VA 22102
10                                               (212) 397-1000 / Fax (646) 843-7603
                                                 mlavin@napolilaw.com
11
12                                               *Attorneys for Plaintiffs and the Putative Classes*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT