Matthew M. Lavin, Esq. (*pro hac vice*)
Aaron R. Modiano, Esq. (*pro hac vice*)
NAPOLI SHKOLNIK PLLC
5757 W. Century Boulevard, Suite 680
Los Angeles, CA 90045
(212) 397-1000
Fax (646) 843-7603

Katie Spielman, Esq.
David Lilienstein, Esq.
DL LAW GROUP
345 Franklin Street
San Francisco, CA 94102
(415) 678-5050
Fax (415) 358-8484

*Attorneys for Plaintiffs*

MERIDIAN TREATMENT SOLUTIONS, INC.,
DESERT COVE RECOVERY, LLC, and
HARMONY HOLLYWOOD LLC,
*on behalf of themselves and all others similarly situated.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| MERIDIAN TREATMENT SERVICES, *et al.*,<br><br>         Plaintiffs,<br><br>    vs.<br><br>UNITED BEHAVIORAL HEALTH (operating as OPTUMHEALTH BEHAVIORAL SOLUTIONS),<br><br>         Defendant. | **Case No.: 4:19-cv-05721-JSW**<br><br>**PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................. 1

INTRODUCTION ......................................................................................................... 1

SUMMARY OF PLAINTIFFS' ALLEGATIONS ...................................................... 5

BACKGROUND ......................................................................................................... 10

   a.   Medical Necessity .............................................................................................. 10

   b.   The ASAM Criteria & Its Background ............................................................. 11

   c.   UBH's Guidelines .............................................................................................. 15

   d.   Findings in the *Wit* Decision ............................................................................ 15

   e.   UBH's Actions Harmed Plaintiffs and Class ................................................... 20

PARTIES .................................................................................................................... 20

JURISDICTION ......................................................................................................... 21

   a.   Subject Matter Jurisdiction .............................................................................. 21

   b.   Personal Jurisdiction ......................................................................................... 22

VENUE ....................................................................................................................... 22

FACTUAL ALLEGATIONS AS TO ALL COUNTS .............................................. 22

   a.   Allegations Common to All Parties .................................................................. 22

   b.   Factual Allegations Regarding Facility Meridian Treatment Center..... **Error! Bookmark not defined.**

   c.   Factual Allegations Regarding Harmony Hollywood..............**Error! Bookmark not defined.**

   d.   Factual Allegations Regarding Desert Cove Recovery............**Error! Bookmark not defined.**

RICO ALLEGATIONS ............................................................................................... 45

   a.   Overview ............................................................................................................ 50

   b.   The Behavioral Policy Analytics Committee.................................................... 52
      b.i.   Actions of Individual Members of BPAC ................................................. 56

   c.   The Enterprise Fraudulently Avoids Paying Valid, Medically Necessary Claims. ................. 62
      c.i.   Post-Rejection Concealment ....................................................................... 63
      c.ii.   Claims Processing ...................................................................................... 63

   d.   Defendants' False Statements ...............................................**Error! Bookmark not defined.**
      d.i.   General Misrepresentations .........................................**Error! Bookmark not defined.**

e.   Defendants Racketeering Acts and Underpayment of Claims ................................ 64
     (1)   Predicate Acts ..................................................................... 65
     (2)   Fraudulent Representations Using the Mail and Wires ............................ 71
     (3)   RICO Proximate Cause ............................................................ 71

A.   The Continuing Nationwide Pattern and Other Victims Affected ......... **Error! Bookmark not defined.**

f.   UBH's Pattern of Racketeering Activity .................................**Error! Bookmark not defined.**
     Relatedness...........................................................................**Error! Bookmark not defined.**
     Continuity............................................................................**Error! Bookmark not defined.**
     UBH Illegally Profited from the Repeated Use of the Mails and Wires for its Fraud..... **Error! Bookmark not defined.**

CLASS ACTION ALLEGATIONS ........................................................................ 72

a.   Class Definitions ................................................................................ 72

b.   Numerosity and Ascertainability .......................................................... 73

c.   Typicality ........................................................................................ 73

d.   Adequacy of Representation ................................................................ 73

e.   Predominance of Common Issues .......................................................... 74

f.   Superiority........................................................................................ 75

CAUSES OF ACTION ................................................................................... 75

Count I:    Violation of RICO, 18 U.S.C. § 1962(c) (as against all Defendants)........................ 76

Count II:    Violation of RICO conspiracy, 18 U.S.C. § 1962(d) (as against all Defendants)..... 78

PLAINTIFFS' STATE LAW CAUSES OF ACTION ................................................ 78

Count III:    UNFAIR BUSINESS PRACTICES ................................................... 80

Count IV: BREACH OF IMPLIED CONTRACT ....................................................... 82

Count V:    BREACH OF ORAL CONTRACT ...................................................... 83

Count VI:    PROMISSORY ESTOPPEL ............................................................ 84

Count VII:    INTENTIONAL MISREPRESENTATION ............................................. 85

Count VIII    NEGLIGENT MISREPRESENTATION ................................................ 86

Count IX:    CONCEALMENT......................................................................... 87

Count X:    INTENTIONAL INTERFERENCE IN PROSPECTIVE ECONOMIC RELATIONS 88

PRAYER FOR RELIEF ................................................................................... 89

JURY DEMAND .................................................................................................................... 90

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Meridian Treatment Solutions, Inc., ("Meridian), Harmony Hollywood, LLC, ("Harmony"), and Desert Cove Recovery, LLC. ("Desert Cove") (collectively "Plaintiffs"), complain on their own behalves and jointly, on behalf of all others similarly situated, against United Behavioral Health ("UBH") (operating as OptumHealth Behavioral Solutions), and allege the following:

## INTRODUCTION

1.      Plaintiffs bring this case on behalf of themselves and all others similarly situated because their businesses cannot withstand United Behavioral Health's ("UBH") denial of medically necessary claims for treatment provided to its insureds.

2.      Plaintiffs' patients suffer from mental health and substance use disorder ("MH/SUD") conditions. Plaintiffs render medically necessary services for MH/SUD treatment.

3.      UBH sells and/or administers health insurance services to tens of millions of customers each year.

4.      UBH insured the patients that Plaintiffs treated.[1] All of the patients whose claims are at issue in this litigation had health insurance from UBH that provided reimbursement for claims from out-of-network ("OON") treatment providers.

5.      All of the Plaintiffs and the class that they represent are OON providers.

6.      UBH's insureds rely on UBH to provide reimbursement for the medically necessary care they receive.

7.      Between May 22, 2011 and January 31, 2019, UBH represented to Plaintiffs, patients, plan sponsors, and the public that it would provide reimbursement for medically necessary MH/SUD treatment.

8.      This was a deliberate misrepresentation and deception. The internal, company-wide guidelines that UBH promulgated to make determinations of medical necessity were driven by UBH's profit concerns, not the medical necessity of a patient.

---

[1] UBH is the claims arbiter for various insurance arrangements, some of which fall outside the classic definition of "insurance." The term "health insurance" and "insured" is used for convenience and clarity.

9.     UBH's deceptive "medical necessity" denials left providers bearing the cost of treatment for all of the claims at issue here.

10.     "Medical Necessity" is a well understood term throughout the medical profession. For example, the State of California set forth five specific factors that apply when evaluating "medical necessity" decisions. These are:

(1) Peer-reviewed scientific and medical evidence regarding the effectiveness of the disputed service.

(2) Nationally recognized professional standards.

(3) Expert opinion.

(4) Generally accepted standards of medical practice.

(5) Treatments that are likely to provide a benefit to a patient for conditions for which other treatments are not clinically efficacious. [Cal. Health & Safety Code § 1374.33]

11.     The patient's cost of treatment does not appear in these standards.

12.     In the specialty of addiction medicine and substance use treatment, the professional standards developed by the American Society of Addiction Medicine (ASAM), are nationally recognized and generally accepted standards for determining appropriate treatment settings and levels of care for the treatment of substance use disorders.

13.     When Plaintiffs provided treatment to UBH's insureds, they provided treatment to their patients based on their determination of medical necessity. They expected and understood that any review of their decisions regarding medical necessity would be in accord with generally accepted standards in the medical community such as the above.

14.     California's Health & Safety Code, *supra*, reflects the generally understood standard for determinations of medical necessity nationally.

15.     As the largest provider of healthcare insurance in the nation, UBH is aware of the meaning of the term "medical necessity" as it is used in the profession.

16.     UBH's internal medical necessity guidelines were not developed based on generally accepted standards of care in the medical community, but rather by accountants, financial committees, and underwriters based on profits.

17.     In developing its internal medical necessity coverage guidelines, UBH disregarded the opinions and advice of its own clinicians in favor of its its financial and underwriting departments and committees. By disregarding their own clinicians' interpretation of medical necessity, UBH's coverage guidelines no longer reflected "medical necessity" as it is understood in the healthcare industry.

18.     UBH never told Plaintiffs or anyone outside of UBH that its medical necessity determinations were made and driven by guidelines based on increasing UBH's profits.

19.     Instead, UBH said claims were evaluated based solely on medical necessity. UBH asserted that it made treatment authorization decisions based on medical necessity millions of times. Every single one of those assertions was untrue. UBH's practice of lying caused direct harm to Plaintiffs, who paid the price for medically necessary claims that UBH refused to pay for financial, rather than medical, reasons. This case seeks to redress the harm that UBH's fraud and deception caused to healthcare providers by having each and every denied claim reprocessed according to *actual* medical necessity standards.

20.     That United misrepresented the basis of its medical necessity determinations is already established.

21.     On March 5, 2019, Magistrate Judge Spero of this Court entered Findings of Fact and Conclusions of Law in *Wit, et al. v. United Behavioral Health*, No. 14-CV-02346-JCS (hereinafter "Wit"). In that decision, Judge Spero specifically found that, for many years, UBH denied claims via a rubric based on profit and cost saving rather than the actual clinical needs of its members who suffered from mental health and/or substance use disorders. Plaintiffs were harmed by UBH's practice of refusing to cover medically necessary Mental Health and Substance Use Disorder treatment because they ultimately footed the bill for the care UBH's insureds received.

- 3 -

22.     As set forth in *Wit*, the guidelines referred to are UBH's Level of Care Guidelines ("LOCGs") and Coverage Determination Guidelines ("CDGs"). Collectively these are referred to as UBH's "guidelines."

23.     On August 6, 2020, Magistrate Spero entered Further Findings of Fact and Conclusions of Law evaluating CDG's stating that "[b]ecause the CDGs discussed above incorporate UBH's LOCGs, which the Court has found to be more restrictive than generally accepted standards of care, UBH's use of these CDGs to make benefits determinations was wrongful for the same reasons its use of the LOCGs was wrongful. [*Id.* ECF 469].

24.     Plaintiffs incorporate the entirety of the *Wit* findings herein by reference.

25.     This case is brought specifically on behalf of the providers that UBH injured.

26.     UBH caused this nationwide harm by applying, for every MH/SUD claim, guidelines that determined medical necessity based on actuarial predictability instead of medical necessity.

27.     Therefore, Plaintiffs, and the class they seek to represent, ask this Court to enter a judgment requiring a neutral third-party overseen and appointed by the Court to reprocess all denied claims from OON behavioral health providers that UBH denied based on the illegal, discredited guidelines. This action also seeks punitive damages pursuant to California law.

28.     The Plaintiffs and putative class did not discover that the denials were the result of improper guidelines until the entry of this Court's decision in *Wit* on March 5, 2019.

29.     The potential dollar amount of wrongfully denied payments owed to Plaintiffs and the class is substantial. The three named Plaintiffs treated 157 patients with over 2,000 collective claims that UBH denied using their discredited medical necessity guidelines from 2011 through January 31, 2019.

30.     Plaintiffs' denied claims exceed $5 million dollars.

31.     Plaintiffs estimate that the number of providers affected by the *Wit* decisions, including both individual providers and facilities, is in the tens of thousands and includes all licensed behavioral healthcare providers in the United States who accepted patients with UBH insurance during the *Wit* class period through January 31, 2019. Based on extrapolation of data known to

- 4 -

Plaintiffs, Plaintiffs believe that the total value, class-wide, of claims denied by UBH under the Guidelines may exceed $9.3 billion dollars.

32.    All denied claims at issue were either exhaustively appealed, the appeals were ignored, or further appeals would have been futile. Plaintiffs and the class they seek to represent have no recourse other than bringing this action.

33.    As shown in *Wit*, UBH violated its independent duty to providers when it misrepresented its claims' evaluation standards. As set forth in detail below, Plaintiffs asked repeatedly about the criteria for payment. UBH repeatedly represented it would reimburse medically necessary services.

34.    Every such representation was a misrepresentation as UBH knew that its "medical necessity" determinations were based on a hidden, illegal, profit-driven scheme and not actual medical necessity.

35.    The level of care and coverage decision guidelines underlying all of UBH's medical necessity decisions were shaped by financial considerations not established, accepted clinical standards.

36.    Faced with a past and present deluge of UBH members suffering from mental health disorders and addiction, and billions of dollars in illegally evaluated and unreimbursed treatment claims, many providers across the country, most of whom are small and community-based, are on the verge of insolvency or bankruptcy or have already been forced out of business.

37.    At the same time, in 2018, UBH's parent company, UnitedHealth Group has reported profits of $12 billion dollars on $226 billion dollars in revenue for that year[2].

38.    This lawsuit seeks to have reimbursement for medically necessary MH/SUD claims determined based on *actual* medical necessity instead of UBH's stock price.

## SUMMARY OF PLAINTIFFS' ALLEGATIONS

39.    Plaintiffs and the putative class consist of more than ten thousand similarly situated treatment centers across the United States.

---

[2] Fortune 500, United Health Group: https://fortune.com/fortune500/2019/unitedhealth-group (last accessed Sep. 10, 2019).

40.     Plaintiffs and the putative class provide sub-acute mental health and substance use disorder services.

41.     Plaintiffs and the putative class are all out-of-network providers with UBH.

42.     Sub-acute care is healthcare that is provided outside of a hospital.

43.     Defendant United Behavioral Health ("UBH" or "Defendant") is responsible for making coverage and level of care determinations that UnitedHealth Group or its subsidiaries' insureds receive. UBH decides whether a patient is entitled to indemnification.

44.     UBH makes Mental Health / Substance Use Disorder (MH/SUD) coverage and level of care decisions for plans issued, administered, underwritten, and/or otherwise managed by UnitedHealth Group and/or its subsidiaries.

45.     At issue here is the MH/SUD treatment that Plaintiffs and the putative class provided to UBH's insureds and/or beneficiaries from May 22, 2011 through January 31, 2019.

46.     Each and every one of these insureds received care that clinicians determined was medically necessary, but that whose claims were later denied based on level of care determinations made using defective guidelines.

47.     The guidelines were proprietary to UBH and kept hidden from the patients, providers, and even, when applicable, plan sponsors. Plan sponsors are typically employers or unions who negotiate health insurance arrangements for their employees.

48.     By obscuring their Level of Care Guideline (LOCGs) and Coverage Decision Guidelines (CDGs), UBH was able to deceive all of the parties to its services, including Plaintiffs and the class they seek to represent, into wrongly thinking claims were evaluated based on medical necessity.

49.     The guidelines UBH used were found by this Court to be unlawful in *Wit*, because they did not reflect *actual* medical necessity and were developed subject to approval of UBH's financial decision makers.

50.     The Court in *Wit* held UBH based its coverage and level of care decisions on the benefit expense ("benex") UBH would incur rather than on generally accepted, clinical standards of medical necessity.

51.    The *Wit* Court's holdings apply to all of UBH's decision-making as the guidelines were used for all plans and all patients. The Court specifically found that UBH's guidelines were not plan terms.

52.    *Wit* seeks to address the fraud and redress the harm caused to UBH's insureds and beneficiaries who paid out of their own pockets for the treatment received.

53.    Most patients cannot shoulder the full costs of MH/SUD treatment and, in this vast majority of cases, it is the provider that bears the full cost of treatment services.

54.    This matter seeks to address the fraud and redress the harm that UBH caused to providers like Plaintiffs and the putative class.

55.    The harm that UBH caused to the Plaintiffs and the putative class is their inappropriate and fraudulent denial of valid, medically necessary care at the appropriate medically necessary level of care.

56.    These denials fall broadly into three categories: 1) pre-service denials where UBH required pre-authorization for treatment, authorization was sought, treatment was commenced, but authorization and the claim was denied as not medically necessary; 2) post-service denials where pre-authorization was not required for the medically necessary treatment provided but UBH subsequently denied the claim as not medically necessary; and, 3) fraudulent administrative denials where UBH denied claims with a stated reason of "services not rendered" ("SNR") based on alleged deficiencies in the patient's medical records when such demands were imposed for the purpose of decreasing benefit expenditure and denying valid, medically necessary claims.

57.    As UBH's guidelines were created to discourage rather than encourage medically necessary MH/SUD treatment, UBH intentionally pocketed premiums in exchange for largely empty promises. All the while, those patients who actually sought help, often at some of the lowest, most desperate times of their life, were denied it by those tasked with ensuring they received medically necessary care.

58.    As a California Corporation, UBH has a legal duty to act legally, ethically, and with regard for the public's interest under Cal. Civ. Code §§17200 et seq. Through its practice of applying profit-oriented guidelines to restrict access to care that was medically necessary, and by applying

those guidelines specifically to behavioral health treatment patients and providers, UBH breached these legal duties.

59.    Plaintiffs and the putative class provided medically necessary treatment to UBH's insureds because of UBH's promises.

60.    UBH promised to provide reimbursement for medically necessary treatment.

61.    Plaintiffs bring these claims on their own behalf because Plaintiffs sustained substantial injuries as a result of UBH's application of defective guidelines.

62.    Plaintiffs and the putative class reasonably relied on UBH's promises and provided treatment because of them. *See California Spine and Neurosurgery Institute v. Oxford Health Insurance*, 2019 WL 6171040 (N.D. Cal 2019).

63.    These promises occurred before treatment was first provided in the form of Verification of Benefit ("VOB") and authorization calls, written and oral communications, and while treatment was occurring in the form of repeated authorizations provided both orally and in writing.

64.    For some patients and services, UBH conditioned payment on pre-authorization. A UBH representative would pre-authorize care that they believed was covered under UBH's defective guidelines.

65.    When Plaintiffs failed to secure UBH's pre-authorization for a service Plaintiffs' clinicians believed was medically necessary, Plaintiffs appealed UBH's denial. That process took weeks, sometimes over a month. During the pendency of the appeal process, Plaintiffs continued to provide medically necessary treatment.

66.    Any time UBH upheld its initial denials of prior authorizations it did so based on its defective guidelines. When UBH upheld its pre-authorization denials, it provided no coverage for its insureds. Claims denied for want of pre-authorization are relevant to this case when Plaintiffs were forced to pay the cost of the services provided to UBH's insureds whose claims' denials stemmed from the application of UBH's faulty guidelines.

67.    Other times, UBH did not require pre-authorization for services and merely stated that payment of claims was conditioned on medical necessity.

- 8 -

68.     Plaintiffs and those similarly situated provided services that their clinicians deemed medically necessary.

69.     In most cases it was only *after* services were rendered did UBH decide that its insureds' conditions did not meet its defective medical necessity criteria.

70.     When UBH denied coverage and patients could not pay for care out of pocket, Plaintiffs were forced to incur and bear the costs of the services provided to UBH's insureds whose claims' denials stemmed from the application of UBH's faulty guidelines.

71.     In a similar but not identical situation, UBH would also pre-authorize services, wait for Plaintiffs and those similarly situated to provide services, then request comprehensive medical records.

72.     UBH then compared the submitted records to its guidelines, and deny claims for incongruity with its defective medical necessity guidelines.

73.     When this happened, UBH's insureds had no coverage for the services they received.

74.     As the vast majority of UBH's insureds did not and could not self-pay for the services they received from Plaintiffs, it was the Plaintiffs who bore the entire cost of the services UBH's insureds received.

75.     In each of these scenarios, UBH's application of deficient medical necessity guidelines harmed Plaintiffs and the class they seek to represent.

76.     UBH kept hidden the guidelines it used to determine medical necessity. UBH's decisions were based on cost-containment and shareholder value, not medical necessity.

77.     UBH obscured its criteria and guidelines because it knew they were incongruent with the meaning of medical necessity.

78.     UBH's guidelines were derived from financial policies disguised as coverage decision and level of care guidelines.

79.     As described more fully below, the creation, implementation, and representations that UBH made regarding claims that were denied based on these guidelines form an extensive scheme to defraud, did defraud Plaintiffs and the putative class, costing them estimated billions of dollars in unreimbursed claims.

80.     Plaintiffs and all those similarly situated bring this action to achieve redress for the harm they suffered as a result of Defendant's illegal and fraudulent practices.

## BACKGROUND

81.     This case is about the intersection of the health insurance industry and the substance abuse and mental health crisis in the United States.

82.     MH/SUD treatment is often complicated and difficult to treat effectively.

83.     As a result, MH/SUD treatment is often expensive and unavailable to ordinary Americans without the reimbursements provided by their health insurers.

84.     UBH's conduct renders Plaintiffs' patients effectively uninsured for the care they desperately needed.

85.     Plaintiffs, bound by professional and ethical obligations to provided necessary care are then left in the position contemplated by Congress when it passed the Patient Protection and Affordable Care Act (the "ACA"), footing the bill for uncompensated care. The very premise of the ACA was that Americans need health insurance to access healthcare. The patients Plaintiffs treated were denied indemnification, were unable to pay out of pocket, and transferred liability for the cost of care to Plaintiffs.

86.     Despite UBH's full knowledge of these facts, it chose to deny coverage through illegal guidelines for lifesaving, medically necessary treatment. It is generally accepted in the industry that the American Society of Addiction Medicine ("ASAM") criteria are the standard of care for MH/SUD treatment.

**a. Medical Necessity**

87.     "Medically necessary" and "medical necessity" are terms of art that are understood across the healthcare industry.

88.     For example, the Arizona Administrative Code defines "medically necessary" as "a covered service is provided by a physician or other licensed practitioner of the healing arts within the scope of practice under state law to prevent disease, disability, or other adverse health conditions or their progression, or to prolong life." Ariz. Admin. Code R9-22-101.

89.     For evaluating "medical necessity" decisions, the State of California has set forth five specific factors that apply. These are:

1) Peer-reviewed scientific and medical evidence regarding the effectiveness of the disputed service.

2) Nationally recognized professional standards.

3) Expert opinion.

4) Generally accepted standards of medical practice.

5) Treatments that are likely to provide a benefit to a patient for conditions for which other treatments are not clinically efficacious.

Cal. Health & Safety Code § 1374.33

90.     This reflects how the term is understood nationwide and is understood by health insurers and providers alike.

91.     Although different health plans and health insurance policies often make reference to the concept of medically necessary services, and may even provide a definition of it, they all basically describe the term as it is understood in the healthcare industry at large.

92.     UBH is aware of the meaning of the term "medically necessary" as it is used in the industry.

93.     UBH preyed on Plaintiffs and the putative class having this understanding of medical necessity when UBH developed its own guidelines contrary to this understanding.

94.     UBH's guidelines scheme that forms the basis of Plaintiffs' RICO claims below is centered on this lie and its dissemination through the mails and wires.

95.     These misrepresentations also form the base of UBH's breach of contract. At all relevant times, UBH entered into various oral, implied-in-fact, and/or implied-at-law contracts with Plaintiffs. According to the terms of these contracts, Plaintiffs agreed to render medically necessary care to patients. In exchange, UBH agreed to reimburse Plaintiffs for the medically necessary care rendered to patients.

**b.  The ASAM Criteria & Its Background**

96.     Clinicians rely on heuristics to decide what care a patient may need. In the behavioral healthcare context, Clinicians have to decide whether a patient needs detoxification services to safely ween off of drugs or alcohol, Residential Treatment where a patient has 24 hour structure and monitoring, partial hospitalization services where a patient needs a safe and structured full-day treatment environment, or intensive outpatient care where a patient has accountability and treatment as he or she reintegrates into society.

97.     For addiction treatment, the American Society of Addiction Medicine ("ASAM") publishes a heuristic to aid in making clinical decisions about the type of care a substance abusing patient needs.

98.     As the court in *Wit* found, ASAM's heuristic is an articulation of generally accepted industry standards. ASAM's heuristic is generally referred to as the "ASAM level of care guidelines."

99.     The ASAM criteria have become the most widely used and comprehensive set of guidelines for placement, continued stay and transfer/discharge of patients with addiction and co-occurring conditions.

100.     Over 30 states have mandated use of ASAM criteria.

101.     The ASAM guidelines outline evidence-based criteria and treatment protocols by which providers can safely and effectively evaluate and provide care for patients. Addiction professionals rely on ASAM criteria and guidelines to make clinical decisions about patient care. This is how addiction professionals determine medical necessity for patients. This put addiction professionals at odds with UBH that made decisions based on its profit-derived guidelines that did not reflect medical necessity.

102.     UBH's fraud actively hindered addiction clinicians' ability to render care pursuant to their own clinical judgement.

103.     UBH's clinicians knew ASAM criteria articulated medical necessity.

104.     The ASAM Criteria contemplate six "Dimensions" – clinical and physiological criteria that clinicians use to evaluate the severity of a patient's condition:

**Dimension 1:** *Acute Intoxication and/or Withdrawal Potential* – Exploring an individual's past and current experiences of substance use and withdrawal.

- 12 -

**Dimension 2:** *Biomedical Conditions and Complications* – Exploring an individual's health history and current physical condition.

**Dimension 3:** *Emotional, Behavioral, or Cognitive Conditions and Complications* – Exploring and individual's thoughts, emotions and mental health issues.

**Dimension 4:** *Readiness to Change* – Exploring and individual's readiness and interest in changing.

**Dimension 5:** *Relapse, Continued Use, or Continued Problem Potential* – Exploring an individual's unique relationship with relapse or continued use or problems.

**Dimension 6:** *Recovery/Living Environment* – Exploring an individual's recovery or living situation, and the surrounding people, places and things[3].

105.    Applying these dimensions leads to a determination as to the appropriate ASAM level of care. The levels of care are subgroups of facility-based treatments, and comprise a continuum of care that, when properly rendered, constitute a patient's best chance at successful treatment. Medical and clinical professionals employed by Plaintiffs and the Plaintiff Class applied ASAM criteria to optimize treatment outcomes and to provide the best care possible. The benchmark levels of care for adults are:

| Level | Adult Title | Description |
|---|---|---|
| .5 | Early Intervention | Assessment and education for at risk individuals who do not meet diagnostic criteria for SUD |
| 1 | Outpatient Services | Less than 9 hours of service/week for motivational enhancement/strategies |
| 2.1 | Intensive Outpatient Services | 9 or more hours of service/week to treat multidimensional instability |
| 2.5 | Partial Hospitalization Services | 20 or more hours service/week for multi-dimensional instability not requiring 24-hour care |
| 3.1 | Clinically Managed Low-Intensity Residential Services | 24-hour structure with available trained personnel; at least 5 hours of clinical service/week |

---

[3] ASAM Criteria, 3rd Ed. pg. 43 (2013)

| 3.3 | Clinically Managed Population-specific High-Intensity Residential Services | 24-hour care with trained counselors to stabilize multidimensional imminent danger and prepare for outpatient treatment. Able to tolerate and use full active milieu or therapeutic community |
| 3.5 | Clinically Managed High-Intensity Residential Services | 24-hour care with trained counselors to stabilize multidimensional imminent danger and prepare for outpatient treatment. Able to tolerate and use full active milieu or therapeutic community |
| 3.7 | Medically Monitored Intensive Inpatient Services | 24-hour nursing care and daily physician care for severe, unstable problems in Dimensions 1, 2 or 3. Counseling available to engage patient in treatment. |
| 4 | Medically Managed Intensive Inpatient Services | 24-hour nursing care and daily physician care for severe, unstable problems in Dimensions 1, 2 or 3. Counseling available to engage patient in treatment. |
| OTP | Opioid Treatment (1) Program (Level 1) | Daily or several times weekly opioid agonist medication and counseling multidimensional Stability for those with severe Opioid Disorder[4] |

106.    These criteria and levels of care provide an accepted industry standard for determining medical necessity and the appropriate care and treatment of the patient. Plaintiffs the putative class applied the diagnostic dimensions above to make decisions about clinically appropriate care for each patient.

107.    For claims at issue in this case, UBH chose to apply its own, hidden guidelines to coverage determinations.

108.    The application of UBH's own, illegal guidelines resulted in substantially more denied claims when compared to appropriate, legal guidelines such as those employed by the addiction professionals used to determine medically necessary services.

109.    This is so because UBH's Guidelines were created based on profit, not clinical practice and medical necessity.

---

[4] ASAM Criteria, 3rd Ed. pg. 106 (2013)

110.    Despite the predominance and acceptance of ASAM as the industry standard, UBH created opaque, proprietary criteria that bear little resemblance to the ASAM Criteria or any evidence-based standards of clinical evaluation. UBH's guidelines for administering benefits were based primarily on its interest in maximizing profits while ASAM guidelines are based on maximizing patient recovery.

**c.    UBH's Guidelines**

111.    During all times relevant to this action, UBH created and controlled coverage decision and level of care guidelines that it then applied across all of the insurance arrangements it sold, oversaw, and/or administered, that were then used by its employees in making medical necessity decisions and determinations and treatment authorizations.

112.    UBH did not use level of care and coverage decision guidelines based on accepted, industry standards, such as those put forward by ASAM, in making decisions on medical necessity and treatment authorizations.

113.    UBH knew that its guidelines did not reflect medical necessity. Plaintiffs, patients, and plan sponsors thought that the UBH guidelines accorded with legitimate medical and clinical principles. UBH intended that providers rely on its deceptive standards.

114.    Plaintiffs and the putative class provided services and determined their appropriate level of care based on their professional, clinical judgment and the needs of the patients: the patients' *actual* medical necessity.

115.    Plaintiffs and the putative class relied on UBH's communications and representations to mean what they actually said and not to have a hidden, illegal, fraudulent meaning that increased UBH's stock price at the expense of patient care.

**d.    Findings in the *Wit* Decision**

116.    In *Wit*, this Court found that UBH's guidelines intentionally departed from industry standards in a pervasive, brazen, and intentional scheme based on financial incentive. It found the record "replete with evidence that UBH's Guidelines were viewed as an important tool for meeting utilization management targets, "mitigating" the impact of the 2008 Parity Act, and keeping "benex"

- 15 -

[benefit expense] down" and that UBH rejected the "ASAM Criteria because [UBH] could not be sure that use of the ASAM Criteria would not increase BenEx."

117.    The *Wit* Court detailed the generally accepted standards of clinical practice for treatment of mental health and substance use disorders, having reviewed numerous clinical sources and extensive testimony, summarized as follows:

118.    **First**, it is generally accepted that many mental health and substance use disorders are long-term and chronic. Although a patient may present with certain immediate needs ("acute" or "current symptoms"), often these current acute symptoms are manifestations chronic, underlying condition(s). Effective treatment of individuals with mental health and/or substance use disorders requires much more than just the alleviation of the current, acute symptoms. The chronic, underlying condition(s) must also be addressed. Many MH/SUD's manifest in chronic, severe impairments that are not acute but are nonetheless treatable.

119.    **Second**, many MH/SUD's involve multiple co-occurring conditions that operate synergistically to aggravate each other. Effectively treating an individual disorder requires a comprehensive, coordinated approach to all of the co-occurring conditions. For example, and of particular importance in the present case, effective treatment of substance use disorders requires comprehensive treatment of any co-occurring depressive disorders because that can be the underlying cause for the substance use. The inverse also occurs. A depressive disorder can both exacerbate and be exacerbated by the co-occurring substance use. Co-occurring medical conditions can also aggravate MH/SUD's in such a way that effective patient treatment requires a more intensive level of care than might be justified if only the one condition was present.

120.    Thus, a patient might require residential treatment if, for example, that substance abuser suffers from debilitating social anxiety disorders that make it impossible for that patient to leave home to seek outpatient care even if, in isolation, that patient's substance use disorder would not require residential treatment. The synergy of the two disorders necessitates residential treatment for effective, lasting treatment.

121.    **Third**, effective treatment of patients with MH/SUD's requires placement at the appropriate level of care. It would be inappropriate, as occurred in this case, to deny residential

treatment to plaintiffs and class member's patients where application of ASAM guidelines would require residential treatment (primarily ASAM 3.7 to 3.1) simply because that patient is not currently suffering from some imminent complication or acute condition of their MH/SUD's. Behavioral health professionals generally accept that safety and effectiveness are the primary driving factors in determining the appropriate treatment level for any given patient, these determinations were made by behavioral health professionals on behalf of Plaintiffs and class members. UBH did not care about the safety of the patients of effectiveness of treatment and prioritized "benex[5]" over recovery.

122.   **Fourth**, patients with mental health and substance use disorders must receive treatment at the appropriate level of intensity. In the present case, this almost always will be for patients that clinical necessity dictates residential treatment at ASAM levels 3.7 through 3.1 depending on the patient. Those who receive treatment at a less-than-clinically-appropriate level of care, including no care, face far worse outcomes than those who are treated at the appropriate level of care. By contrast, providing a higher level of care where there is a question about the appropriate level of care intensity does not result in adverse outcomes. It is generally accepted in the MH/SUD field that ambiguity as to the appropriate level of care, given the life or death nature of MH/SUD's, dictates erring on the side of caution and placing the patient at the higher level of care.

123.   **Fifth**, effective treatment must not be limited simply to temporary improvement in the patient's level of functioning. Residential treatment, here ASAM 3.7 through 3.1, cannot be limited to temporary improvement over "baseline" as effective treatment must also aim to prevent relapse or deterioration of the patients' condition(s) and to maintain their level of functioning. This can only occur when all factors are considered and not merely currently presenting or resolved acute symptoms as in UBH's illegal guidelines.

124.   **Sixth**, treatment must not be artificially time limited. The appropriate duration of treatment must be predicated on the individual needs of the patient. In the present case, this means the appropriate duration of residential treatment under ASAM criteria for levels 3.7 through 3.1. It is generally accepted that a patient should not be discharged or placed at a lower level before

---

[5] "benex" is UBH's internal term for "benefit expense" or the cost to UBH in paying for its Insureds' benefits and is described more fully in the March 5, 2019 *Wit* decision described *supra*.

1    treatment has been optimized. Further, treatment should not be terminated or downgraded simply

2    because a patient has become unwilling or unable to participate in treatment. Indeed, if a patient

3    demonstrates an unwillingness to participate in treatment, this may actually justify an increased

4    intensity of treatment rather than the termination of it.

5        125.    **Seventh**, there exist significant developmental differences between adults, children,

6    and adolescents. Children and adolescents are not fully "developed," in the psychiatric sense. Level

7    of care intensity decisions require plans to account for the unique needs of children and adolescents

8    suffering from MH/SUD's. This, in turn, requires a relaxation of admissions and continued service

9    requirements when children and adolescents are involved.

10       126.    **Eighth**, MH/SUD assessments must not be limited to less than a full

11   multidimensional assessment that accounts for the wide variety of information about the patient,

12   which requires behavioral health providers to conduct a holistic, biopsychosocial assessment that

13   involves consideration of multiple factors. Thus, it falls below the required standard of care to make

14   the level of intensity decision based on only a few enumerated factors focused on acute symptoms

15   rather than the entire patient picture.

16       127.    The *Wit* plaintiffs are individual insureds who brought their action against UBH on

17   their own behalf and/or in a representative capacity because their claims were decided using

18   improper guidelines that ultimately resulted in the denial of their claims of benefits for treatment of

19   mental health and substance use disorders.

20       128.    The *Wit* plaintiffs personally incurred the cost of treatment by paying the treatment

21   facilities.

22       129.    The Court certified three separate classes: 1) the ***Wit Guideline Class***, 2) the ***Wit***

23   ***State Mandate Class***, and **3)** the ***Alexander Guideline Class.***

24       130.    The *Wit* Court found UBH culpable for: 1) developing guidelines for making

25   coverage determinations that are far more restrictive than those that are generally accepted even

26   though plaintiffs' health insurance plans provide for coverage of treatment that is consistent with

27   generally accepted standards of care; and 2) prioritizing cost savings over members' interests.

28

131.    In the present litigation, Plaintiffs and the Plaintiff Class are behavioral healthcare providers with claims that were denied by UBH based on medical necessity during the *Wit* class period through January 31, 2019, with such medical necessity coverage determinations made using illegal guidelines, the same guidelines found illegal in *Wit*.

132.    The *Wit* plaintiffs paid providers out-of-pocket as a result of the illegal decision process denying their claims. They suffered personal financial harm. As such, they were the proper Plaintiffs to bring suit.

133.    However, their experiences and ability to pay for such treatments are the exception, not the rule. For the claims at issue here, far more typical of the experiences of MH/SUD treatment providers nation-wide, substance-addicted and mentally ill patients were not able to pay out-of-pocket for the full costs of treatment services rendered.

134.    The financial burden of the denials that resulted from the illegal guidelines fell on the Plaintiff-providers, not the patients or their families.

135.    Plaintiffs, with this Complaint, are not pursuing legal claims with respect to any specific UBH benefit determinations challenged by individual members of the certified classes in *Wit*, to the extent that any such claims are perceived to overlap.

136.    Plaintiffs challenge the illegal guidelines that UBH used in its scheme to defraud Plaintiff-providers.

137.    The Plaintiff-providers and putative class in this litigation provided MH/SUD services based on the representations and promises made to them by UBH, ignorant of the fraudulent scheme that was behind those representations and promises.

138.    UBH applied its guidelines to deny services already rendered, deny authorizations for services being rendered during the pendency of the pre-authorization and appeal process, and deny claims based on incongruence between submitted medical records and UBH's faulty guidelines.

139.    These guidelines were common across all of the insurance plans or other contracts under which Plaintiffs' patients and patients of the putative Class were indemnified for healthcare expenses. They were internal guidelines that UBH used for all MH/SUD claims.

140.     The *Wit* Court made specific findings as to these guidelines and held a ten-day bench trial. After the trial, the Court found that the plaintiffs "established that the emphasis on cost-cutting that was embedded in [UBH]'s Guideline development process actually tainted the process, causing UBH to make decisions about Guidelines based as much or more on its own bottom line as on the interests of the plan members… by adopting Guidelines that are unreasonable and do not reflect generally accepted standards of care."

141.     *Wit* analyzed two frameworks by which UBH adjudicated claims: Level of Care Guidelines ("LOCGs") and Coverage Determination Guidelines ("CDGs"). Both were found to be illegal.

142.     These guidelines were organized according to the acuity of care at issue (*e.g.*, outpatient vs. inpatient treatment), another deviation from accepted principles and standards of care in MH/SUD treatment.

143.     As a result of the Court's findings in *Wit*, United adopted, or at least has represented that it has adopted, the ASAM criteria for its LOCG's.

**e.   UBH's Actions Harmed Plaintiffs and Class**

144.     Plaintiffs and the Plaintiff Class were irrevocably harmed by UBH's flawed coverage adjudication mechanism. As a direct result of UBH's misrepresentations relating to its claims adjudication processes, Plaintiffs and the Plaintiff Class were left wrongly uncompensated for care they provided. As such, Plaintiffs and the putative Class absorbed the costs of billions of dollars' worth of medically necessary healthcare that UBH should have covered.

145.     Because they have been harmed by UBH's misconduct, Plaintiffs complain on behalf of themselves and all others similarly situated to obtain all relief available under all applicable California and Federal laws. This action seeks to have paid the valid claims for medically necessary services rendered to UBH's insureds.

## PARTIES

146.     Plaintiff Meridian Treatment Solutions, Inc., a Florida corporation, offers sub-acute treatment for individuals suffering from mental health, addiction and other co-occurring disorders in Lauderdale-By-The-Sea, Florida.  Meridian provides Mental Health and Substance Use Disorder

("MH/SUD") treatment to patients covered under health insurance plans sold or administered by UBH. Meridian routinely provided services for which it remains unreimbursed as a result of UBH's application of illegal Guidelines. Plaintiff was not aware that UBH was using the illegal Guidelines to make coverage and level of care decisions until the March 5, 2019 decision in *Wit*.

147.   Plaintiff Harmony Hollywood, LLC ("Harmony") offers sub-acute treatment for individuals suffering from mental health, addiction and other co-occurring disorders in Los Angeles, California. Harmony provides MH/SUD treatment services to patients covered under health insurance plans sold or administered by UBH. Harmony routinely provided services for which it remains uncompensated as a result of UBH's pre-authorization and clinical necessity guidelines. Harmony was not aware that UBH was using illegal guidelines to make coverage and level of care decisions until the March 5, 2019 decision in *Wit*.

148.   Plaintiff Desert Cove Recovery, LLC, ("Desert Cove") offers sub-acute treatment for individuals suffering from mental health, addiction and other co-occurring disorders in Scottsdale, Arizona. Desert Cove provides MH/SUD treatment services to patients covered under health insurance plans sold or administered by UBH. Desert Cove routinely provided services for which it remains uncompensated as a result of UBH's pre-authorization and clinical necessity guidelines. Desert Cove was not aware that UBH was using illegal guidelines to make coverage and level of care decisions until the March 5, 2019 decision in *Wit*.

149.   Defendant United Behavioral Health ("UBH") is a California corporation, with its principal place of business at 425 Market Street, 14th Floor, San Francisco, CA  94105. UBH is a "provider of mental health[6]" and administers behavioral health benefits for UnitedHealth Group. UnitedHealth Group and OptumHealth Behavioral Solutions are separate companies, incorporated in separate states, and are distinct and separate legal entities. "United" is an umbrella term that refers to a myriad of different companies in different lines of business that operate independently.

## **JURISDICTION**

### a.  **Subject Matter Jurisdiction**

---

[6] 2018 Statement of Information of United Behavioral Health, Document G063267, Filed September 26, 2018.

150.    Plaintiffs Meridian and Harmony are headquartered in diverse jurisdictions, and the sum of the amounts in controversy exceeds $5,000,000. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA") under 28 USC § 1332(d) as the amount in controversy exceeds $5,000,000, the class has more than 100 members, and the parties are minimally diverse.

**b.   Personal Jurisdiction**

151.    The Court has personal jurisdiction over the named Plaintiffs as they have voluntarily submitted to the jurisdiction of the Court in the filing of the present lawsuit.

152.    The Court has personal jurisdiction over all absent and unnamed putative class members regardless of whether they have minimum contacts with the forum as Plaintiffs seek a remedy in equity, not law, and, further, any and all due process protections required will be provided for during the litigation after class certification. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985).

153.    Defendant UBH is a California corporation. The Judicial Council Comment to the California Code of Civil Procedure section 410.10 recognizes incorporation in the state as a basis for general, personal jurisdiction.

## VENUE

154.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant UBH has its principal place of business in this jurisdiction.

155.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims brought herein occurred in this jurisdiction.

156.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(d) because Defendant is subject to personal jurisdiction within the state and has sufficient contacts with the Northern District of California to subject them to personal jurisdiction as if the district were a separate state.

157.    Venue is also proper pursuant to 29 U.S.C. § 1132(e)(2) as many of the breaches giving rise to the claims brought herein occurred in this district.

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

**a.   Allegations Common to All Parties**

- 22 -

158.   Defendants apply their guidelines uniformly to deny claims.

159.   The guidelines are not plan terms and they are not applied differently to claims based on any plan terms.

160.   The mechanics of application and fraudulent misrepresentation are common amongst plaintiffs.

161.   The fraudulent misrepresentations are made across state lines using both the mail and wires.

162.   The misrepresentations are made to increase UBH's profits at the expense of the Plaintiffs and the putative class.

163.   The Plaintiffs and the putative class were actually deceived by these representations and believed during the class period that claim denials were based on guidelines that were consistent with generally accepted standards in the industry.

164.   Each Plaintiff and every member of the putative class verified benefits before providing care. Verification is the process that occurs prior to obtaining authorization if authorization is required.

165.   Verifying benefits is the process undertaken by a provider, such as Plaintiffs and the putative class, of calling an insurance company like UBH to find out what services UBH will pay for.

166.   Plaintiff, Meridian, for instance, called UBH twice on February 12, 2016 to verify that UBH's insured RT had active insurance coverage. Meridian obtained verification reference numbers 1-567440 and C-60431252584638 on these calls.

167.   On the phone, over the wires and, upon information and belief, across state lines, UBH's representatives stated that all coverage for behavioral health was determined based on medical necessity.

168.   When asked about any financial restraints on coverage, UBH's representative said there were no limitations or coverage maximums and did not report that any other financial factor was considered in determining eligibility for coverage.

169.   During the calls, Plaintiffs and every member of the putative class asked if there were any pre-certification or prior authorization requirements to provide specific types of treatment. Many times, UBH would not pay for care unless UBH authorized the care in advance.

170.   Other times, Plaintiffs would request authorization for patients in their care only to find out days later, after a delayed response from United, that United was denying care for services already provided.

171.   Sometimes, Plaintiffs learned that UBH would decide whether to pay claims only after Plaintiffs provided treatment. Plaintiff Meridian, for instance, learned that for RT's Intensive Outpatient services, UBH would determine medical necessity *after* services were billed.

172.   When Meridian submitted bills for IOP services that its clinicians had deemed medically necessary under ASAM, UBH refused to pay. UBH's justification was that such claims were not medically necessary following their review despite having already authorized the claims and Meridian having provided treatment to the patient.

173.   On other occasions, even after authorizing services, UBH would demand all medical records as a condition of payment. Frequently, UBH would apply its illegal guidelines to disqualify claims for payment based on minute technical imperfections in Plaintiff's charts.

174.   In many cases, United denied payment for both authorized and unauthorized claims based on alleged deficiencies in Plaintiffs' medical records. The majority of these claims was denied with a code "SNR" which UBH defined as "Services Not Rendered as Billed."

175.   The bases for denying claims were derived from standards and guidelines set by UBH's financial team, without any clinical justification. (Statements of Dr. Lorenzo Triana, describing case at Case 3:14-cv-05337-JCS Document 312 Filed 11/01/17 Page 203 of 230 [7]. Specifically, BPAC elected to impose a categorical requirement that "initial evaluations" be filled

---

[7] Testimony of Dr. Lorenzo Triana, describing an e-mail chain evaluating changes to level of care guidelines: "Discussion point for BPAC. No evidence base for the current standard that the initial evaluation be completed within three treatment days of admission. Evidence base doesn't provide an alternative standard. After discussion with Lorenzo Triana and Bill Bonfield recommending that the standard be maintained as a business decision"

1   out within 3 days because BPAC knew the requirement would lead to decreased benefit expense

2   resulting from claims denial for non-compliance with the arbitrary standard.

3          176.   For the claims at issue, UBH caused care to go uncompensated when it denied

4   authorizations for services rendered during the pendency of the pre-authorization process; denied

5   care for services that had already been rendered, or denied care based on the incongruity between

6   patient charts and its proprietary level of care guidelines.

7          177.   After UBH denied claims, it went through an additional step to deceive Plaintiffs and

8   the putative class. UBH sent "Electronic Remittance Advice" to every single Plaintiff in this case.

9   Electronic Remittance Advice (ERA) is an electronic explanation to the healthcare provider of the

10  health insurance payment made. ERAs are electronically distributed to providers through their

11  respective payment systems.

12         178.   ERAs contain Adjustment Codes and Remittance Advice Remark Codes.

13  "Adjustment Codes" – provide financial information about claim decisions. There are approximately

14  325 standard adjustment codes, which are designed to communicate denial or payment adjustment

15  reasons to providers. Remittance Advice Remark Codes (RARCs) are used to provide additional

16  explanation for an adjustment already described by an Adjustment Code, or to convey information

17  about claim processing. Each RARC identifies a specific message as shown in the Remittance

18  Advice Remark Code List. For every single claim at issue for Plaintiffs and the class they seek to

19  represent, UBH issued ERAs with inaccurate and misleading adjustment and remark codes.

20         179.   By way of example, EQ, one of Plaintiff Meridian's Patients who was insured by

21  UBH had her claims denied based on UBH's application of its illegal LOCGs.

22         180.   United sought to deceive Meridian via the ERA coding system. After stating that it

23  would pay for medically necessary services in the Verification of Benefits process and providing

24  authorization, which UBH employee "Lori" provided over the telephone, and after EQ received

25  covered, medically necessary services, Defendants issued an ERA with completely false, fraudulent

26  denial codes.

27

28

181.    EQ received covered Partial Hospitalization Care. Meridian accurately billed for that care, and sent in records when requested. When United denied services, however, it issued an ERA denying claims with two explanatory Adjustment Codes and one Remark Code.

182.    On the attached ERA, for denied care on May 31, 2016, there is one adjustment code: "226 Information requested from the Billing/Rendering Provider was not provided or was insufficient/incomplete" and one adjustment code "N706 Missing documentation." But for the denial and date of service, the May 31 claim was identical to at least 4 other claims submitted in the days before and after the May 31 claim. Meridian submitted identical, ASAM compliant medical records for every single date of service in question. Shockingly, despite of her knowledge UHC's proprietary guidelines, Defendant's own care manager, Lori, represented that ASAM criteria were the appropriate standard on May 24, 2016 when she discussed authorizing additional Partial Hospitalization Treatment.

183.    Despite authorizing services and acknowledging that ASAM criteria were met, Defendants found it convenient to pay for some days of EQ's treatment, and inconvenient to pay the claim in the attached ERA, so it decided to apply its false and fraudulent medical necessity criteria to deny services, even though the 5 services were otherwise *EXACTLY THE SAME*.

184.    The misrepresentations in the ERA, which was transmitted electronically and by mail, shows that Defendants processed claims based on financial and not clinical bases. Additionally, "Lori" misrepresented UBH's review standards when she stated to Meridian's utilization management that she was relying on ASAM 2.5 criteria to make a medical necessity determination.

185.    For every denied claim at issue in this case, Defendant issued similarly false and misleading ERAs. For many of the services in question, Defendant's agents made similarly false and misleading statements about the medical necessity criteria that would be used to evaluate claims.

186.    In *Wit*, this court found that Defendant's coverage determinations were based on illegal criteria that caused the improper denial of MH/SUD claims between 2011 and 2017.

187.    UBH developed its Guidelines internally, they are not guidelines common to the MH/SUD treatment industry.

188.    The Guidelines at issue in the present case are those used by UBH from May 22, 2011 up to and until UBH adopted and began making clinical necessity decisions using the ASAM guidelines after January 31, 2019.

189.    UBH, by its own admission, ceased using its Clinical Determination Guidelines and Level of Care Guidelines after January 31, 2019.

190.    UBH's Guidelines did not attempt to independently account for co-occurring mental health disorders, risk of relapse, motivation barriers, availability of social support, or whether a lower level of care will be equally as effective. Generally accepted industry standards recognize that recognition and treatment of each of these omitted factors is critical to successful and effective outcomes.

191.    UBH's Guidelines provided that residential rehabilitation for substance abuse will only be covered when the claimant is intoxicated or experiencing or likely to develop withdrawal.

192.    UBH's Guidelines precluded treatment at the residential rehabilitation level of care in the absence of intoxication upon admission without concurrent evidence or likelihood of withdrawal. Even with evidence of withdrawal, they required immediate discharge once detoxification or withdrawal has passed.

193.    Further, UBH's guidelines called for denial of residential treatment coverage if inconsistent with UBH's Guidelines, requiring a lower level of care if it is "safe" (even if it will not be as effective as a higher level of care) and the obligation of patients to prove by "compelling evidence that continued treatment in the current level of care is required to prevent acute deterioration or exacerbation of the member's current condition."

194.    UBH's Guidelines called for a denial of outpatient coverage absent the manifestation of acute symptoms and/or imminent risk of harm or relapse. In many cases, the presence of pre-requisite acute symptoms would qualify patients for hospitalization. In other cases, the UBH CDGs included pre-requisites that bore no relation to the appropriate goals of outpatient care.

195.    ASAM guidelines represent the generally accepted clinical standards of care for mental health and addiction treatment. ASAM guidelines indicate that residential treatment "withdrawal management," a process potentially far exceeding the duration of detoxification, but

also discretely account for: "emotional, behavioral, or cognitive conditions and complications," "readiness to change," "relapse, continued use, or continued problem potential," and "recovery/living environment."

196.   ASAM does not require the presence of either withdrawal or comorbid mental health/medical conditions for admission to residential rehabilitation. ASAM guidelines and industry standards also indicate that continuing outpatient treatment is necessary in circumstances far beyond those specified in UBH's LOCGs and CDGs.

197.   Individuals who are appropriately placed in the clinically managed levels of care have minimal problems with intoxication or withdrawal (Dimension 1) and few biomedical complications (Dimension 2), so on-site physician services are not required. Such individuals may have relatively stable problems in emotional, behavioral, and cognitive conditions (Dimension 3), meeting the diagnostic criteria of the Diagnostic and Statistical Manual of Mental Disorders (DSM) of the American Psychiatric Association. Many also have significant limitations in the areas of readiness to change (Dimension 4), relapse, continued use, or continued problem potential (Dimension 5), or recovery environment (Dimension 6). Therefore, they need interventions directed by appropriately trained and credentialed addiction treatment staff. Such individuals also need case management services to facilitate their reintegration into the larger community.

198.   Moreover, ASAM calls for continued treatment at the prescribed level of care if any of the following apply:

> The patient is making progress but has not yet achieved the goals articulated in the individualized treatment plan. Continued treatment at the present level of care is assessed as necessary to permit the patient to continue to work toward his or her treatment goals;

> *-OR-*

> The patient is not yet making progress but has the capacity to resolve his or her problems. He or she is actively working toward the goals articulated in the individualized treatment plan. Continued treatment at the present level of care is assessed as necessary to permit the patient to continue to work toward his or her treatment goals;

> *-AND/OR-*

- 28 -

New problems have been identified that are appropriately treated at the present level of care. The new problem or priority requires services, the frequency and intensity of which can only safely be delivered by continued stay in the current level of care. The level of care in which the patient is receiving treatment is therefore the least intensive level at which the patient's new problems can be addressed effectively.

199.    ASAM further specifies that "[w]hile the duration of treatment varies with the severity of an individual's illness and his or her response to treatment, the length of service in clinically managed Level 3 programs tends to be longer than in the more intensive medically monitored and medically managed levels of care ... Longer exposure to treatment interventions is necessary for certain patients to acquire basic living skills and to master the application of coping and recovery skills."

200.    Unlike UBH's Guidelines, ASAM's Criteria instructively state that that "all matrices in The ASAM Criteria correlate risk ratings and the types of services and modalities needed and indicate the intensity of services where the patient's needs can best be met."

201.    Further, ASAM noted, when an insurer such as UBH develops its own treatment level of care guidelines "rather than adhering to nationally validated, reliable, and accepted guidelines, it may appear that decision-influencing factors such as cost considerations outweigh valid evidence-based authorization requests for medically necessary treatment."

202.    UBH applied faulty guidelines to services for all levels of MH/SUD treatment, including in making determinations about the medical necessity of out-patient levels of care. UBH denied claims for Partial Hospitalization Program ("PHP") services, Intensive Outpatient services ("IOP"), and routine Outpatient services ("OP") based on profit.

203.    As such, UBH's guidelines clearly discriminate against its insureds with MH/SUD's. Unlike the restrictive internal practices and policies that UBH applies to MH/SUD claims, UBH applies far less restrictive internal policies and practices to medical claims.

204.    It is in this environment that Plaintiffs and putative class members provided MH/SUD services to UBH's insureds.

205.    Plaintiffs own and operate sub-acute Mental Health and Substance Use Disorder MH/SUD facilities in Florida and California. Similarly situated Plaintiffs operate MH/SUD facilities throughout the country. Between 2011 and 2019, Plaintiffs and class members' facilities and

individual providers administered MH/SUD services to millions of patients who were beneficiaries of health plans administrated by UBH and/or insured by plans sold and/or underwritten by UBH.

206.    Plaintiffs and the providers they seek to represent, provide, among other services, Sub-acute Detoxification Services ("DTX"), Residential Treatment Center services ("RTC"), Partial Hospitalization Program Services ("PHP"), Intensive Outpatient Services ("IOP"), and Outpatient services ("OP"). The DTX, RTC, PHP, IOP and OP services that Plaintiffs offer are the subject of this action.

207.    Members of the Plaintiff Class offer sub-acute detoxification services ("DTX") which correspond with ASAM level of care 3.7. ASAM 3.7 services are characterized as "Medically Monitored Intensive Inpatient Services" in which 24-hour nursing care with physician availability, and 16 hour per day clinician availability are necessary to treat and manage symptoms.

208.    ASAM indicates that level of care 3.7 is appropriate where, pursuant to ASAM Dimensions 1-6, patient has some combination of: high but manageable withdrawal risk; requires 24-hour medical monitoring; has moderately severe cognitive impairment requiring 24 hour structured setting; has low interest in treatment and needs motivational strategies; has challenges controlling use at less intensive care levels, or has a dangerous home environment. This summary of ASAM dimensions is an overview, and not all conditions need to be met to justify placing a patient at the 3.7 level of care.

209.    Members of the Plaintiff Class offer Residential Treatment Care services ("RTC") which correspond with ASAM level of care 3.5. ASAM 3.5 is characterized by 24-hour care with trained counselors, and is appropriate where patients have minimal severe withdrawal risk or manageable withdrawals, do not require 24-hour medical monitoring, would benefit from a 24-hour setting for stabilization, have difficulty with treatment, need skills to prevent continued use; and/or have dangerous home environments requiring a 24-hour structured environment. This summary of ASAM dimensions is simplified, and not all need to be met to justify placing a patient at the 3.5 level of care.

210.    Members of the Plaintiff Class offer Partial Hospitalization Services ("PHP") which correspond with ASAM level of care 2.5, characterized by more than 20 hours a week of services.

According to ASAM standards, 2.5 level of care is appropriate where there is only moderate risk of severe withdrawal; little or no cognitive impairment; poor treatment engagement requiring structured program; likelihood of relapse without near daily monitoring or support; unsupportive home environment the risks of which may be mitigated by structure and support. This summary of ASAM dimensions is simplified, and not all need to be met to justify placing a patient at the 2.5 level of care.

211.     Members of the Plaintiff Class offer Intensive Outpatient Services ("IOP") that correspond with ASAM level of care 2.1. ASAM level of care 2.1 is described as a program with more than 9 hours of service per week, which is appropriate where a patient has minimal risk of severe withdrawal; no biomedical complications; few cognitive impairments; openness to recovery with some need for structure; variable treatment engagement; high likelihood of relapse without support; unsupportive home environment which is mitigated by structure and monitoring. This summary of ASAM dimensions is simplified, and not all need to be met to justify placing a patient at the 2.1 level of care.

212.     Members of the Plaintiff Class offer Outpatient Services ("OP") that correspond with ASAM level of care 1.0. ASAM level of care 1.0 is described as a program with less than 9 hours of service per week, which is appropriate where a patient has minimal risk of severe withdrawal; no biomedical complications; no unmanageable cognitive impairments; ready for recovery but in need of strategies to strengthen readiness; able to maintain abstinence with little need for structure; and/or a supportive home environment with which the patient can cope. This summary of ASAM dimensions is simplified, and not all need to be met to justify placing a patient at the 1.0 level of care.

213.     Plaintiff and the Plaintiff Class are providers who are either in-network ("INN") or out-of-network ("OON") providers.

214.     The same Guidelines were used for INN and OON provider claims.

215.     INN, or contracting providers, have entered into reimbursement contracts with UBH where they agree to accept discounted reimbursement rates as a trade off in exchange for the benefit of increased business that results from being part of their "preferred provider organization." UBH's

members and insureds are subject to lower co-payments and deductibles and are accessible through directories maintained by UBH. INN provider contracts generally set out the terms of reimbursement but do not address the specifics of medical necessity criteria. The criteria are determined by the insurance arrangement or plan. INN patients must be pre-authorized to receive care through the same administrative and clinical mechanisms as OON providers.

216.    Unlike INN providers, OON providers, do not execute reimbursement contracts with UBH, and rely on good-faith reimbursement at usual, customary, or reasonable rates ("UCR") to cover the cost of patients' care in treatment.

217.    INN and OON providers are subject to substantially identical pre-certification requirements and medical necessity standards. UBH's Utilization Management department administers pre-certification and pre-authorizations for both INN and ONN plans, and adjudicates post-service medical necessity. Pre-authorization protocols and guidelines are independent and external to the terms of INN contracts. Without pre-certification, claims will be summarily unpaid regardless of network status. UBH's application of illegal guidelines harmed in and out-of-network providers alike.

218.    Such plans include both ERISA and non-ERISA plans. None of Plaintiffs the Plaintiff Class members' claims herein are subject to ERISA. The claims are for interactions specifically between providers and UBH. They are not brought on behalf of the insureds, rather the claims as alleged here involve independent duties owed by UBH to the providers outside of ERISA.

219.    In 2016, approximately 292 Million Americans had some form of health insurance with approximately 216 million having a private or "commercial" plan. Every taxpayer in the United States is legally obligated to carry health insurance. Of the commercial plans, approximately 178 million were employment based and 52 million were purchased directly[8].

---

[8] Barnett, Jessica C., *et al.*, *Health Insurance Coverage in the United States: 2016* (March 2017), United States Census Bureau

220.    According to the U.S. Department of Labor, in 2016 there were approximately "2.2 million ERISA-covered group health plans covering approximately 135 million people[9]," or approximately 61% of covered workers according to the Henry J. Kaiser Foundation[10].

221.    Therefore, around 39% of all employment-based plans, approximately 86 million, and all individual plans, 52 million, a total of about 138 million, are non-ERISA based plans. As UBH has possession of every single plan relevant to the present litigation, they are in a position to provide the exact percentage of self-funded and fully-insured plans they oversee.

222.    Non-ERISA plans are frequently purchased by individuals from state healthcare exchanges or are small group employer plans.  Non-ERISA plans are also referred to as "fully insured plans" because benefit payments are paid from the assets of the insurer, rather than by the employer.

223.    Of the 216 million people insured by commercial insurance in 2016, 70 million, or 32%, were covered by plans issued or administered by UnitedHealth Group. It is the largest private health insurance company in the United States. In 2016, their revenue exceeded $186 billion dollars.

224.    Not all policies administered, sold, and/or underwritten by UBH required pre-certification or pre-authorization. UBH applied the Guidelines for these plans in post-service reviews which often resulted in post-service denials.

225.    Plaintiffs observed all of UBH's published policies in delivering care to their patients. Plaintiffs sought timely pre-certification and pre-authorization when required and timely submitted accurate bills for services provided. When pre-certification was not required, Plaintiffs rendered services in good faith, believing that UBH would cover medically necessary services. Plaintiffs medical and clinical staffs made care decisions pursuant to their addiction expertise and generally accepted industry standards, including those published by ASAM.

226.    Prior to providing care, Plaintiffs verified that patients had benefits for all services provided by conducting a "verification of benefits" phone inquiry ("VOB").

---

[9] U.S. Dept. of Labor, *Annual Report on Self-Insured Group Health Plans* (March 2019)

[10] Henry J. Kaiser Family Foundation, *2016 Employer Health Benefits Survey*, kff.org (Sep. 14, 2016) https://www.kff.org/report-section/ehbs-2016-section-ten-plan-funding/

227.  During the VOB process, Plaintiffs' or their agents asked, and UBH's agents confirmed, coverage for clinically necessary MH/SUD services.

228.  Based on information received from the VOBs, Plaintiffs treated UBH's insureds. Plaintiffs reasonably relied on UBH to provide benefits according to the language and information obtained in the VOB.

229.  Plaintiffs and the Plaintiff Class rendered medically necessary services while pre-authorization decisions were pending, pursuant to their experienced, professional judgement, regardless of pre-certification requirements, in reliance upon UBH's statements that it would cover medically necessary MH/SUD services. In all cases relevant here, UBH refused to authorize services that had already been provided citing lack of medical necessity under their internal guidelines.

230.  All post-service claim denials and non-payments were based on UBH's Guidelines that this Court found illegal and based on UBH's profit over patients motive in *Wit*.

231.  Plaintiffs and all those similarly situated exhausted all appeals procedures and other administrative remedies available to dispute non-payment and/or further appeals would have been futile.

**b.  Factual Allegations Regarding Facility Meridian Treatment Solutions**

232.  Plaintiff Meridian Treatment Solutions Inc. is a MH/SUD provider with its primary place of business in Fort Lauderdale-by-the-Sea, Florida. Between 2014-2019 Meridian provided sub-acute MH/SUD services to 49 patients insured or covered under benefits plans administered by UBH, for which UBH denied payments based on medical necessity.

233.  Meridian provided PHP (ASAM 2.5), IOP (ASAM 2.1) and OP (ASAM 1.0) services to UBH members.

234.  Meridian is licensed by the State of Florida to provide PHP, IOP, and OP services. Each of the services Meridian provides correspond with the specific ASAM levels of care discussed above.

235.  Meridian administered care following clinical best-practices designed and implemented based on the ASAM criteria by their medical directors, licensed and board-certified physicians in the State of Florida with significant training, experience and expertise in addiction and

mental health treatment. The medical directors applied ASAM Criteria when diagnosing and prescribing care. The medical directors supervised Meridian's clinical team to provide comprehensive, patient-specific, and symptom specific treatment in accordance with ASAM.

236.    Meridian used an internal billing team to submit and follow up on medical bills submitted to UBH, to conduct utilization review, and to pursue patient collections from UBH. The billing team worked closely with the clinical team to ensure that the treatment provided met the patients' needs. Prior to admitting UBH Patients, Meridian's billing team called UBH to confirm that each Patient had active coverage for the care to be provided. The billing team requested information about how services were covered, if pre-certification was required, and what conditions of pre-certification and coverage were. In general, UBH representatives stated that where there was coverage, medical necessity was a condition of treatment.

237.    Meridian relied upon UBH to fulfill assurances made during verifications of benefits and utilization review processes that clinically necessary care would be covered. But for these representations and assurances, Meridian would not have provided services.

238.    Prior to and during UBH's members' admission and treatment, Meridian's utilization review team worked to obtain pre-certifications from UBH. Precertification is listed in the VOB as a condition of payment for some services. To obtain pre-certification, a member of Meridian's utilization review team called UBH or one of its designated subsidiaries, requested coverage, and provided any needed clinical documentation. When UBH disagreed with Meridian's clinicians about appropriate level of care, or UBH categorically denied pre-certification, Meridian's utilization review team appealed the decision and requested a peer-to-peer review, in which clinicians at Meridian would discuss patient's care with clinicians at UBH. If UBH still disagreed with the clinical team, Meridian would file an appeal and await the decision.

239.    The final decision often took three or four days, or longer. During that lag time, Meridian's treatment team provided appropriate, medically necessary care for UBH's insureds pursuant to their clinical judgement at their own expense in expectation of reimbursement. Ultimately, a final decision would be reached several days later. In all cases at issue here, UBH denied the care. As a result of UBH's coverage denial, the lag time to obtain that denial, and

1    Meridian's duty to act in its patients' best interests, Meridian provided unreimbursed days of
2    services.

3        240.    In other cases, UBH either did not require authorization or UBH verbally pre-
4    authorized several days of care in advance only to later retroactively deny the claims based on
5    medical necessity under its Guidelines.

6        241.    In yet other cases, Meridian sought and obtained authorizations, provided services,
7    submitted bills, and then received requests for medical records. When Meridian sent medical records,
8    UHC applied its illegal LOCGs to deny coverage based on deviations from its LOCGs inapplicable
9    to the propriety of the service billed.

10       242.    By way of example, Meridian provided care to patient RT between February 12th and
11   February 19th of 2016.

12       243.    On February 12, prior to admitting to Plaintiff's care, Plaintiff called Defendant twice
13   to confirm that RT's treatment would be covered. Pursuant to reference numbers 1-1567440 and C-
14   60431252584638, and Defendant's agent, RT's Defendant would pay for care that Medical
15   Necessity, and precertification was required for Partial Hospitalization Services, meaning that
16   Defendant had to agree in advance to any payment for RT.

17       244.    Approximately a month prior to admitting to treatment, had RT relapsed on heroin
18   after 7 months of sobriety. Plaintiff's clinical team determined that patient could be safely treated at
19   the Partial Hospitalization Level of care and began the precertification process.

20       245.    On February 15th, 2020, Defendant's representative "Angela" authorized 5 days of
21   services pursuant to authorization number 4RSXWE-01. "Angela" stated that Defendant agreed
22   services were medically necessary and agreed to cover services for 5 days of care between February
23   13th and 17th of 2016.

24       246.    On February 19th, Defendant's representative "Mary" represented that Defendant
25   agreed another 6 days of coverage medically necessary for RT, pursuant to the same authorization
26   number Angela provided on February 15th.

27       247.    Despite issuing authorization numbers for 11 days of service, Defendant applied its
28   illegal level of care guidelines to deny claims as medically unnecessary as rendered.

- 36 -

248.     Instead of paying claims like "Mary" and "Angela" said UBH would, Defendant requested medical records for all dates of service.

249.     When records were received, Defendant denied claims based on alleged incongruence with Defendant's illegal level of care criteria. UBH applied its deficient LOCG's to withdraw its agreement that the services provided were medically necessary. This was part of a pattern of frequent use of illegal criteria to deny medically necessary claims.

250.     Plaintiff has detailed records of hundreds of phone conversations with named agents of Defendants who made identical fraudulent representatives.

251.     Defendant also issued false and fraudulent explanations of why claims were denied. For every single claim at issue in this action, United further deceived providers by withholding or not posting Electronic Remittance Advice, Provider Remittance advice or clear Explanations of Benefits ("EOBs"). Instead of acknowledging that claims were denied based on Defendant's financial decisions, Defendant passed simply let the claims linger in limbo.

252.     Medical necessity coverage denials by UBH have left Meridian unreimbursed for not less than **$1,739,852** in services.

253.     The coverage denials in question were based on criteria contained in the discredited UBH Guidelines. Although records of these claims are already in the possession of UBH, due to the protected health information contained within them, Plaintiffs will provide these records again either under seal or upon the entry of a protective order in this matter.

254.     Meridian exhausted all available internal appeals mechanisms for all denied claims with UBH.

**c.   Factual Allegations Regarding Harmony Hollywood**

255.     Plaintiff Harmony Hollywood, LLC. ("Harmony") is a MH/SUD provider with its primary place of business at 830 N Mariposa Ave, Los Angeles, CA 90029 in Between 2015-2019 Harmony provided sub-acute MH/SUD services to at least 99 patients insured or covered under benefit plans administered by UBH for which UBH denied payments based on medical necessity.

256.     Harmony provided DTX (ASAM 3.7), RTC (ASAM 3.5), PHP (ASAM 2.5), IOP (ASAM 2.1), and OP (ASAM 1.0) services to UBH's members.

257.    Harmony is licensed by the State of California to provide DTX, RTC, PHP, IOP and OP services. Each of the services Harmony provides correspond with specific ASAM levels of care discussed above. Since Harmony opened, it has provided care to many patients who required pre-certification from UBH as a condition of payment and whose care was subject to application of UBH's Guidelines.

258.    Harmony administered care following clinical best-practices designed and implemented based on the ASAM criteria by their medical directors, licensed and board-certified physicians in the State of California with significant training, experience and expertise in addiction and mental health treatment. The medical directors applied ASAM Criteria when diagnosing and prescribing care. The medical directors supervised Harmony's clinical team to provide comprehensive, patient-specific, and symptom specific treatment in accordance with ASAM.

259.    Harmony employed a third-party billing company as its agent to submit and follow up on medical bills submitted to insurance, to conduct utilization review, and to pursue patient collections from UBH. The billing team worked closely with the clinical team to ensure that the treatment provided met the patients' needs. Prior to admitting UBH patients, Harmony's billing team called UBH to confirm that each Patient had active coverage for the care to be provided. The billing team requested information about how services were covered, if pre-certification was required, and what conditions of pre-certification and coverage were. In general, UBH representatives stated that where there was coverage, medical necessity was a condition of treatment.

260.    Prior to and during UBH's members' admission and treatment, Harmony's utilization review team worked to obtain pre-certifications from UBH. Precertification is listed in the VOB as a condition of payment for some services. To obtain pre-certification, a member of Harmony's utilization review team called UBH or one of its designated subsidiaries, requested coverage, and provided any needed clinical documentation. When UBH disagreed with Harmony's clinicians about appropriate level of care, or UBH categorically denied pre-certification, Harmony's utilization review team appealed the decision and requested a peer-to-peer review, in which clinicians at Harmony would discuss patient's care with clinicians at UBH. If UBH still disagreed with the clinical team, Harmony would file an appeal and await the decision.

- 38 -

261.    The final decision often took three or four days, or longer. During that lag time, Harmony's treatment team provided appropriate, medically necessary care for UBH's insureds pursuant to their clinical judgement at their own expense in expectation of reimbursement. Ultimately, a final decision would be reached several days later. In all cases at issue here, UBH denied the care. As a result of UBH's coverage denial, the lag time to obtain that denial, and Harmony's duty to act in its patients' best interests, Harmony provided unreimbursed days of services.

262.    By way of example, Harmony treated UBH insured EL between August 26, 2018 and September 6, 2018. EL received authorization for some days of treatment, but for date of service September 6, 2019, UBH refused to provide authorization, citing an issue with licensure unrelated to EL's 2018 treatment. Numerous instances of follow-up with UBH yielded only the same repetition that due to failure to obtain a licensee for Incidental Medical Services, EL's care did not meet UBH's standards per calls with UBH on August 27 at 11:42am, and again on September 4, 2018 at 11:16am. While the remainder of EL's stay was covered, UBH refused to cover September 6, 2018 claiming that non-compliance with UBH's level of care guidelines rendered the service provided medically unnecessary.

263.    By way of example Harmony treated UBH insured LP between June 25 and July 2 2018. UBH covered 3 days of detoxification services. As LP was transitioned to a lower level of care, UBH's Case Manager Adam, at telephone number 800-548-6549 ext 67205 denied coverage for Residential Treatment. Harmony's care team did not believe it was safe for LP to receive care at any level lower than RTC, especially in light of her recent need for medically assisted detoxification. Nevertheless, on June 29, 2018 and July 2, 2018, over the course of various Peer to Peer reviews, UBH dragged out the precertification process while LP was receiving residential treatment. When UBH representative Adam indicated that UBH denied preauthorization for coverage for medical necessity on July 2, 2018 at 4:51 pm, citing a low withdrawal risk, LP had already received 6 days of residential treatment services. This denial violates the guidelines put forward in ASAM, and the care for this member remains unpaid.

264.    In other cases, UBH either did not require authorization or UBH verbally pre-authorized several days of care in advance only to later retroactively deny the claims based on medical necessity under its Guidelines.

265.    In yet other cases, Harmony sought and obtained authorizations, provided services, submitted bills, and then received requests for medical records. When Harmony sent medical records, UHC applied its illegal LOCGs to deny coverage based on deviations from its LOCGs inapplicable to the propriety of the service billed.

266.    By way of example, for dozens of patients it treated in 2017 and 2018, Harmony sought and obtained authorizations, provided services, submitted bills, and then received requests for medical records. When Harmony sent medical records, UHC applied its illegal LOCGs to deny coverage based on deviations from its LOCGs inapplicable to the propriety of the service billed.

267.    Patient GG, for example, received residential treatment from Harmony between February 14 and March 3, 2018. Harmony obtained prior authorization for every single day of service prior to treating GG. Harmony's representatives spoke repeatedly with UBH's Case Managers Tracy, at phone number 800-548-6549 ext. 67969, and Christine at phone number 800-548-6549 ext. 67138. Over the course of at least 10 telephone calls to both of UBH's care managers, including confirmation calls on February 15, 2018 at 9:28 AM February 23, 2018 at 10:21am, PST; February 27, 2018 at 11:10am PST, Harmony's representatives received authorizations from Sasha and Eric to provide medically necessary residential MH/SUD treatment pursuant to authorization numbers PBQB4A-01; PBQB4A-02; 2M25JR-01; and 2M25JR-02. Tracy and Christine agreed that the clinical notes that Harmony submitted substantiated and satisfied UBH's medical necessity standards.

268.    After providing medically necessary, authorized care for GG, Harmony submitted timely, accurate bills. UBH, in response, requested medical records for every single date of service authorized. For every single date of service billed, Harmony submitted uniform medical records indicating that ASAM Compliant care was rendered for every single date of service billed. Every date of service had substantially medical records, prepared and recorded subject to rigorous oversight and industry leading care. Without justification or explanation, however, UBH denied payment for

claims for services for February 20-27, 2018. The only justification found for the aberration was provided by various representatives, including Vicki Crump, at UBH's Program and Network Integrity Department. The denial justification was that: "documentation submitted does not appear to be an accurate depiction of the services billed."

269.    The claims review standard for these medical records was the United Behavioral Health Level of Care Guidelines. Without further explanation, and despite exhaustive efforts on appeal, claims continued to be denied.

270.    The alleged inadequacies, which were the based on Optum's deficient level of care guidelines, caused claims for medically necessary services to be denied because the services as rendered were deemed not medically necessary.

271.    Harmony experienced identical claims denials, and claims denials for the reasons discussed infra for claims for at least 1,000 other claims filed on behalf of at least 75 other patients insured by UBH.

272.    Harmony, or its agents, exhausted all available internal appeals mechanisms for all denied claims with UBH.

273.    Harmony remains wrongly uncompensated for not less than **$1,500,000** worth of services that were subject to the type of claim denials discussed *infra*.

**d.  Factual Allegations Regarding Desert Cove Recovery**

274.    Plaintiff Desert Cove Recovery, LLC, ("Desert Cove") is a MH/SUD provider with its primary place of business at 15170 Hayden Rd. Ste 4, Scottsdale, AZ 85260. in Between 2015-2019 Desert Cove provided sub-acute MH/SUD services to at least 80 patients insured or covered under benefit plans administered by UBH for which UBH denied payments based on medical necessity.

275.    Desert Cove provided DTX (ASAM 3.7), RTC (ASAM 3.5), PHP (ASAM 2.5), IOP (ASAM 2.1), and OP (ASAM 1.0) services to UBH's members.

276.    Desert Cove is licensed by the State of Arizona to provide DTX, RTC, PHP, IOP and OP services. Each of the services Desert Cove provides correspond with specific ASAM level of care discussed above.

277.    Since Desert Cove opened, it has provided care to many patients who required pre-certification from UBH as a condition of payment and whose care was subject to application of UBH's Guidelines.

278.    Desert Cove administered care following clinical best-practices designed and implemented based on the ASAM criteria by their medical directors, licensed and board-certified physicians in the State of Arizona with significant training, experience and expertise in addiction and mental health treatment.

279.    The medical directors applied ASAM Criteria when diagnosing and prescribing care. The medical directors supervised Desert Cove's clinical team to provide comprehensive, patient-specific, and symptom specific treatment in accordance with ASAM.

280.    Desert Cove employed a third-party billing company as its agent to submit and follow up on medical bills submitted to insurance, to conduct utilization review, and to pursue patient collections from UBH.

281.    The billing team worked closely with the clinical team to ensure that the treatment provided met the patients' needs.

282.    Prior to admitting UBH patients, Desert Cove's billing team called UBH to confirm that each Patient had active coverage for the care to be provided. The billing team requested information about how services were covered, if pre-certification was required, and what conditions of pre-certification and coverage were. In general, UBH representatives stated that where there was coverage, medical necessity was a condition of treatment.

283.    Desert Cove relied upon UBH to fulfill assurances made during verifications of benefits and utilization review processes that medically necessary care would be covered. But for these representations and assurances, Desert Cove would not have provided services.

284.    Prior to and during UBH's patients' admission and treatment, Desert Cove's utilization review team worked to obtain pre-certifications from UBH. Precertification is listed in the VOB as a condition of payment for some services. To obtain pre-certification, a member of Desert Cove's utilization review team called UBH, requested coverage, and provided any needed clinical documentation.

285.   When UBH disagreed with Desert Cove's clinicians about an appropriate level of care decision, or denied pre-certification under UBH Guidelines, Desert Cove's utilization review team appealed the decision and requested a peer-to-peer review, in which clinicians at Desert Cove would discuss the patient's care with staff clinicians at UBH. If UBH still denied the request, Desert Cove would file an appeal and await the decision.

286.   The final decision from UBH often took three or four days, or longer if care was provided over a weekend. During that lag time, Desert Cove's treatment team provided medically necessary care for UBH's insureds pursuant to their clinical responsibilities, professional judgment, and ASAM criteria. Ultimately, a decision would be reached several days later by UBH. In all cases at issue here, UBH denied coverage.

287.   As a result of the coverage denial, the lag time to obtain that denial, and Desert Cove's duty to act in its patients' best interests, Desert Cove was harmed by being unpaid for several days of treatment per patient.

288.   In other cases, UBH either did not require authorization or UBH verbally pre-authorized several days of care in advance only to later retroactively deny the claims based on medical necessity under its Guidelines.

289.   In yet other cases, Desert Cove sought and obtained authorizations, provided services, submitted bills, and then received requests for medical records. When Desert Cove sent medical records, UHC applied its illegal LOCGs to deny coverage based on deviations from its LOCGs inapplicable to the propriety of the service billed.

290.   By way of example, Desert Cove rendered Partial Hospitalization Services to UBH's insured MD between April 18 and May 11, 2016.

291.   MD was an intra-venous heroin user. He reported injecting heroin up to 5 times per day. He reported that he had continuously failed to remain abstinent from drugs and alcohol on his own.

292.   MD had no access to a supportive environment conducive to recovery.

293.   MD had limited bio-medical obstructions to treatment.

- 43 -

294.    MD suffered from low motivation or compromised motivation to remain abstinent from drugs.

295.    MD satisfied all or substantially all of the 6 ASAM factors indicating the medical/clinical propriety of treatment in a Partial Hospitalization Program.

296.    Over the course of at least 8 verification and authorization phone calls for that stay Desert Cove representative Megan called UBH to confirm and re-confirm benefits.

297.    Megan spoke to: "Sheila B" on May 2, 2016; "Ashley" on June 6, 2016; "Bridgette" on May 17, 2016; "Ashley" again on June 22, 2016; and "Eileen" on August of 2016.

298.    On each and every single one of these calls, UBH's representatives confirmed that medically necessary Partial Hospitalization Services were covered for OON providers.

299.    Desert Cove rendered services, documented services, and timely submitted bills.

300.    Instead of paying claims as promised, UBH denied the services based on a lack of medical necessity – the term upon which coverage was conditioned in the VOB. After asking for claims reprocessing, UBH responded to the appeal with a letter stating, in relevant part, the following:

> "Partial Hospitalization Care was not available for the following reasons: You were admitted to the partial hospitalization level of care on April 16, 2016. You had completed an inpatient program and had 28 days of sobriety at the time of your admission. On admission you were medically and psychiatrically stable. You were engaged in treatment and committed to recovery. You could have been treated at a lower level of care such as an intensive outpatient program."

301.    This coverage determination is deeply flawed because Partial Hospitalization Programs would be inappropriate for a patient exhibiting any of the included bases for denying care. Patients presenting with medical or psychiatric instability would be disqualified from Partial Hospitalization Programs because patients presenting with such instability would be unsafe to treat in a Substance Use Disorder Partial Hospitalization Program.

302.    A patient who is withdrawing from drugs or alcohol and who has not completed an inpatient program is generally unprepared for a non-residential program. Patients who are not motivated to get help will not seek treatment in a non-residential context. Under UBH's coverage

- 44 -

1    criteria, PHP is covered subject to medical necessity, but in a "catch-22" is also never medically

2    necessary.

3          303.    UBH sent this false, fraudulent and deceptive letter to Plaintiff Desert Cove by way of

4    the US Mails. The coverage denials in question were based on criteria that *Wit* explained were illegal.

5          304.    The letter was prepared and sent by Leslie Moldauer, MD, the Associate Medical

6    Director at United Behavioral Health. Ms. Moldauer's letter makes no mention of medical necessity,

7    only alluding to the "member's benefit plan." As Ms. Moldaueer knew, coverage for MD was

8    conditioned on Medical Necessity.

9          305.    Desert Cove, or its agents, exhausted all available internal appeals mechanisms for all

10   denied claims with UBH.

11         306.    All or substantially all providers who's claims were denied citing lack of medical

12   necessity were sent similar denial letters in the mail.

13         307.    Desert Cove remains wrongly uncompensated for not less than **$500,000** worth of

14   services that were subject to the type of claim denials discussed *infra*.

15                          **FEDERAL RICO ALLEGATIONS**

16         308.    RICO claims are to "be liberally construed to effectuate its remedial purposes" *Odom*

17   *v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) *quoting Sedima, S.P.R.L. v. Imrex Co.*, 473

18   U.S. 479, 498 (1985) and "[RICO] has become a tool for everyday fraud cases brought against

19   respected and legitimate enterprises." *Sedima* at 499.

20         309.    The RICO enterprise was formed within the United umbrella of companies and

21   subsidiaries and included UBH along with those committees and individuals identified with

22   specificity in the following paragraphs sought to profit from through the commission of racketeering

23   activities for the benefit of members of the enterprise and UBH.

24         310.    Within the enterprise were individuals from multiple entities including United

25   Behavioral Health, Optum Health Behavioral Solutions, United Health Group, Optum Behavioral

26   Health, and Optum Behavioral Solutions. These multiple entities came together to form the RICO

27   enterprise at issue and the RICO enterprise is distinct from the entities or "persons" that comprise it.

28

311.    Specific individuals who participated in the enterprise's activities include Dr. Lorenzo Triana, the Senior Director of Medical Behavioral Operations at Optum Behavioral Health Solutions, and Co-Chair of the Behavioral Policy Analytics Committee (rebranded the Utilization Management Committee in 2017), Maria Sekac from Optum Behavioral Health, co-chair of the Coverage Determination Committee, Fred Motz, an actuary with the finance team from Optum Health Behavioral Solutions, Irvin "Pete" Brock, a member of the affordability department at UnitedHealth Group, Carolyn Regan from Optum Behavioral Solutions, Dr. William Bonfield, the Chief Medical Officer at Optum Behavioral Health, Dr. Martin Rosenzweig, the Chief Medical Officer at UnitedHealth Group, and Dr. Danesh Alam, the Behavioral Medical Director with UnitedHealth Group, and others, members of the Behavioral Policy Analytics Committee, later branded the Utilization Management Committee ("BPAC/UMC" or "BPAC").

312.    The purpose of the Behavioral Policy Analytics Committee, or "BPAC" was to monitor and control the rates at which behavioral health benefits were consumed by persons whose benefits were administered by United Behavioral Health. *Wit v. United Behavioral Health,* Case 3:14-cv-05337-JCS Document 311 Filed 10/27/17 Page 67 of 182 (hereafter cites are given without party caption.)

313.    BPAC, and each of its members, was ultimately responsible for the "Benefit Expense" or "Ben-ex" of all benefits administered by United Behavioral Health. *Id.*

314.    BPAC controlled benefit expense by way of its Coverage Determination Guidelines and Level of Care Guidelines. Those guidelines were the criteria upon which United Behavioral Health's employees were to base the denial or approval of benefits. *Id.* At pp. 71 line 13-14. For instance, Dr. Lorenzo Triana wrote a May 15, 2012 Power Point presentation explaining that the role of BPAC was "Ensuring the dissemination of the guidelines to the organization; and Assessing and ensuring the consistency of benefits management processes with medical plans to satisfy nonquantitative parity requirements." *Id.* at lines 1-2

315.    The BPAC operated on the premise that its role was to control the amount of money UBH paid out by "using the power to pay or not pay to change provider behavior." Case 3:14-cv-05337-JCS Document 311 Filed 10/27/17 Page 76 of 182, lines 18-23. (Executive Note by William

1  Bonfield M.D. on March 10, 2016 in Executive Summary of "Forward Redesign Behavioral Health
2  UM Process Workshop 1: Current State").

3      316.    The BPAC's leverage was substantial because their benefits utilization guidelines
4  applied to all commercial and public sector businesses managed by UBH and/or Optum. Case 3:14-
5  cv-05337-JCS Document 311 Filed 10/27/17 Page 79 of 182 line 17-19 (Excerpt from the 2014
6  Utilization Management Program Description, a document drafted by the Utilization Management
7  Committee outlining UBH's processes for managing behavioral health benefits.)

8      317.    Decisions the BPAC made were informed, in relevant part, by monthly meetings
9  between BPAC members including Dr. William Bonfield and Dr. Lorenzo Triana, and the UBH
10 Affordability Department. The Affordability Department is an internal department at UBH that
11 analyzes and predicts the financial impact of benefits administration. The Affordability Department
12 informed BPAC members about the financial impacts of Behavioral Health benefits administration
13 decisions BPAC made, planned to make, or weighed making. Case 3:14-cv-05337-JCS Document
14 311 Filed 10/27/17 Page 119, 120 of 182, lines 21-25; 1-6.

15     318.    Among other responsibilities, the Affordability Department, and its representative on
16 the BPAC, provided feedback about overall annual benefit expense targets, which were a
17 performance metric for BPAC and the benefits administrators it oversaw. Case 3:14-cv-05337-JCS
18 Document 311 Filed 10/27/17 Page 127 of 182, lines 18-19. During Dr. Lorenzo Triana's tenure as
19 the co-chair of BPAC, Irvin Brock was the Affordability Department's representative on BPAC,
20 ensuring that every decision made was actuarially driven. *Id.*

21     319.    UBH also had an actuary, Fred Motz, sitting on BPAC. Mr. Motz role was to further
22 evaluate the financial implications of any clinical decisions BPAC made.

23     320.    Compensation and performance for the BPAC and its members depended on
24 successfully limiting and reducing the amount of benefits paid for behavioral health treatment. Case
25 3:14-cv-05337-JCS Document 311 Filed 10/27/17 Page 129 of 182 lines 3-11.

26     321.    The BPAC, and each of its members, worked together to benefit themselves by
27 controlling the way in which Behavioral Health benefits were administered. The result was that,
28 despite numerous efforts by Optum's clinicians to change the UBH behavioral health guidelines,

1   including the Level of Care and Coverage Determination Guidelines, BPAC ensured that defective
2   proprietary guidelines remained in place.

3      322.   The BPAC considered adopting the ASAM guidelines,  which UBH's clinicians
4   conceded were the generally accepted standards of care, numerous times during the class period. For
5   instance, in 2012, initiatives to implement the ASAM guidelines were shot down by BPAC and its
6   members because "use of these criteria usually will result in more authorization as they are more
7   subjective and broader than our [UBH's] Level of Care Guidelines/CDGs." Case 3:14-cv-05337-
8   JCS Document 312 Filed 11/01/17 Page 123 of 230, Lines 5-7.

9      323.   In another instance, in 2015, a working committee's efforts to roll out ASAM
10  implementation were killed by BPAC because the working group could not demonstrate that the
11  ASAM guidelines would be "ben-ex neutral." Case 3:14-cv-05337-JCS Document 312 Filed
12  11/01/17 Page 119 of 230 lines 21-25. (Cross examination of Dr. Danesh Alam).

13     324.   Dr. Danesh Alam worked as a medical reviewer at UBH, and was also the head of a
14  working group called "SUDS 2." In 2014 the SUDS 2 working group was tasked with analyzing the
15  financial impact of implementing ASAM in Connecticut, which had passed a statute requiring
16  ASAM be used. Case 3:14-cv-05337-JCS Document 312 Filed 11/01/17 Page 110 of 230, line 1-3.
17  The SUDS 2 working committee concluded that ASAM should be implemented. BPAC's
18  determination that finances drove the clinical decision making surrounding ASAM are further
19  evident from BPAC members' response to Dr. Danesh Alam's 2014 proposition to implement
20  ASAM guidelines.

21     325.   The result of the financial departments involvement in clinical decision making was
22  that UBH did not adjust its guidelines, did not implement ASAM, and, in some cases, did not abide
23  by state laws requiring ASAM's implementation.

24     326.   BPAC, in response to Alam's recommendation, via Dr. Martin Rosenzweig, the Chief
25  Medical Officer in 2014, refused to implement or consider speaking with the UBH legal department
26  about implementing ASAM until SUDS 2 working group conducted a financial analysis. Case 3:14-
27  cv-05337-JCS Document 312 Filed 11/01/17 Page 116 of 230, line 15-18.

28

- 48 -

327.    In addition to decisions about implementing ASAM, the tentacles of UBH's actuaries wound their way into decisions about other drafting aspects of guidelines. For instance, during a 2015 meeting of the BPAC, which included Fred Motz and Pete Brock of UBH financial departments, as well as Carolyn Regan (who was the Vice President of Clinical Policy at the time), decided on level of care guidelines based on "business decisions" rather than clinical judgment. Case 3:14-cv-05337-JCS Document 312 Filed 11/01/17 Page 200 of 230, lines 7-9 "there were two additional areas where BPAC made business decisions impacting the Level of Care Guidelines." Those business decisions involved the timing and frequency of mandatory physician visits. BPAC decided to require physician visits as frequently as possible for levels of care where BPAC new claims were paid at a "bundled rate." That meant that, without clinical basis, BPAC chose to drive up the cost of care in order to discourage treatment at the RTC level of care. This decision was made solely for business purposes as there was "no current best practice" indicating the necessity of that operation.

328.    BPAC/UMC members Lorenzo Triana, Fred Motz, Irvin Brock, Carolyn Regan, and others were involved in conspiring to reap the residual fruits of a conspiracy to save UBH money. They systematically controlled benefits dispensation over the course of almost a decade, repeatedly placing financial gain ahead of clinical wellbeing.

329.    The BPAC/UMC members knew that, by limiting Ben-ex they stood to enjoy professional and financial gains. The BPAC members steered the enterprise that, while having the blessing of UBH, operated distinctively in that its participants exercised discrete control of the association in fact conspiracy.

330.    The BPAC/UMC members cloaked their venal calculus in jargon to disguise the fact that financial gain drove their operations. BPAC/UMC, by way of its members and the sub-groups they supervised, exerted uniform and exacting control over benefits dispensation, such that there was approximately 98% consistency between benefits determinations, as determined by the "interrater reliability" metric. Case 3:14-cv-05337-JCS Document 311 Filed 10/27/17 Pages 99-102 of 182. That metric measures how consistently benefits are administered.

331.     The application of the illegal guidelines to the claims at issue in this litigation and the subsequent communications to Plaintiffs and the putative class that crossed state lines, used the mail and wires, fraudulently stating that the claims were denied for failure to meet medical necessity requirements are predicate acts of racketeering activity.

332.     There tens of thousands or more of such racketeering acts that occurred during the applicable period over multiple years.

333.     The racketeering acts deceived the Plaintiffs and the putative class into believing that claims were actually denied for the reasons stated in ERAs and other communications.

334.     The enterprise profited UBH by illegally reducing United's benefit expenses at the Plaintiffs' and class members' expense.

335.     The purpose of the enterprise was to profit UBH and deprive Plaintiffs and the class members of their property, their interest in having their A/R, valid medically necessary claims, paid.

336.     It achieved this purpose for many years and now Plaintiffs and the putative class seek to hold it accountable and seek treble damages in the amount of the unpaid claims and business losses to be proven at trial.

### a.     Overview

337.     Federal "RICO is widely regarded as a broad statute; indeed, RICOs text itself provides that its terms are to be liberally construed to effectuate its remedial purposes." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (internal quotations omitted).[11] RICO's breadth of language and construction is particularly evident in the enterprise concept. Included within the definition of enterprise is "*any* union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added).

338.     An association-in-fact RICO enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle* at 946.

---

[11] *See also, Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 497 (1985) ("RICO is to be read broadly.").

339.    As to the first factor, purpose, within UBH and individuals including Dr. Lorenzo Triana, the Senior Director of Medical Behavioral Operations, and Co-Chair of the Behavioral Policy Analytics Committee (rebranded the Utilization Management Committee in 2017), Maria Sekac, co-chair of the Coverage Determination Committee, Fred Motz, an actuary with the finance team, Pete Brock, a member of the affordability department, Carolyn Regan, and others, through BPAC have associated to form an ongoing informal organization, engaged in and the activities of which affect trade or commerce, with the common purpose of engaging in a course of conduct that includes the development and implementation of a scheme to fraudulently deny claims of out-of-network MH/SUD treatment providers.

340.    The aforementioned have joined together to create and exploit false and fraudulently developed Level of Care and Coverage Decision guidelines as an excuse for refusing to indemnify Plaintiffs and the class for services provided, to UBH's and the enterprise's financial benefit.

341.    The presence or absence of a commercial contract is irrelevant.

342.    An association does not stop becoming an association because the relationship between its insureds are documented in a contract, nor does anything in the definition of enterprise insulate from liability those whose common purpose may include some legal activity. RICO's definition of enterprise "include[s] both legitimate and illegitimate enterprises within its scope; it no more excludes criminal enterprises than it does legitimate ones." *Turkette*, 452 U.S. 576, 580-81 (1981). *See also, Sedima,* 473 U.S. at 499 ("Yet Congress wanted to reach both 'legitimate' and 'illegitimate' enterprises. The former enjoy neither an inherent capacity for criminal activity nor immunity from its consequences.") (internal citation omitted).

343.    The enterprise formed by UBH, individuals, and United's committees focused on Behavioral Health Policy, is the vehicle for the illegal, racketeering activity of mail and wire fraud.

344.    Examples of these activities performed are set forth in the preceding and following sections for every Plaintiff.

345.    The enterprise has a common purpose of its members in performing these activities which includes financial gain as the direct result of the fraudulent scheme.

346.     Reducing benefit expense on the backs of Plaintiffs and the putative class is the financial gain realized by the enterprise, likely amounting to billions of dollars during the many years that the enterprise operated.

347.     As to the second *Boyle* factor, there are relationships among the persons and entities associated with the enterprise.

348.     UBH, the identified individuals, and the identified committees, including BPAC, coordinate their racketeering efforts, and share the money obtained from Plaintiffs and other victims of the scheme.

349.     The relationships between the members of the association-in-fact enterprise are sufficient to permit them to pursue the enterprise's purpose. UBH, the individuals, and the committees all cooperated closely to implement the scheme and share the benefits of the scheme.

350.     These relationships continued during the multi-year class period as the enterprise continued to pursue its purpose.

351.     The relationships and purpose are clearly set forth through the scheme and decisions implemented through BPAC described in the following sections.

352.     BPAC provided the roadmap, the illegal guidelines, that UBH, United and its associated entities deployed to cause valid, medically necessary claims to go unpaid, costing Plaintiffs and the putative class billions of dollars over a multi-year period.

**b.     The Behavioral Policy Analytics Committee**

353.     The purpose of the Behavioral Policy Analytics Committee ("BPAC") was to monitor and control the rates at which behavioral health benefits were consumed by persons whose benefits were administered by UBH. *See Wit v. United Behavioral Health*, Case 3:14-cv-05337-JCS Document 311 Filed 10/27/17 Page 67 of 182.

354.     BPAC, and each of its members, was ultimately responsible for the "Benefit Expense" or "Ben-ex" of all mental health benefits of United's insureds. *Id.*

355.     UBH and individuals from other associated United entities and subsidiaries all participated in the creation and direction of BPAC and profited from its actions.

356.    UBH, BPAC, and its individual members each exercised control over the enterprise through the reduction of benefit expense by way of the development, establishment, and implementation of the Coverage Determination Guidelines and Level of Care Guidelines.

357.    The guidelines were the criteria upon which United based the denial or approval of their insureds' benefits. *Id.* At pp. 71 line 13-14.

358.    For example, Dr. Lorenzo Triana wrote in 2012 that one of BPAC's purposes was to ensure that the flawed guidelines were disseminated and throughout the many different United entities and that they were applied consistently and uniformly. BPAC ensured that the flawed guidelines were applied uniformly to claims regardless and without any concern or consideration of any individual, policy terms.

359.    The BPAC operated on the premise that its role was to control the amount of money UBH paid out by "using the power to pay or not pay to change provider behavior." Case 3:14-cv-05337-JCS Document 311 Filed 10/27/17 Page 76 of 182, lines 18-23. (Executive Note by William Bonfield M.D. on March 10, 2016 in Executive Summary of "Forward Redesign Behavioral Health UM Process Workshop 1: Current State").

360.    Plaintiffs and the class have a property interest in accounts receivable related to the payment of claims for their services. Denying the claims by fraudulent means deprives Plaintiffs and the class providers of their property. UBH, United and associated United entities have profited and continue to profit from this fraud.

361.    BPAC's influence and effect throughout UBH and associated United entities was substantial because their guidelines applied to all commercial and public sector businesses managed by UBH and/or Optum. Case 3:14-cv-05337-JCS Document 311 Filed 10/27/17 Page 79 of 182 line 17-19 (Excerpt from the 2014 Utilization Management Program Description, a document drafted by the Utilization Management Committee outlining UBH's processes for managing behavioral health benefits.)

362.    BPAC's decisions were informed, in relevant part, by monthly meetings between BPAC members including Dr. William Bonfield and Dr. Lorenzo Triana, and the UBH Affordability Department. The Affordability Department is an internal department at UBH that analyzes and

1  predicts the financial impact of benefits administration. The Affordability Department informed
2  BPAC members about the financial impacts of Behavioral Health benefits administration decisions
3  BPAC made, planned to make, or weighed making. Case 3:14-cv-05337-JCS Document 311 Filed
4  10/27/17 Page 119, 120 of 182, lines 21-25; 1-6.

5       363.  Among other responsibilities, the Affordability Department, and its representative on
6  the BPAC, provided feedback about overall annual benefit expense targets, which were a
7  performance metric for BPAC and the benefits administrators it oversaw. Case 3:14-cv-05337-JCS
8  Document 311 Filed 10/27/17 Page 127 of 182, lines 18-19.

9       364.  During Dr. Lorenzo Triana's tenure as the co-chair of BPAC, Irvin Brock was the
10  Affordability Department's representative on BPAC, ensuring that every decision made was
11  actuarially driven. *Id*.

12       365.  Fred Motz, an actuary, also sat on BPAC. Mr. Motz's role was to further evaluate the
13  financial implications of any clinical decisions BPAC made.

14       366.  Compensation and performance for BPAC and its members depended on successfully
15  limiting and reducing the amount of benefits paid for behavioral health treatment. Case 3:14-cv-
16  05337-JCS Document 311 Filed 10/27/17 Page 129 of 182 lines 3-11.

17       367.  BPAC, and each of its members, worked together to benefit UBH, associated United
18  entities, and themselves by controlling the way in which behavioral health benefits were
19  administered.

20       368.  The result was that, despite numerous efforts by UBH's own clinicians to change the
21  UBH behavioral health guidelines, including the Level of Care and Coverage Determination
22  Guidelines, BPAC ensured that defective guidelines remained in place and that they would
23  fraudulently be represented as valid guidelines based on industry-wide standards of medical
24  necessity.

25       369.  The ASAM guidelines described in previous sections are one such example of an
26  industry-wide, generally accepted standard.

27
28

370.    BPAC considered adopting the ASAM guidelines, which UBH's clinicians conceded were the generally accepted standards of care, numerous times during the class period, but declined to do so because of the anticipated benex cost to United and its associated entities.

371.    For example, in 2012 initiatives to implement the ASAM guidelines were rejected by BPAC and its members because "use of these criteria usually will result in more authorization as they are more subjective and broader than our [UBH's] Level of Care Guidelines/CDGs." Case 3:14-cv-05337-JCS Document 312 Filed 11/01/17 Page 123 of 230, Lines 5-7.

372.    In another instance, in 2015, additional internal efforts to roll out ASAM implementation were prevented by BPAC because the working group attempting to implement ASAM guidelines could not demonstrate that they would be "ben-ex neutral." Case 3:14-05337-JCS Document 312 Filed 11/01/17 Page 119 of 230 lines 21-25. (Cross examination of Dr. Danesh Alam).

373.    Dr. Danesh Alam worked as a medical reviewer at UBH, and was also the head of a working group called "SUDS 2." In 2014 the SUDS 2 working group was tasked with analyzing the financial impact of implementing ASAM in Connecticut, which had passed a statute requiring ASAM be used. Case 3:14-cv-05337-JCS Document 312 Filed 11/01/17 Page 110 of 230, line 1-3. The SUDS 2 working committee concluded that ASAM should be implemented.

374.    The result of the financial departments involvement in BPAC, affecting clinical decision making, was that UBH did not adjust its guidelines, did not implement ASAM, and, as in the case of Connecticut and additional states, did not abide by state laws requiring ASAM's implementation and use.

375.    BPAC, via Dr. Martin Rosenzweig, the Chief Medical Officer in 2014, refused to implement or consider speaking with the UBH legal department about implementing ASAM until SUDS 2 working group conducted a financial analysis and could establish that implementation of ASAM would not increase benex. Case 3:14-cv-05337-JCS Document 312 Filed 11/01/17 Page 116 of 230, line 15-18. In otherwords, BPAC would only consider ASAM to the extent that it could be contorted to produce the same result as the profit-driven guidelines that were established and implemented by BPAC.

376.    During a 2015 meeting of BPAC, which included Fred Motz and Pete Brock of UBH financial departments, as well as Carolyn Regan, then Vice President of Clinical Policy, decided on level of care guidelines based on "business decisions" rather than clinical judgment. Case 3:14-cv-05337-JCS Document 312 Filed 11/01/17 Page 200 of 230, lines 7-9.

377.    There were two additional areas where BPAC made business decisions impacting the Level of Care Guidelines. Those business decisions involved the timing and frequency of mandatory physician visits.

378.    BPAC required physician visits as frequently as possible for levels of care where BPAC new claims were paid at a "bundled rate" without any corresponding clinical justification. This primarily affected RTC claims. RTC claims correspond with the higher levels of care and should be reimbursed accordingly. RTC claims are paid at bundled rates.

379.    BPCA made its decision to increase provider cost and thus discourage the provision of medically necessary treatment for those levels of care. This decision was made solely for business purposes as there was "no current best practice" indicating the necessity of that operation.

380.    The BPAC/UMC members knew that, by limiting Ben-ex they stood to enjoy professional and financial gains. The BPAC members steered the enterprise that, while having the blessing of UBH, operated distinctively in that its participants exercised discrete control of the association in fact conspiracy.

381.    The BPAC/UMC members cloaked their venal calculus in jargon to disguise the fact that financial gain drove their operations. BPAC/UMC, by way of its members and the sub-groups they supervised, exerted uniform and exacting control over benefits dispensation, such that there was approximately 98% consistency between benefits determinations, as determined by the "interrater reliability" metric. Case 3:14-cv-05337-JCS Document 311 Filed 10/27/17 Pages 99-102 of 182. That metric measures how consistently benefits are administered.

   *b.i.    Actions of Individual Members of BPAC*

382.    As set out in that decision, "instead of insulating its Guideline developers from these financial pressures, UBH has placed representatives of its Finance and Affordability Departments in key roles in the Guidelines development process throughout the class period. For example, Peter

Brock, the head of UBH's Affordability Department, and Fred Motz, from UBH's Finance Department, were both members of the [Behavioral Policy and Analytics Committee] BPAC, the committee responsible for approving the LOCGs and CDGs."

383.    Individuals at UBH that actively participated in and conspired to further this scheme ("financial executives") include but are not limited to:

384.    **Dr. Martorana** ("Martorana") was one of the other committee members who received these reports and used them to actively further and conspire to further the guidelines scheme. He oversaw and directed UBH's Care Advocacy clinicians and oversaw "quality improvement."

385.    In this capacity, Martorana furthered and conspired to further the guidelines scheme by giving direction to UBH's Care Advocacy clinicians based on financial, not clinical, concerns and apply financial, not clinical, considerations to "quality improvement."

386.    Martorana ensured that UBH's Care Advocacy clinicians applied the guidelines so as to result in medical necessity decisions that were not in accord with the generally accepted standard of care.

387.    Martorana and Triana were both instrumental in implementing "benex" in the guidelines scheme so that determinations made as to medical necessity did not accord with appropriate and accurate clinical evaluations of medical necessity as if such determinations had been made in accord with industry standard criteria.

388.    Benex is not an accepted or acceptable concern in generally accepted practice when determining medical necessity.

389.    The Finance and Affordability committee at UBH participated in the development and implementation of the guidelines.

390.    The guidelines had to be approved by the Finance and Affordability committee prior to being rolled out.

391.    The Finance and Affordability committee thus actively participated in and conspired to further the guidelines scheme.

392.    **Mr. Gerard Niewenhous** ("Niewenhous"), a trained social worker, was employed at UBH since 2003. He was responsible for maintaining the Level of Care Guidelines from 2003 to the

1  middle of 2016 and for drafting the Coverage Determination Guidelines from 2010 to the middle of
2  2015.

3      393.   During the *Wit* trial, the Court specifically found that Niewenhous's testimony that the
4  Guidelines were developed solely to reflect generally accepted standards of care was not credible.
5  Communications considered by the Court involving Niewenhous made it crystal clear that the primary
6  focus of the Guideline development process, in which Mr. Niewenhous played a critical role, was the
7  implementation of a "utilization management" model that keeps benefit expenses down by placing a
8  heavy emphasis on crisis stabilization and an insufficient emphasis on the effective treatment of co-
9  occurring and chronic conditions.

10      394.   As such, Niewenhous actively furthered and conspired to further the guidelines scheme.

11      395.   Niewenhous was also directly involved in the guidelines scheme and the active
12  deception of the scheme as it related to authorization of services. In a 2016 email reviewed by the
13  Court, Niewenhous stated that "[o]ur guidelines are used to authorize services. Presumption is that
14  services are acute." Niewenhous went on to note in the email that "services for severely and
15  persistently ill members that are intended to endure don't play to an acute care UR model." In lay
16  persons' terms – the very ill do not qualify for coverage.

17      396.   UBH instructed Niewenhous to "edit the CDG" accordingly, which he did. (August
18  2010 CDG for Custodial Care stating that "Improvement of the patient's condition is indicated by the
19  reduction or control of the acute symptoms that necessitated hospitalization or residential treatment.").

20      397.   Niewenhous, with UBH, was instrumental in the incorporation of the "utilization
21  management" model into the guidelines. In an e-mail dated December 9, 2015 considered by the Court
22  in *Wit*, entitled "Guideline Touchbase Call," under the general heading "Development of the
23  [Utilization Management] Model" and the subheading "Current Model" there is a bullet point that
24  states: "Is not organized to manage the needs of members with concurrent medical and behavioral
25  health conditions." Niewenhous testified that this statement reflected the fact that "in [UBH's]
26  commercial business the services focus on the reasons why somebody came into treatment at that
27  point... Historically, we haven't covered the lower levels of residential. However, if we move to using
28  ASAM, I don't see how we are able to deny the lower levels if the member has a residential benefit."

398.    Niewenhous' e-mail clearly shows the purpose of the guidelines was to deny care and avoid coverage.

399.    Niewenhous' e-mail clearly shows that the enterprise and conspirators with the enterprise intended to reduce expenses, present deceptive language and communications using the wires and mails to make it seem as if the guidelines reflected a generally accepted standard of care.

400.    In fact, the guidelines scheme explicitly rejected ASAM, recognized as the generally accepted standard of care and allegedly adopted by UBH from February 1, 2019 to present, and did so for financial considerations.

401.    Dr. Theodore Allchin is a board-certified child and adolescent psychiatrist. He began working part-time at UBH in 1988, splitting his time between private practice and his work at UBH until 2009, when he ended his private practice.

402.    **Dr. Allchin** ("Allchin") has the title Associate Medical Director at UBH. He actively furthered and conspired to further the guidelines scheme. His role at UBH was to perform peer reviews, conducts case consultations with providers, and perform "rounds" with UBH care advocates, as well as serving on a national credentialing committee.

403.    In this capacity, he was responsible for implementing the guidelines in practice and maintaining the deception to a national credentialing committee that the guidelines were in accord with generally accepted standards of care.

404.    He attempted to further this deception through his testimony in *Wit.* He testified to the Court that UBH's Guidelines were consistent with generally accepted standards of care which he based primarily on the "clinical best practices" in the Guidelines. The Court found his testimony unpersuasive.

405.    He testified that the Guidelines were consistent with generally accepted standards of care with respect to treatment of co-occurring conditions. The did not find his testimony credible on this.

406.    As such, Allchin participated in, furthered, and conspired to further the guidelines scheme because he supported criteria he knew put profit over patients.

407.   **Dr. Danesh Alam** ("Alam") is a board-certified psychiatrist employed by UBH and holds the position of Behavioral Medical Director. In that capacity he supervises Care Advocacy staff and makes medical necessity determinations.

408.   Dr. Alam, through implementation of the guidelines and applying them to medical necessity determinations participated in, furthered, and conspired to further the guidelines scheme. As a board-certified psychiatrist Alam knew that the guidelines did not comport with generally accepted standards of care, such as ASAM, and chose to apply them and make medical necessity decisions for patients despite this.

409.   Alam attempted to continue this deception through his testimony to the Court. The Court did not find Alam's testimony credible.

410.   Even more telling, the Court found that Alam's testimony at trial also revealed that he had misrepresented material facts in his expert report when he stated that UBH contracts with "few, if any" providers of lower-intensity residential treatment, namely, at the 3.3 and 3.5 levels under ASAM. At trial, in contrast, he conceded that UBH does contract with such providers. Dr. Alam also repeatedly offered interpretations of the Guidelines that were inconsistent with their plain meaning.

411.   Further showing the power and influence of Finance and Affordability committee in the guidelines scheme, Alam provided testimony that finance would not sign-off on implementing the ASAM criteria. He testified that they refused to do so as "they could not estimate the financial impact on BenEx in changing from using the UBH guidelines to ASAM (testimony that proposed "rollout" of ASAM pilot would be terminated if it led to an increase in utilization."

412.   The guidelines scheme was an orchestrated scheme to defraud providers and patients to minimize UBH's benex. The record in *Wit* clearly shows that despite clinicians' knowledge that ASAM was appropriate, UBH made a corporate policy decision not to use those guidelines based on underwriters concerns about benex and its predictability.

413.   **Dr. William Bonfield** ("Bonfield") is the former UBH Chief Medical Officer. His testimony to the Court in *Wit* acknowledged that the guidelines were not developed in accordance with industry best practices. He testified that the concept of "why now" employed by the guidelines was first developed by the medical director of a managed care company called Biodyne.

414.    In the 2014 version of the Guidelines, UBH defined "why now" as the "acute changes in the member's signs and symptoms and/or psychosocial and environmental factors leading to admission." (2014 Guidelines) (Admission sub-bullet beginning "[t]he member's current"). The same definition is used in the 2015 and 2016 versions of the Guidelines. (2015 Guidelines); (2016 Guidelines); (2016 Guidelines (June).

415.    The Court specifically found that the "why now" approach, derived from "crisis intervention literature" did not accord with generally accepted standards of care, such as ASAM, because it excluded from consideration factors related to a patient's chronic condition that are not directly tied to acute changes. The "why now" approach that pervaded the guidelines did not appear in any journals or academic publications that would support UBH and Bonfield's position that "why now" met the generally accepted standard of care. To the contrary, it clearly did not.

416.    Bonfield actively worked to obtain and implement guidelines that he knew did not comport with generally accepted standards of care, furthered the fraud and conspired to further the fraud by representing that they did, and actively participated in, furthered, and conspired to further the guidelines scheme.

417.    **John Beaty** ("Beaty") is the UBH employee who was responsible for UBH's accreditation with NCQA and URAC. He participated in, furthered, and conspired to further the guidelines scheme by concealing essential information as to the guidelines from these organizations and fraudulently representing to them then UBH's guidelines comported with generally accepted standards of care. Beaty knew that the accreditation would be relied on by both providers and patients and would provide a clear indicium of respectability and authority that providers and patients would rely on.

418.    Beaty was able to obtain NCQA and URAC accreditation.

419.    With NCQA and URAC accreditation, the authorizations UBH gave providers were all the more fraudulent and deceptive because they had the authority of the accreditations behind them when they were made.

420.    Thus, Beaty participated in, furthered, and actively conspired to further the guidelines conspiracy.

*b.ii     The Enterprise Illegally Profits From Denying Valid, Medically Necessary Claims.*

421.    The enterprise illegally profits from denying valid, medically necessary claims.

422.    Instead of looking at the actual medical necessity to provide treatment to its insureds, despite having ready access to sources such as the ASAM guidelines, the enterprise developed secret proprietary guidelines that focused on benex, not patients.

423.    For all of the claims, the enterprises profit increases to the extent benex decreased by denying valid, medically necessary claims.

424.    Denying the claims by fraudulent means deprives Plaintiffs and the putative class of their property.

425.    The enterprises activity is coordinated across numerous United companies that administer plans that provide OON MH/SUB benefits.

426.    These entities coordinate their efforts in undertaking the racketeering activities.

427.    The relationships among the members of the enterprise are sufficient to permit them to pursue the enterprise's purpose.

428.    As the third *Boyle* factor, longevity, the enterprise functioned for nearly a decade.

429.    Each member of the enterprise participates purposefully and knowingly in the affairs of the enterprise by engaging in activities that seek to further, assist or help effectuate the goals of the enterprise.

430.    Each member of the enterprise agreed to participate in the affairs of the enterprise with knowledge of the enterprise's unlawful goals and purposes, including the scheme, to commit acts in furtherance of the enterprise's common purpose, and to share in monies obtained through the scheme.

431.    Each member of the enterprise has engaged and continues to engage in incidents of racketeering activity in furtherance of the enterprise's common unlawful purpose.

432.    Each member of the enterprise agreed to, and do act through the enterprise to, manipulate the guidelines to deny valid, medically necessary claims and reduce benex.

433.    The enterprise has functioned as a continuing unit for more than two years and has existed such that its members pursued the enterprise's purpose during this time.

- 62 -

*b.iii.    Post-Denial Concealment*

434.    For every claim at issue in this litigation, documents concealing the true means and basis for payment were issued electronically, in the mail, and on inquiry, over the phone.

435.    These constitute predicate acts of racketeering activity.

436.    Provider Remittance Advice letters ("PRAs") were mailed documents that allegedly provided a detailed explanation of the price reductions. In the PRA documents, the reason stated for the denial of the claim was fraudulent.

437.    The fraudulent reasons provided in the PRAs were designed to deceive Plaintiffs and the putative class into accepting the denials as valid and appropriate.

438.    The PRAs contained standardized notes allegedly explaining payment denials.

439.    The claims at issue received inconsistent PRA notes, none of which accurately explained that profit, not the medical necessity of the patient, was behind the denial.

440.    Instead, the codes provided generic notes or no notes at all.

441.    The purpose of the notes on every PRA was to pass off as the denial legitimate and objective.

442.    The PRA notes were part of the scheme to deceive Plaintiffs and the putative class into accepting the denials.

*b.iv.    Claims Processing*

443.    Every time a claim is processed by United, United's claim handling system sends to the healthcare provider an alleged explanation of how and why the claim was processed in a specific way. That document, called an "Provider Remittance Advice" (hereinafter "PRA"), is generally transmitted to the treated patient and the treating provider via the United States Postal Service.

444.    The PRAs that United sent in this action are false and were created with the intent to deceive the documents' recipients.

445.    United has sent tens, if not hundreds, of thousands, or more, of PRAs making misstatements about claim denials via the United States Postal Service, facsimiles, and electronic data interchanges.

446.    Every PRA for claims denied for medical necessity was misleading.

447. The Defendants knew that the denials were fraudulent and intentionally misleading and are not, in fact, based on objective, reliable assessments and determinations of medical necessity.

448. Nevertheless, the PRAs sent to Plaintiffs continued to fraudulently represent that the claims were denied for medical necessity based on an objective assessment of the claim.

### c. Racketeering Acts and Denial of Claims

449. The denial of claims fall into three categories: pre-service denials, post-service denials, and services not rendered as billed denials.

*c.i. Pre-service Denials*

450. Prior to offering many of the services at issue, United required providers to obtain prior authorization. In order to "manage utilization" United only authorized 2-3 days at a time for most services. When United denied and Plaintiffs appealed authorizations, or when authorization was sought over the weekend and then denied, Plaintiffs' patients were left uncovered for those dates of service.

451. Plaintiffs, and the class they represent, seek to recover money damages for claims that whose denials were pre-service, post-service, and for "services not rendered as billed."

*c.ii. Post-Service Denials*

452. Sometimes, no pre-authorization was required for services. Instead, United stated in its Verification of Benefits that services would be covered based on UBH's determination that the services were medically necessary. Providers, trusting their own clinical judgment, provided thousands of units of service that United later decided were not medically necessary. To make those medical necessity determinations, United relied on guidelines that, for the reasons stated throughout, were false and fraudulent.

453. Sometimes, no pre-authorization was required for services. Instead, United stated in its Verification of Benefits that services would be covered based on the determination that the services were medically necessary. Providers, trusting their own clinical judgment, provided thousands of units of service that United later decided were not medically necessary. To make those medical necessity determinations, United and related plan administrators relied on guidelines that, for the reasons stated throughout, were false and fraudulent.

454. Plaintiffs and the class they represent seek to recover money damages for the medically necessary services that they provided and have not received any reimbursement for.

c.iii.    *Services Not Rendered As Billed Denials*

455. After Plaintiffs provided services to UBH members, UBH frequently requested medical records as a condition of payment. In many cases, United denied payment for both authorized and unauthorized claims based on alleged deficiencies in Plaintiffs' medical records. The majority of these claims was denied with a code "SNR" which UBH defined as "Services Not Rendered as Billed."

456. The bases for denying claims were derived from standards and guidelines set by UBH's financial team, without any clinical justification. (Statements of Dr. Lorenzo Triana, describing case at Case 3:14-cv-05337-JCS Document 312 Filed 11/01/17 Page 203 of 230[12]. Specifically, BPAC elected to impose a categorical requirement that "initial evaluations" be filled out within 3 days because BPAC knew the requirement would lead to decreased benefit expense resulting from claims denial for non-compliance with the arbitrary standard.

457. The Enterprise has denied every claim at issue in the present litigation. The enterprise profits by unlawfully retaining the denied amount.

458. In addition to profit, the enterprise has the effect of eliminating competition between contracting and non-contracting providers; pushing non-contracting providers into unfavorable contracts with United; and avoid liability for enterprise and racketeering acts.

(1)    *Predicate Acts*

*Overview of Predicate Acts and Inequitable Conduct*

459. Each Plaintiff in this case had numerous claims systematically denied by the United plan administrator acting in concert with the enterprise. A sampling of such acts are provided below.

*Predicate Acts as to Meridian Treatment Solutions*

---

[12] Testimony of Dr. Lorenzo Triana, describing an e-mail chain evaluating changes to level of care guidelines: "Discussion point for BPAC. No evidence base for the current standard that the initial evaluation be completed within three treatment days of admission. Evidence base doesn't provide an alternative standard. After discussion with Lorenzo Triana and Bill Bonfield recommending that the standard be maintained as a business decision"

460.    Between 2014-2019 Meridian provided sub-acute MH/SUD services to 49 patients insured or covered under benefits plans administered by United, which denied payments based on medical necessity.

461.    Each of these denials was based on illegal guidelines, was improper, and was a valid claim for medically necessary treatment and the appropriate, medically necessary level of care.

462.    By way of example, Meridian provided care to patient RT between February 12th and February 19th of 2016.

463.    On February 12, prior to admitting to Plaintiff's care, Plaintiff called Defendant twice to confirm that RT's treatment would be covered. Pursuant to reference numbers 1-1567440 and C-60431252584638, and Defendant's agent, RT's Defendant would pay for care that Medical Necessity, and precertification was required for Partial Hospitalization Services, meaning that Defendant had to agree in advance to any payment to RT.

464.    Approximately a month prior to admitting to treatment, had RT relapsed on heroin after 7 months of sobriety. Plaintiff's clinical team determined that patient could be safely treated at the Partial Hospitalization Level of care and began the precertification process.

465.    On February 15th, 2020, Defendant's representative "Angela" authorized 5 days of services pursuant to authorization number 4RSXWE-01. "Angela" stated that United agreed services were medically necessary and agreed to cover services for 5 days of care between February 13th and 17th of 2016.

466.    On February 19th, Defendant's representative "Mary" represented that Defendant agreed another 6 days of coverage medically necessary for RT, pursuant to the same authorization number Angela provided on February 15th.

467.    Despite issuing authorization numbers for 11 days of service, United applied its illegal level of care guidelines to deny claims as medically unnecessary as rendered.

468.    Instead of paying claims like "Mary" and "Angela" said they would, United requested medical records for all dates of service.

469.     When records were received, Defendant denied claims based on alleged incongruence with Defendant's illegal level of care criteria. United applied its deficient LOCG's to withdraw its agreement that the services provided were medically necessary.

470.     This was part of a pattern of frequent use of illegal criteria to deny medically necessary claims.

471.     Meridian has detailed records of hundreds of phone conversations with named agents of Defendants who made identical fraudulent representatives.

472.     The explanations provided to Meridian over the wires and in the mail contain false and fraudulent explanations of why claims were denied. For every single claim at issue in this action as to Meridian, United deceived Meridian by withholding or not posting Electronic Remittance Advice, Provider Remittance advice or clear Explanations of Benefits ("EOBs").

473.     Instead of acknowledging that claims were denied based on Defendant's financial decisions, Defendant passed the buck and simply let the claims linger in limbo.

*Predicate Acts as to Harmony Hollywood*

474.     Between 2014-2019 Harmony Hollywood provided sub-acute MH/SUD services to patients insured or covered under benefits plans administered by United, which denied payments based on medical necessity.

475.     Each of these denials was based on illegal guidelines, was improper, and was a valid claim for medically necessary treatment and the appropriate, medically necessary level of care.

476.     By way of example, Harmony treated United's insured EL between August 26, 2018 and September 6, 2018. EL received authorization for some days of treatment, but for date of service September 6, 2019, UBH refused to provide authorization, citing an issue with licensure unrelated to EL's 2018 treatment. Numerous instances of follow-up with United yielded only the same repetition that due to failure to obtain a licensee for Incidental Medical Services, EL's care did not meet United's standards per calls with United on August 27 at 11:42am, and again on September 4, 2018 at 11:16am. While the remainder of EL's stay was covered, United refused to cover September 6, 2018 claiming that non-compliance with United's level of care guidelines rendered the service provided medically unnecessary.

1

2

3

4

5

6

7

8

9

10

11

477.    Harmony treated United insured LP between June 25 and July 2 2018. United covered 3 days of detoxification services. As LP was transitioned to a lower level of care, Case Manager Adam, at telephone number 800-548-6549 ext 67205 denied coverage for Residential Treatment. Harmony's care team did not believe it was safe for LP to receive care at any level lower than RTC, especially in light of her recent need for medically assisted detoxification. Nevertheless, on June 29, 2018 and July 2, 2018, over the course of various Peer to Peer reviews, United dragged out the precertification process while LP was receiving residential treatment. When United representative Adam indicated that United denied preauthorization for coverage for medical necessity on July 2, 2018 at 4:51 pm, citing a low withdrawal risk, LP had already received 6 days of residential treatment services. This denial violates the guidelines put forward in ASAM, and the care for this member remains unpaid.

12

13

14

15

16

17

18

19

20

21

478.    Patient GG received residential treatment from Harmony between February 14 and March 3, 2018. Harmony obtained prior authorization for every single day of service prior to treating GG. Harmony's representatives spoke repeatedly with United Case Manager Tracy, at phone number 800-548-6549 ext. 67969, and Christine at phone number 800-548-6549 ext. 67138. Over the course of at least 10 telephone calls to both, including confirmation calls on February 15, 2018 at 9:28 AM February 23, 2018 at 10:21am, PST; February 27, 2018 at 11:10am PST, Harmony's representatives received authorizations to provide medically necessary residential MH/SUD treatment pursuant to authorization numbers PBQB4A-01; PBQB4A-02; 2M25JR-01; and 2M25JR-02. Tracy and Christine agreed that the clinical notes that Harmony submitted substantiated and satisfied UBH's medical necessity standards.

22

23

24

25

26

27

28

479.    However, after providing medically necessary, authorized care for GG, Harmony submitted timely, accurate bills. United, in response, requested medical records for every single date of service authorized. For every single date of service billed, Harmony submitted uniform medical records indicating that ASAM Compliant care was rendered for every single date of service billed. Every date of service had substantially medical records, prepared and recorded subject to rigorous oversight and industry leading care. Without justification or explanation, United denied payment for claims for services for February 20-27, 2018. The only justification found for the aberration was

provided by various representatives, including Vicki Crump, at UBH's Program and Network Integrity Department. The denial justification was that: "documentation submitted does not appear to be an accurate depiction of the services billed."

480.    The claims review standard for these medical records were the illegal guidelines at issue in this case. Without further explanation, and despite exhaustive efforts on appeal, claims continued to be denied.

481.    The alleged inadequacies, themselves based on the deficient level of care guidelines, caused claims for medically necessary services to be denied because the services as rendered were deemed not medically necessary.

482.    Harmony experienced identical claims denials, and claims denials for the reasons discussed infra for claims for at least 1,000 other claims filed on behalf of at least 75 other patients insured by United.

*Predicate Acts as to Desert Cove Recovery*

483.    Between 2014-2019 Meridian provided sub-acute MH/SUD services to patients insured or covered under benefits plans administered by United, which denied payments based on medical necessity.

484.    Each of these denials was based on illegal guidelines, was improper, and was a valid claim for medically necessary treatment and the appropriate, medically necessary level of care.

485.    By way of example, Desert Cove rendered Partial Hospitalization Services to UBH's insured MD between April 18 and May 11, 2016.

486.    MD was an intra-venous heroin user. He reported injecting heroin up to 5 times per day. He reported that he had continuously failed to remain abstinent from drugs and alcohol on his own.

487.    MD had no access to a supportive environment conducive to recovery.

488.    MD had limited bio-medical obstructions to treatment.

489.    MD suffered from low motivation or compromised motivation to remain abstinent from drugs.

490.   MD satisfied all or substantially all of the 6 ASAM factors indicating the medical/clinical propriety of treatment in a Partial Hospitalization Program.

491.   Over the course of at least 8 verification and authorization phone calls for that stay Desert Cove representative Megan called UBH to confirm and re-confirm benefits.

492.   Megan spoke to: "Sheila B" on May 2, 2016; "Ashley" on June 6, 2016; "Bridgette" on May 17, 2016; "Ashley" again on June 22, 2016; and "Eileen" on August of 2016.

493.   On each and every single one of these calls, UBH's representatives confirmed that medically necessary Partial Hospitalization Services were covered for OON providers.

494.   Desert Cove rendered services, documented services, and timely submitted bills.

495.   Instead of paying claims as promised, UBH denied the services based on a lack of medical necessity – the term upon which coverage was conditioned in the VOB. After asking for claims reprocessing, UBH responded to the appeal with a letter stating, in relevant part, the following:

> "Partial Hospitalization Care was not available for the following reasons: You were admitted to the partial hospitalization level of care on April 16, 2016. You had completed an inpatient program and had 28 days of sobriety at the time of your admission. On admission you were medically and psychiatrically stable. You were engaged in treatment and committed to recovery. You could have been treated at a lower level of care such as an intensive outpatient program."

496.   This coverage determination is deeply flawed because Partial Hospitalization Programs would be inappropriate for a patient exhibiting any of the included bases for denying care. Patients presenting with medical or psychiatric instability would be disqualified from Partial Hospitalization Programs because patients presenting with such instability would be unsafe to treat in a Substance Use Disorder Partial Hospitalization Program.

497.   A patient who is withdrawing from drugs or alcohol and who has not completed an inpatient program is generally unprepared for a non-residential program. Patients who are not motivated to get help will not seek treatment in a non-residential context. Under UBH's coverage criteria, PHP is covered subject to medical necessity, but in a "catch-22" is also never medically necessary.

498.    UBH sent this false, fraudulent and deceptive letter to Plaintiff Desert Cove by way of the US Mails. The coverage denials in question were based on criteria that *Wit* explained were illegal.

499.    The letter was prepared and sent by Leslie Moldauer, MD, the Associate Medical Director at United Behavioral Health. Ms. Moldauer's letter makes no mention of medical necessity, only alluding to the "member's benefit plan." As Ms. Moldaueer knew, coverage for MD was conditioned on Medical Necessity.

500.    Desert Cove, or its agents, exhausted all available internal appeals mechanisms for all denied claims with UBH.

501.    All or substantially all providers who's claims were denied citing lack of medical necessity were sent similar denial letters in the mail.

    *(2)    Fraudulent Representations Using the Mail and Wires*

502.    Indeed, to this end, as described above, the provider remittance advice documents ("PRAs") the Plaintiffs receive from the Insurance Companies accompanying Insurance Companies' denial of claims all provide fraudulent reasons for the denial.

503.    These representations were made using the mail and wires.

504.    The Plaintiffs were deceived and directly injured by these deceptions.

    *(3)    RICO Proximate Cause*

505.    Every Plaintiff has been directly injured by the enterprise's scheme.

506.    The objective of the scheme is to increase profits by illegally reducing benex with illegal guidelines. Every Plaintiff is a target of the scheme.

507.    In implementing this scheme, Plaintiffs have had thousands of valid, medically necessary claims denied.

508.    They denials were done so on a systematic basis as part of UBH's regular way of doing business.

509.    There are no other victims of this scheme who have been directly injured, or more directly injured than Plaintiffs, by the fraudulent conduct.

510.    As the most directly injured victims, Plaintiffs can be counted on to vindicate the law as private attorneys general. Plaintiffs' injuries are not just the foreseeable and natural consequence of the scheme, they are the objective of the scheme.

## CLASS ACTION ALLEGATIONS

511.    Plaintiffs bring this action as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed subclasses and seek to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and/or (b)(3) of the Federal Rules of Civil Procedure, subject to amendment and additional discovery as follows:

### a.  Class Definitions

*Putative Class*: All behavioral healthcare providers who, between May 22, 2011 and January 31, 2019 were denied pre-service authorizations or where submitted claims were deniedon the basis of 'medical necessity' such that the determination of 'medical necessity' was made through the application of UBH's LOCGs and CDGs; and where such claims remain unpaid.

*Size of Class*. The members of the class defined above are so numerous that joinder of all members is impracticable. The precise number of members in the class is known only to UBH and Plaintiffs reasonably believe that the class number exceeds 10,000.

*Class Representatives*. Named Plaintiffs, Meridian Treatment Centers and Desert Cove each provided MH/SUD services subject to the same UBH LOCG and CDG guidelines as in *Wit*. Each Named Plaintiff engaged in industry standard, generally accepted practices for each phase of determining appropriate level of care based the patients' medical necessity, administering treatment, billing, and following up on claims. Each Named Plaintiff billed for services according to standard, uniform, medical coding. Each named plaintiff was uncompensated for claims based on UBH's illegal guidelines. Each named plaintiff is entitled to relief in the form of claims reprocessing.

Excluded from the Class are:

i. Defendants, including any entity or division in which Defendants have a controlling interest, along with their legal representative, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates;

ii. The Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family;

iii. Any class counsel or their immediate family members; and

iv. All governmental entities.

- 72 -

512.    Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

### b.   Numerosity and Ascertainability

513.    This action meets the numerosity requirement of Fed. R. Civ. P. 23(a)(1), given that the number of impacted providers are reasonably believed by the Plaintiffs to exceed ten thousand making individual joinder of class members' respective claims impracticable. While the exact number of class members is not yet known, a precise number can be ascertained from UBH's records for denied MH/SUD claims made using illegal guidelines from 2011-2019.

514.    The resolution of the claims of the class members in a single action will provide substantial benefits to all parties and the Court. It is expected that the class members will number at least in the tens of thousands.

515.    Finally, Class members can be notified of the pendency of this action by Court-approved notice methods.

### c.   Typicality

516.    Pursuant to Federal Rules of Civil Procedure 23(a)(3), Plaintiffs' claims are typical of the claims of class members and arise from the same course of conduct by Defendants. Plaintiffs' persons and real property, like all Class Members, have been damaged by UBH's misconduct in that they have incurred damages and losses related to the claims wrongfully denied by UBH both before after services had already been rendered through the use of illegal Guidelines.

517.    Furthermore, the factual basis of Defendants' actions and misconduct are common to all Class Members and represent a common thread of misconduct resulting in common injury to all Class Members. The relief Plaintiffs seek is typical of the relief sought for absent Class Members.

### d.   Adequacy of Representation

518.    Plaintiffs will serve as fair and adequate class representatives as their interests, as well as the interests of their counsel, do not conflict with the interest of other members of the class they seek to represent.

- 73 -

519.    Further, Plaintiffs have retained counsel competent and well experienced in class action, multi-district litigation, mass tort, insurance, pharmaceutical and environmental tort litigation.

520.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither the Plaintiffs nor their counsel have interests adverse to the Class.

**e.  Predominance of Common Issues**

521.    There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, making it appropriate to bring this action under Rule 23(b)(3). The answers to these common questions will advance resolution of the litigation as to all Class Members. Common legal and factual issues include:

- Whether UBH engaged in verifications of benefits (VOB) conversations with a provider prior to the insured receiving treatment.

- What level of treatment UBH authorized in VOB conversations.

- Whether UBH authorized treatment in utilization review and UCR conversations.

- What level of treatment was provided to the member.

- What payments were made to providers.

- Whether partial payments were made based on a lower level of care than was received by the member.

- What guidelines UBH used in determining MH/SUD benefits.

- What guidelines UBH used in determining MH/SUD coverage decisions.

- What guidelines UBH used in determining "Level of Care."

- Whether such guidelines applied appropriate standards.

- Whether such guidelines provided appropriate care for members.

- Whether such guidelines accorded with the generally accepted standards of care.

- Whether UBH intentionally delayed in processing claims.

- Whether UBH intentionally delayed in denying claims.

- Whether UBH delayed level of care decisions knowing that its members would continue to receive care until such decision was made.

- Whether UBH retroactively denied authorizations, knowing that its members had already received care, to save from paying benefits expenses.

- Whether UBH is liable to Plaintiffs and the Class for their actions.

- Whether UBH is required to reprocess all MH/SUD denials made under the illegal Guidelines via a Special Master or neutral third-party.

**f. Superiority**

522.    The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case. Given the great number of providers across the nation, it is impracticable for Plaintiffs and the Class to individually litigate their respective claims due to the risk of inconsistent or contradictory judgments, generating increased delays and expense, and wasting judicial resources. No unusual difficulties are likely to be encountered in the management of this class action. Therefore, the class action mechanism presents considerably less management challenges and provides the efficiency of a single adjudication under the comprehensive oversight of a single court.

## <u>CAUSES OF ACTION</u>

523.    Plaintiffs do not bring a cause of action under ERISA as the state law claims do not arise under and are not preempted by ERISA. A large percentage of the claims which underlie this lawsuit do not involve ERISA plans.

524.    Plaintiffs' RICO causes of action are not preempted by ERISA, the McCarran-Ferguson Act, or any other statute.

525.    Plaintiffs' state law causes of action are not preempted by ERISA.  Plaintiffs and the Plaintiff Classes' claims rely on the violation duties that arise independently of an ERISA plan. *See Hansen v. Grp. Health Coop.*, 902 F.3d 1051 (9th Cir. 2018); *Marin Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941 (9th Cir. 2009). As such these claims are not preempted by ERISA.

1

**Count I:     Violation of RICO, 18 U.S.C. § 1962(c) (as against all Defendants)**

2      526.    The Plaintiffs re-allege and restate the facts set forth above as if they were fully set

3  forth herein.

4      527.    The Plaintiffs are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and

5  1964(c).

6      528.    UBH is a "person" within the meaning of 18 U.S.C. § 1961(3).

7      529.    As set forth above, during the class period, UBH has been and continues to be, a part

8  of an association-in-fact RICO enterprise within the meaning of 18 U.S.C. § 1961(4).

9      530.    The Enterprise is comprised of at least UBH.

10     531.    UBH has an existence separate and distinct from the Enterprise.

11     532.    UBH is associated with the Enterprise.

12     533.    The Enterprise was and is engaged in interstate commerce and its activities affect

13  interstate commerce.

14     534.    UBH has conducted and participated in the conduct of the Enterprise's affairs through

15  a pattern of racketeering activity.

16     535.    UBH exercises management and/or control over the affairs of the Enterprise.

17     536.    UBH has engaged in at least two incidents of racketeering activity that have the same

18  or similar purposes, results, participants, victims or methods of commission or are otherwise

19  interrelated by distinguishing characteristics and are not isolated incidents.

20     537.    The incidents of racketeering activity engaged in by UBH embraces criminal conduct

21  that has the same or similar purposes, in that they sought to, and did, unlawfully avoid reimbursing

22  Plaintiffs.

23     538.    The incidents of racketeering activity engaged in by UBH embraces criminal conduct

24  that has similar results, in that they sought to, and did, unlawfully avoid reimbursing Plaintiffs.

25     539.    The incidents of racketeering activity engaged in by UBH embraces criminal conduct

26  that has the same or similar participants, including but not limited to UBH.

27

28

540.    The incidents of racketeering activity engaged in by UBH embraces criminal conduct that has the same or similar victims, consisting of the Plaintiffs and the class, whom Defendants have schemed to deny claims from.

541.    The incidents of racketeering activity engaged in by UBH embraces criminal conduct that is not isolated, rather those incidents are part of the Defendant's regular way of doing business and are regularly and systematically engaged in by them to deny out-of-network providers, including Plaintiffs, appropriate reimbursement.

542.    The incidents of racketeering activity involve the denial of claims for services provided to different persons, on different dates, at different locations.

543.    Defendant's conduct poses a continuing threat of racketeering activity.

544.    UBH has engaged in thousands, or more, of incidents of racketeering activity directed at Plaintiffs and other providers.

545.    UBH has engaged in these incidents of racketeering activity and criminal activity on a continuing basis.

546.    The incidents of racketeering activity engaged in by UBH have been and continue to be part of the Defendant's regular way of doing business.

547.    The incidents of racketeering activity are extremely lucrative for UBH.

548.    UBH will continue to engage in similar incidents of racketeering activity indefinitely, unless forced to cease by judicial intervention.

549.    UBH has been engaged in racketeering activity for at least two years and that activity remains ongoing.

550.    UBH has conducted and participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity consisting of multiple instances of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343, which conduct constitutes racketeering activity under 18 U.S.C. § 1961(1)(B).

551.    As a direct and proximate result of UBH's violations of 18 U.S.C. § 1962(c), the Plaintiffs were injured in their business, suffering financial losses within the meaning of 18 U.S.C. § 1964(c).

**Count II:    Violation of RICO conspiracy, 18 U.S.C. § 1962(d) (as against all Defendants)**

552.    The Plaintiffs reassert and reallege the facts set forth above as if fully set forth herein.

553.    The Plaintiffs are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

554.    UBH is a "person" within the meaning of 18 U.S.C. § 1961(3).

555.    As set forth above, since at least the beginning of the class period, UBH has been, and continue to be, part of an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), comprised of at least UBH.

556.    UBH has committed overt acts which are also acts of racketeering activity as defined in 18 U.S.C. § 1961(1)(B). These overt acts and acts of racketeering activity consist of multiple instances of mail fraud and wire fraud, as set forth above.

557.    UBH has agreed to a conspiracy that has as its objective a substantive violation of the federal RICO Act.

558.    UBH has agreed to participate directly or indirectly in the conduct of the affairs of the Enterprise by agreeing to commit, or aid other members of the conspiracy to commit, at least two predicate acts.

559.    UBH acted knowingly and purposely with knowledge of the unlawful objective of the conspiracy and with the intent to further its unlawful objective.

560.    As a direct and proximate result of UBH's violations of 18 U.S.C. § 1962(d), the Plaintiffs have been injured in their businesses and property, suffering financial losses.

561.    As a direct and proximate result of UBH's violations of 18 U.S.C. § 1962(d), the Plaintiffs were injured in their business, suffering financial losses within the meaning of 18 U.S.C. § 1964(c).

**PLAINTIFFS' STATE LAW CAUSES OF ACTION**

562.    Under the oral, implied-in-fact, and implied-at-law contracts at issue, Plaintiffs agreed to render medically necessary care to patients; in exchange, UBH agreed to pay Plaintiffs pursuant to the terms of the oral, implied-in-fact, and implied-at-law contracts for that care. In

general, the oral, implied-in-fact, and implied-at-law contracts at issue provided for medically necessary care to be paid at Plaintiffs' usual and customary rate for the care provided.

563. Plaintiffs agreed to submit bills to UBH reflecting the Plaintiffs' usual and customary total billed charges associated with rendering medically necessary care to the patients. In exchange, UBH agreed to process and pay such claims according to the agreed-to terms of the contracts.

564. Prior to rendering care to patients, Plaintiffs received pre-authorization from an employee of UBH, verifying that the patients were enrolled in a UBH health plan and that, based on the patient's history and symptoms, services were authorized as medically necessary. As part of this process, UBH provided Plaintiffs with either an authorization number or a confirmation message showing that each patient was eligible and pre-authorized for benefits at a specific level of care/service intensity.

565. Based on UBH's pre-authorization assurances and representations that UBH would pay the Plaintiffs for rendering the medical care as described above, Plaintiffs rendered medically necessary care to patients.

566. Plaintiffs reasonably relied on UBH's agents and/or employees' representations that i) the patients were enrollees of UBH's health plan; and ii) the patient's history and symptoms qualified for authorization for payment of benefits from UBH at a specific level of care/service intensity; and iii) Plaintiffs would be paid for their services in providing care for patients. Plaintiffs thus were induced to not make alternate financial arrangements to obtain payment for the medically necessary care rendered to patients.

567. This action is not brought by an ERISA plan participant or beneficiary.

568. This is action not brought to recover benefits due to an insurance policyholder or group insurance plan participant or beneficiary.

569. Plaintiffs are not traditional ERISA entities. They are not insurance companies managing ERISA claims, employers providing ERISA benefits, nor are they patients entitled to ERISA benefits. Instead, Plaintiffs are third parties that contracted with UBH to provide services for an agreed-upon amount.

570.    Plaintiffs do not contend that UBH violated the terms of any ERISA agreement or agreements. Indeed, Plaintiffs are not privy to the terms of the group health plans and/or individual health insurance policies to which their patients are participants, beneficiaries and/or parties.  Rather, Plaintiffs claim the amounts promised to them by UBH precisely because they are not owed under the patients' health plans and/or policies but rather are owed under the independent agreements between UBH and the Plaintiffs.

**Count III:        UNFAIR BUSINESS PRACTICES**

571.    Plaintiffs re-allege and incorporate the factual allegations above, as though such allegations were fully stated herein.

572.    Plaintiffs bring Count I under Cal. Civ. Code §§ 17200 *et seq.*, California's Unfair Competition Law ("UCL") for damages they sustained from Defendant's unlawful business practices based on the conduct including that alleged *supra* and below in counts III-X, and under Cal. Civ. Code § 3294 for punitive damages arising from the acts and based on the conduct including that alleged above in paragraphs 1 through 155 and below in counts II-IX.

573.    As a California corporation, UBH is subject to Cal. Civ. Code §§17200 *et seq*.

574.    Under the UCL "unlawful, unfair or fraudulent business act[s] or practice[s]" are prohibited.

575.    The UCL's coverage for "an unlawful business practice" is broad, and embraces "anything that can properly be called a business practice and that at the same time is forbidden by law." *See Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1102 (S.D. Cal. 2017) *citing Cel–Tech Commc'ns v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999).

576.    In *Wit* cited *supra*, the court found United's Guidelines to be illegal.

577.    Plaintiffs have detailed, at length, how these illegal guidelines were part of an overall, fraudulent guidelines scheme.

578.    The fraudulent guidelines scheme underlies Plaintiffs' RICO causes of action.

579.    As a detailed fraudulent scheme is alleged in Plaintiffs' RICO causes of action, this clearly sets forth, with specificity, Plaintiffs' allegations that UBH's practices were fraudulent.

- 80 -

580.     Additionally, UBH violated the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, 42 U.S.C. § 300gg-26, as UBH's use of illegal Guidelines in making decisions on clinical necessity for MH/SUD were more restrictive than those applied in making decisions about coverage of medical/surgical services. *Wit* found the record "replete with evidence that UBH's Guidelines were viewed as an important tool for meeting utilization management targets, 'mitigating' the impact of the 2008 Parity Act, and keeping 'benex' [benefit expense] down" and that UBH rejected the "ASAM Criteria because [UBH] could not be sure that use of the ASAM Criteria would not increase BenEx."

581.     UBH violated the anti-discrimination mandate within the Affordable Care Act at 42 U.S.C. § 300gg-5 by discriminating against Plaintiffs and class members who provided services to patients suffering from MH/SUD disorders based on illegal clinical necessity criteria that was asymmetric to medical/surgical criteria, and that placed profit above patient well-being.

582.     UBH violated the California Mental Health Parity Act, incorporated into the Knox-Keene Health Care Service Plan Act at Cal. Health & Safety Code § 1374.72. UBH violated the Act as many of the claims at issue in the present litigation involve patients that are dual-diagnosis[13] with the "severe mental illnesses" included in the Act[14].

583.     UBH engaged in acts and practices that offend public policy and are immoral, unethical, oppressive and substantially injurious to consumers.

584.     UBH's unfair acts and practices irrevocably harmed Plaintiffs and class members.

---

[13] Dual diagnosis (also referred to as co-occurring disorders) is a term for when a patient experiences a mental illness and a substance use disorder simultaneously. Either disorder—substance use or mental illness—can develop first. People experiencing a mental health condition may turn to alcohol or other drugs as a form of self-medication to improve the mental health symptoms they experience. However, research shows that alcohol and other drugs worsen the symptoms of mental illnesses. NAMI, Dual-Diagnosis, https://www.nami.org/learn-more/mental-health-conditions/related-conditions/dual-diagnosis (last visited Aug 12, 2019).

[14] (1) Schizophrenia. (2) Schizoaffective disorder. (3) Bipolar disorder (manic-depressive illness). (4) Major depressive disorders. (5) Panic disorder. (6) Obsessive-compulsive disorder. (7) Pervasive developmental disorder or autism. (8) Anorexia nervosa. (9) Bulimia nervosa. Cal. Health & Safety Code § 1374.72.

## Count IV: BREACH OF IMPLIED CONTRACT

585.    Plaintiffs re-allege and incorporate the factual allegations above, as though such allegations were fully stated herein.

586.    Based on the conduct alleged above, including that alleged above, an implied in fact contracts for Plaintiffs would provide medically necessary substance abuse treatment to UBH's insureds in exchange for and would receive reimbursement for the treatment services based on the treatment provided being medically necessary.

587.    As outlined in detail above, Plaintiffs employed objective professionals who, in accord with the generally accepted standards of care, made decisions as to the appropriate, medically necessary treatment of their patients.

588.    This was communicated to UBH and UBH authorized this treatment for medically necessary services.

589.    UBH, after already having provided verification of benefits and authorization of treatment services, applied, in bad faith, illegal guidelines in order to deny claims for not meeting medical necessity requirements.

590.    It is this illegal decisioning process that UBH applied to all MH/SUD claims, regardless of any individual plan terms, that constitutes bad faith by UBH and harmed Plaintiffs.

591.    The full extent of this harm cannot be determined until UBH reprocesses every denied claim using legal guidelines that comport with generally accepted standards of care. However, Plaintiffs believe that this amount will extend into the hundreds of millions of dollars, or more, given the scale of UBH's fraudulent practices.

592.    Plaintiffs have performed all conditions, covenants, and promises required to be performed in accordance with the terms and conditions of said contracts/agreements except, if applicable, those that have been excused, waived or are otherwise inapplicable.

593.    UBH breached the implied in fact contracts, by way of example and without limitation, by engaging in the conduct alleged above.

594.    As a proximate and direct result of the UBH's breach of contract, Plaintiffs and class members have suffered, and will continue to suffer in the future, damages subject to proof at the time of trial.

**Count V:    BREACH OF ORAL CONTRACT**

595.    Plaintiffs re-allege and incorporate the factual allegations above, as though such allegations were fully stated herein.

596.    Based on the conduct alleged above, Plaintiffs and UBH entered into oral contracts telephonically whereby Plaintiffs would provide medically necessary substance abuse treatment to UBH's insureds and UBH would reimburse Plaintiffs for the medically necessary treatment.

597.    This contract is independent of any individual plan or plan term.

598.    The contract is independent because Plaintiffs are not parties to the plans or policies under which their patients are insured, and do not receive copies of the plans or policies.  The contract is based on separate agreements made by and between Plaintiffs, who agree to provide medical treatment services, on the one hand, and UBH, who pre-authorizes and agrees to reimburse Plaintiffs for those medical treatment services rendered to its insureds.

599.    The guidelines UBH used to evaluate medical necessity were applied uniformly across all plans that had MH/SUD benefits.

600.    Plaintiffs have performed all conditions, covenants, and promises required to be performed in accordance with the terms and conditions of said contracts/agreements except, if applicable, those that have been excused, waived or are otherwise inapplicable.

601.    UBH breached these agreements by using illegal Guidelines that resulted in denials of claims that Plaintiffs' independent clinicians had already determined were medically necessary as to the patients.

602.    UBH promised to pay claims that were medically necessary. The total amount of denied claims that were denied by UBH but were medically necessary cannot be fully determined until every MH/SUD claim that was denied for medical necessity is reprocessed using appropriate, legal, guidelines that comport with generally accepted standards of care.

603.     Once the claims are reprocessed any disputes between Plaintiffs and UBH as to the actual reimbursement amount can then be addressed. However, questions as to amount are not ripe until a legal, appropriate determination is made on medical necessity.

604.     As a proximate and direct result of UBH's breach of contract, Plaintiffs and the Plaintiff Class have suffered, and will continue to suffer in the future, damages subject to proof at the time of trial.

**Count VI:     PROMISSORY ESTOPPEL**

605.     Plaintiffs re-allege and incorporates the factual allegations above as though such allegations were fully stated herein.

606.     "The elements of promissory estoppel are (1) a clear promise, (2) reasonable reliance, (3) substantial detriment, and (4) damages 'measured by the extent of the obligation assumed and not performed.' " *California Spine & Neurosurgery Inst. v. United Healthcare Servs., Inc.*, 2018 WL 6074567, at *4 (C.D. Cal. June 28, 2018) *quoting Toscano v. Greene Music*, 124 Cal. App. 4th 685, 692 (2004).

607.     As described in detail for each patient, during the initial VOB call made by Providers' employee(s) to UBH's agent, the employee(s) did more than enquire as to the terms of the UBH's policy for their insured and whether the Insured's policy provided coverage for the anticipated treatment.

608.     The actual policy of insurance is not at issue in this cause of action.

609.     Plaintiffs were never in possession of the policy of insurance issued by UBH.

610.     Plaintiffs did not contact UBH to discuss policy language.

611.     They contacted UBH to obtain the promise that it would reimburse the Provider directly for the medically necessary services that Provider anticipated rendering once they were actually rendered.

612.     It is this promise to pay, not a discussion of policy terms that may or may not apply under any given policy, that is the specific promise that forms the basis of the promissory estoppel claim.

613.    For each patient, both during the initial VOB call and, later, during authorization calls, UBH promised to reimburse Providers for medically necessary treatment they provided.

614.    This specific promise constitutes the first element of Plaintiff's promissory estoppel claim.

615.    As to the second element, reasonable reliance, the course of conduct between the Plaintiffs and UBH over numerous years for tens of thousands of patients, with Defendant paying the Plaintiffs for medically necessary claims that they promised to directly reimburse. It was reasonable for the Plaintiffs to rely upon UBH's promises.

616.    The third element, substantial detriment, is clear.

617.    Plaintiffs were not reimbursed by UBH for medically necessary services that they provided to UBH's insureds.

618.    The fourth element, damages 'measured by the extent of the obligation assumed and not performed' is quantified based on the numerous calls between Plaintiffs and UBH described above as well as the invoices that Plaintiffs submitted to UBH for direct reimbursement.

619.    Simply put, UBH specifically promised to pay Plaintiffs for medically necessary services rendered to Defendant's insureds.

620.    Because of the application by UBH of illegal guidelines, no reimbursements were made for the claims at issue in this litigation.

621.    UBH had the obligation to reimburse Plaintiffs for the medically necessary services they rendered to UBH's insureds.

622.    This is the obligation that UBH assumed and that they have not performed by failing to issue so much as a single payment for any of the claims at issue here.

623.    As such, Plaintiffs are entitled to damages to be proven at trial.

**Count VII:    INTENTIONAL MISREPRESENTATION**

624.    Plaintiffs re-allege and incorporate the factual allegations above, as though such allegations were fully stated herein.

625.    Plaintiffs bring this Count under Cal. Civ. Code, § 1701(1) for Intentional Misrepresentation.

- 85 -

626.     UBH represented to Plaintiff that UBH intended to indemnify or otherwise pay for medically necessary healthcare services that Plaintiff provided for the benefit of UBH.

627.     UBH did not intend to pay Plaintiffs based on a true and fair determination of medical necessity.

628.     As outlined in detail in Plaintiffs' allegations, UBH actively concealed the true, profit driven nature of its guidelines that were used to determine medical necessity.

629.     Outside of UBH, no one knew that "utilization" and "benex" were key factors in the creating and assessing the guidelines.

630.     Outside of UBH no one knew that UBH had chosen not to implement ASAM criteria for MH/SUD claims because UBH's financial department viewed ASAM criteria as too costly to UBH.

631.     As detailed above, UBH actively concealed this from Plaintiffs, patients, and the entire public.

632.     UBH went so far in this deception as to fraudulently obtain accreditations for its guidelines and provide discredited testimony, under oath, when questioned on the guidelines.

633.     UBH knew that its representation that Plaintiffs' claims were denied for medical necessity relied on guidelines that could not determine medical necessity according to the appropriate standard of care.

634.     Plaintiffs reasonably relied on UBH's representation that it would reimburse medically necessary claims in accord with legal, appropriate guidelines.

635.     Plaintiffs, and all others similarly situated, were harmed by UBH's representations because claims submitted to UBH were never evaluated using guidelines that could appropriately evaluate medical necessity.

636.     Plaintiffs and class members substantially relied on UBH's representation of intent to cover services that were medically necessary when they agreed to render services for the benefit of UBH and its members.

**Count VIII     NEGLIGENT MISREPRESENTATION**

637.   Plaintiffs re-allege and incorporate the factual allegations above, as though such allegations were fully stated herein.

638.   Plaintiffs bring this Count under Cal. Civ. Code § 1710 for negligent misrepresentation.

639.   As a California corporation defendant United Behavioral Health is subject to Cal. Civ. Code § 1710.

640.   UBH represented to Plaintiffs and UBH's insureds that UBH truly intended to pay healthcare benefits for healthcare services Plaintiffs provided for UBH's insureds that were medically necessary.

641.   UBH's representation of its intent pay healthcare benefits for medically necessary treatment was untrue.

642.   Plaintiffs reasonably relied on UBH's representation when they agreed to provide medically necessary healthcare for UBH's insureds.

643.   Plaintiffs were harmed by bearing the cost of the care they provided for UBH's insureds, and by bearing the administrative costs of seeking redress.

644.   Plaintiffs and class members' reliance on UBH's representation was a substantial factor in causing Plaintiffs' harm.

**Count IX:    CONCEALMENT**

645.   Plaintiffs re-allege and incorporate the factual allegations above, as though such allegations were fully stated herein.

646.   Plaintiffs bring this Count under Cal. Civ. Code 1703(c) for damages resulting from fraudulent Concealment.

647.   As a California corporation defendant United Behavioral Health is subject to Cal. Civ. Code § 1703(c).

648.   UBH disclosed some facts to Plaintiffs about their intent to cover MH/SUD services that were medically necessary but intentionally failed to disclose the entire guidelines scheme outlined above.

649.     UBH's representation that it would provide and had authorized coverage for medically necessary treatment services was a meaningless representation because UBH concealed that its determination of medical necessity would be made through the application of illegal, profit driven guidelines.

650.     Plaintiffs did not know that UBH intended to use profit-based and illegal level of care guidelines to determine medical necessity resulting in a disproportionate number of denied claims.

651.     UBH intended to deceive Plaintiffs and class members by concealing facts about its actual intent to determine medically necessary services as it is understood and generally accepted in the industry.

**Count X:     INTENTIONAL INTERFERENCE IN PROSPECTIVE ECONOMIC RELATIONS**

652.     Plaintiffs re-allege and incorporate the factual allegations above, as though such allegations were fully stated herein.

653.     Plaintiffs bring this Count under California common law as a cause of action for Intentional Interference with Prospective Economic Relations necessitating reprocessing of Plaintiffs and the Plaintiff Classes' denied claims by a Special Master or neutral-third party and for punitive damages resulting from such interference.

654.     Plaintiffs, and all others similarly situated, and UBH's insureds and beneficiaries of plans administered by UBH, had an economic relationship that would have resulted in an economic benefit to Plaintiffs.

655.     Plaintiffs operated their facilities in such a way that they expected to be paid in exchange for providing medically necessary treatment to patients.

656.     UBH knew of the relationship between Plaintiffs and their patients who were UBH's insureds.

657.     UBH engaged in wrongful conduct when denied claims on the basis of medical necessity, knowing that the guidelines it used to determine medical necessity did not reflect and fell well below the required standard of care.

658.     UBH used its illegal, substandard guidelines to determine medical necessity because its guidelines were created around "utilization" and "benex" targets.

659.    It chose not to use ASAM or a similar, generally accepted standard of care as it would result in too many medically necessary claims being paid by UBH.

660.    By choosing to implement a system that it knew would result in increased denials and lower payments to Plaintiffs and class members, UBH knew that it was interfering and intentionally chose to interfere with Plaintiffs and class members prospective economic relationships.

661.    UBH engaged in wrongful conduct with the intention of disrupting Plaintiffs and the Plaintiff Classes' business model based on payment for medically necessary services rendered. UBH knew with reasonable certainty that its wrongful conduct would interfere with this because it promised to reimburse medically necessary services while knowing that it was using illegal, fraudulent guidelines to determine medical necessity.

662.    UBH did cause the relationship between Plaintiffs and UBH's insureds to be disrupted.

663.    UBH's conduct was a substantial factor in causing irrevocable economic harm to Plaintiffs and all those similarly situated.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs and the Class demand judgment against Defendant, and each of them, jointly and severally, and request the following relief from the Court:

A.      an award certifying the Class;

B.      a declaration that UBH acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health and safety their insureds;

C.      an order requiring that the reprocessing of all claims denied or underpaid on the basis of its illegal guidelines for where Plaintiffs and the Class provided treatment to UBH's members by a Special Master or neutral third-party at Defendant's expense;

D.      an award to Plaintiffs and the Class of injunctive and punitive damages;

E.      an order for an award of attorney fees and costs, as provided by law;

F.      an award of pre-judgment and post-judgment interest as provided by law; and

G.      an order for all such other relief the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of any and all issues in this matter so triable.

Dated: November 12, 2020          Respectfully submitted,

NAPOLI SHKOLNIK PLLC

/s/ Matthew M. Lavin

DL LAW GROUP

/s/ David Lilienstein
*Attorneys for Plaintiffs and the Putative Classes*